**UNITED STATES DISTRICT COURT**

**EASTERN DISTRICT OF LOUISIANA**

| | | |
|---|---|---|
| **LLOYD J. GUSMAN, JR.** | * | **CIVIL ACTION NO. 20-984** |
| | * | |
| **VS.** | * | **SEC. I(1)** |
| | * | |
| **ARCHER SHIPPING, LTD.,** | * | **JUDGE LANCE M. AFRICK** |
| **KIRAN INTERNATIONAL** | * | |
| **HOLDING COMPANY, LTD., and** | * | **MAG. JUDGE van MEERVELD** |
| **KIRAN HOLDING AS** | * | |

**********************************

**MEMORANDUM IN SUPPORT OF MOTION TO EXCLUDE PLAINTIFF'S LIABILITY EXPERT, ROBERT E. BORISON**

**MAY IT PLEASE THE COURT:**

Because the Federal Rules of Evidence and related jurisprudence preclude the classic unreliable and unhelpful expert from testifying at trial, defendant, Archer Shipping, Ltd. ("Archer"), moves this Honorable Court for an order excluding the 6 May 2021 report and related opinions of the liability expert, Robert E. Borison, proffered by plaintiff, Lloyd J. Gusman, Jr. In his report, Borison purports to charge the vessel's crew with nonexistent duties, and then sets forth opinions that contradict the governing law and aim to do nothing more than tell the trier of fact what he wants the legal outcome to be. As such, not only is Borison not qualified to render the opinions he relays, but his 6 May 2021 report sets forth only improper and erroneous opinions that are based entirely on inapposite assumptions or nonexistent legal theories, making them unreliable and unhelpful as a matter of law.[1]

Thus, pursuant to Rule 702 of the Federal Rules of Evidence, Borison's opinions based on his 6 May 2021 report should be excluded, and he should be precluded from testifying about those opinions at the trial of this matter.

[1] See 6 May 2021 Expert Report of Robert E. Borison, attached hereto as Exhibit A.

## Background

### *I. Pertinent Facts[2] Relating to Alleged Accident*

On 2 April 2019, the KIRAN BOSPHORUS, a Maltese-flagged bulk carrier owned by Archer and bearing IMO No. 9576997, was moored midriver at American River Transportation Co.'s ("ARTCO") Mile 110 mid-stream buoy system, and from the time of 1445 hours on 1 April 2019, the vessel had been undergoing discharge operations relating to her cargo of bulk urea.[3] Urea is a white, bead-like substance that is commonly associated with its use in fertilizers, and as a "bulk cargo," it was carried loose in the vessel's cargo holds, in that it was not packaged or containerized in any way.[4]

As is customary with cargo operations for an oceangoing carrier vessel like the KIRAN BOSPHORUS, the vessel's crew did not perform the cargo discharge operations, and here, those operations were performed by local stevedores, Coastal Cargo Company ("Coastal") and ARTCO Stevedoring, from 1 April 2019 until early on 11 April 2019.[5]

Coastal utilized its own equipment to discharge the bulk urea cargo, including a floating crane barge (the ELISA A) with a "clambucket" tool suspended from the crane's boom.[6] To keep the ELISA A in place near the appropriate cargo hold during the midstream discharge, Coastal's longshoremen attached the crane barge's mooring wires to the appropriate cleats on the KIRAN BOSPHORUS, and then would "shift" the ELISA A and her mooring wires from hold to hold as

---

[2] Please note that a detailed factual narrative was set forth in Archer's Memorandum in Support of Motion for Summary Judgment (R. Doc. 46-1).
[3] See Vessel Statement of Facts, attached hereto as Exhibit B, as well as excerpts from deposition of Chief Officer Melih Ciftci, attached hereto as Exhibit C, p. 28:7-10. Please note that C/O Ciftci's first language is Turkish, so some phrasing in the excerpts attached as Exhibit C may read awkwardly.
[4] See Exhibit C, pp. 25:3-8, 28:11-16.
[5] Exhibit B; Exhibit C, p. 30:8-16; see excerpts from deposition of Emil Roy Brupbacher, attached hereto as Exhibit E, pp. 33:1 – 39:15. Please note that some witnesses refer to the buoy system and facility as ARTCO, while others refer to it as ADM. But it is undisputed that the vessel was moored at that facility and undergoing the subject discharge operations there. For the purposes of this motion, it is referred to as ADM.
[6] See photo attached as Exhibit D-1 (Exhibit 1 to Exhibit D, which is the declaration of C/O Ciftci authenticating said photographs); see also Exhibit E, p. 19:15-19.

the Coastal crew unloaded respective cargo holds in accordance with the discharge plan.[7] Utilizing their crane and the attached clambucket to "scoop" the urea from the vessel's cargo holds, Coastal longshoremen discharged the urea from the KIRAN BOSPHORUS's cargo holds to midriver barges moored along the vessel's starboard side.[8] As Coastal finishes in a given cargo hold, the ADM supervisor in charge of the job makes the call as to when and where the Coastal longshoremen were to shift the barge and mooring wires.[9]

As a result of expected limitations with use of the clambucket tool for a small bead-like cargo such as urea, it is unavoidable that some of the urea cargo escapes from the clambucket with each lift and swing over to the barges, and falls to the deck during the operation.[10] And due to safety protocols and concerns (as well as common sense), the area beneath an operating crane and suspended load during cargo operations cannot be entered or traversed while the clambucket is being used to discharge bulk cargo from a hold to a midstream barge.[11]

As an employee of Coastal, plaintiff was a part of Coastal's discharge operations at ADM for the KIRAN BOSPHORUS on 2 April 2019, working as a laborer.[12] On the night of the accident, plaintiff had arrived at ADM with the "night crew" and boarded the ship around 6:00 p.m. (1800 hours).[13] Upon his arrival to the KIRAN BOSPHORUS, plaintiff's supervisor first tasked him with moving the mooring wires to adjust the crane barge, and he had already noticed

---

[7] Exhibit E, pp. 18:11 – 19:3.
[8] Exhibit D, including D-1 through D-3 (showing the machinery and methodology employed during the subject discharge operation); Exhibit E, pp. 40:21 – 42:23; see excerpts from deposition of Lloyd Gusman, attached hereto as Exhibit F, pp. 90:12 – 93:9; Exhibit C, p. 52:16-22.
[9] Exhibit E, pp. 46:11 – 47:20, 48:10-14; see excerpts from deposition of Dejuante Murray, attached hereto as Exhibit G, pp. 27:23 – 28:7.
[10] Exhibit E, pp. 42:24 – 44:19; Exhibit C, pp. 30:24 – 31:9, 45:3-6, 52:16-22; see also Exhibit D.
[11] Exhibit E, pp. 45:12 – 46:2, 47:1-6; Exhibit C, pp. 41:19 – 42:1, including errata sheet within; see also Exhibit G, p. 27:6-22.
[12] Exhibit F, p. 76:3-8; see also the Coastal Cargo "First Report of Injury" within Exhibit F.
[13] Exhibit F, p. 88:1-24.

the white cargo on deck.[14] In fact, plaintiff testified that prior to being assigned with that first task of shifting wires, he had been waiting on the ship, just standing by on the deck while he awaited orders, and thus was aware of the presence of some cargo on the deck.[15]

According to plaintiff, he was to unhook the barge mooring wire on the starboard side of the ship, whereas "the lead man was going to do the rest" and re-hook the barge wire once the barge was moved forward.[16] After boarding the vessel for this task, plaintiff successfully made his way across the deck and "unclamped" the barge wire from the hook on the ship.[17] When he tried to stretch the barge mooring wire after unhooking it, he realized it had gotten "stuck" someplace, so he dropped the wire and traversed the deck again, ostensibly to find the issue with the Coastal mooring wire.[18] As plaintiff was then "walking back" after checking on the "stuck" wire, he allegedly slipped and fell on the deck, purportedly injuring his neck and back.[19] He confirmed that nobody witnessed his alleged fall, and the vessel's officers were not notified that any accident occurred while the KIRAN BOSPHORUS was undergoing discharge operations at ADM, even though the vessel continued discharging at ADM for eight additional days.[20]

The testimony to date confirms that the discharge operation and plaintiff's work were solely within the purview and direction of Coastal and/or ADM, such that the ship's crew had no supervisory control over the Coastal crew or the actual cargo discharge methods, and the Coastal longshoremen were instructed and supervised by Coastal foreman Robert Pack, who worked in

---

[14] Exhibit F, pp. 104:14-25, 174:18-23.
[15] Exhibit F, pp. 117:13 – 119:10.
[16] Exhibit F, p. 109:11-16.
[17] Exhibit F, pp. 106:9 – 111:14, 185:3-16.
[18] *Id.*
[19] Exhibit F, pp. 96:12-25; 106:9-18. Plaintiff had a 20-plus year history of chronic low back pain, and, in fact, unbeknownst to his employer, had received medial branch nerve blocks at L3, L4 and L5 roughly two weeks before this alleged accident. Exhibit E, pp. 61-62; see also excerpts from the deposition of Dr. Suneil Jolly, attached hereto as Exhibit H, pp. 17-18, 40-41.
[20] Exhibit F, p. 124:9-21; Exhibit G, p. 9:4-15; Exhibit C, pp. 46:2-11, 64:25 – 65:7; Exhibit E, p. 54:9-23.

tandem with the ADM supervisor at the time, with safety briefings and trainings also coming from Coastal and/or ADM.[21] And the supposed hazard here of slippery excess cargo was specifically addressed to plaintiff and his colleagues in their safety trainings and/or meetings.[22]

Brupbacher, who has years of experience surrounding this type of discharge operation,[23] clearly testified it is the Coastal foreman's responsibility to make sure that the Coastal employees do not walk on the deck to shift the lines prior to it being cleared, and that it is likewise that foreman's responsibility to get the deck cleared.[24] He further elaborated that it is typically ADM's supervisor that would convey to the ship's crew that it was time to clean the deck.[25] Especially pertinent to the issue here, Brupbacher confirmed that Coastal bears responsibility for its longshoremen, agreeing that if a Coastal supervisor sees what he deems to be a dangerous condition aboard a vessel, that supervisor should tell his guys to stand down until it is fixed.[26] To that end, Brupbacher confirmed that the Coastal foreman should know what his longshoremen are doing, have an awareness of the surroundings on the ship, and should not instruct his men to move a line unless he deemed it safe.[27] Most critically, when shown an illustrative photo of the deck that was reportedly taken on the night of plaintiff's accident, Brupbacher – with his years of experience in this industry with bulk cargo operations – testified that "**[t]hat looks like a typical deck whenever you're working urea for any crane operator**."[28]

The experienced Chief Officer of the KIRAN BOSPHORUS for the subject voyage,

---

[21] Exhibit E, pp. 33:1-23, 37:15 – 38:25, 65:20 – 66:16; Exhibit F, pp. 89:8 – 90:3, 175:3 – 178:7; Exhibit G, pp. 15:9-20, 22:7-18, 24:6 – 25:25.
[22] Exhibit E, pp. 36:12 – 37:7, 48:15 – 49:2; Exhibit F, p. 183:14-16; Exhibit G, p. 26:5-11.
[23] Exhibit E, pp. 10:6 – 11:23 (detailing his experience in longshoring and supervising).
[24] Exhibit E, pp. 48:24 – 49:10.
[25] Exhibit E, pp. 49:25 – 50:4.
[26] Exhibit E, p. 66:11-16.
[27] Exhibit E, pp. 51:19 – 52:15, 64:6 – 65:19.
[28] Exhibit E, p. 44:8-15 (emphasis added).

Melih Ciftci,[29] echoed the normalcy of cargo spillage during an operation such as the subject one.[30] He likewise confirmed that, as is customary, his involvement in cargo operations is limited to developing the discharge plan for the stevedore, stating that "I can give the discharging plan, that's all."[31] C/O Ciftci further confirmed that he has no involvement in directing movement of the crane barge[32] and the ship's crew does not perform the discharge of the cargo.[33]

While C/O Ciftci explained that his crew will generally sweep the deck of excess cargo in conjunction with overall maintenance of the ship and preparing the ship for cargo operations,[34] he stressed that his crew's ability to clean up loose cargo hinges on where it has fallen – "If the loose cargo is on the crane working area, I cannot order that kind of thing."[35] C/O Ciftci further explained that "crane working area means an area under a working crane boom where considered working and passing inside of that area is dangerous and not permitted."[36] Since the vessel's chief officer does not specifically monitor cargo operations after presenting the stevedores with the discharge plan, *the stevedore* determines when the crane barge needs to be shifted according to the discharge plan, such that the vessel's crew has no way of inherently knowing precisely when that will happen.[37] And the Chief Officer confirmed that nobody asked him to clean the deck on the day of plaintiff's alleged accident, nor was he aware of any stevedore asking any of his crewmembers to clean the deck on that day.[38]

It is because of the identifiable danger with suspended machinery that the area in front of

[29] Exhibit C, pp. 20:25 – 24:10.
[30] Exhibit C, pp. 30:24 – 31:9.
[31] Exhibit C, pp. 25:9 – 30:16.
[32] Exhibit C, pp. 36:2 – 37:6.
[33] Exhibit C, pp. 39:8-14, 65:25 – 66:19.
[34] Exhibit C, pp. 40:20 – 41:11, 53:13-19, 54:9-20
[35] Exhibit C, p. 41:12-22.
[36] See Exhibit C, pp. 41:19 – 42:1 and errata sheet within Exhibit C, which contains explanation where Zoom conference was interrupted (as C/O Ciftci was deposed virtually from a location in Turkey).
[37] Exhibit C, pp. 37:7-23, 66:1-17; Exhibit G, p. 18:6-15.
[38] Exhibit C, p. 64:12-24.

the cargo hold and beneath the crane is off-limits during active operations, and why it is not possible for anyone – neither the vessel crew nor the stevedores – to enter it for the purpose of clearing cargo until it is known that the operations have ceased. Of note, the pictured green-painted walkway that is outlined in yellow is the non-skid walkway on the KIRAN BOSPHORUS.[39] For safety reasons, the stevedores are supposed to remain in that walkway at all times while on the deck of the vessel, and the Coastal longshoremen (including plaintiff) could have accomplished the task of unhooking barge wires by walking in that non-skid walkway.[40] And in the event that a Coastal longshoreman did not believe it was safe to walk on the deck, including in the non-skid walkway, he was free to wait until the deck was clear.[41]

## *II. Borison's Report and Opinions*

On 6 May 2021, Borison submitted a report that set forth three "opinions" relating to the occurrence of plaintiff's accident.[42] Though he accurately recognizes that plaintiff was indeed a longshoreman employed by Coastal and that the equipment involved in the discharge operation was owned by Coastal, Borison's report otherwise relays incorrect and/or inconsistent "facts" from the outset. First, contrary to Borison's retelling, the testimony has established that nobody actually witnessed plaintiff's alleged accident.[43] Second, Borison conveniently omits the critical facts that it was plaintiff's supervisor with Coastal that instructed him (and his fellow co-workers) to shift the barge wires and that plaintiff had successfully traversed the deck once prior to discovering that the mooring wire was "stuck."[44] Third, Borison misstates plaintiff's testimony concerning the supposed request to his supervisor regarding clean-up of the excess cargo, as he

[39] Exhibit D.
[40] Exhibit C, p. 65:8-24.
[41] Exhibit C, pp. 66:20 – 67:2; *see also* Exhibit E, pp. 51:19 – 52:15.
[42] Exhibit A.
[43] *Compare* Exhibit A, p. 5 *with* Exhibit F, p. 124:9-21 and Exhibit G, p. 9:4-15.
[44] *Compare* Exhibit A, pp. 5-6 *with* Exhibit F, p. 104:14-25, 106:9 – 111:14, 174:18-23, 185:3-16.

ignores plaintiff's testimony that he asked his supervisor *who* was going to clean it up (not *to* clean it up), that he could not identify whether the crewmember that the supervisor purportedly talked with spoke English and that he did not know when this supposed exchange took place.[45]

In reaching his first opinion concerning "protocols," Borison effectively opines that C/O Ciftci should have had a plan for excess cargo cleanup during the discharge operation to protect the longshoremen.[46] However, as is discussed below, such an opinion contradicts a vessel owner's duties under *Scindia*, and en route to reaching that purported opinion, Borison also appears to have concocted testimony concerning the vessel crew's knowledge and involvement.[47] His second opinion concerns the availability of a "safe designated walkway free from slipping hazards"; however, this opinion ignores both the verified presence of the non-skid walkway on the deck of the KIRAN BOSPHORUS and the fact that the witnesses with the appropriate experience in bulk cargo discharge all testified (practically uniformly) that urea spillage was expected, commonplace and unavoidable, aside from relying on inapplicable regulations.[48] Lastly, his third opinion preposterously asserts that it was somehow the vessel crew's responsibility to use its stop work authority on behalf of plaintiff, while wrongly stating that plaintiff had "attempt[ed] to use his Stop Work Authority," which is entirely unsupported.[49]

Critically, while Borison claims to have experience in this sect of the maritime industry (which is challenged below), he completely ignores the testimony of Coastal's seasoned superintendent, who clearly testified that Pack (plaintiff's supervisor) both should have known what his men were doing and should have had them wait until the deck was clear if he thought

---

[45] *Compare* Exhibit A, p. 6 *with* Exhibit F, pp.119:2 – 121:10.
[46] Exhibit A, pp. 6-7.
[47] *Compare* Exhibit A, p. 7 *with* Exhibit C generally.
[48] *Compare* Exhibit A, pp. 7-8 *with* Section I, *supra*; see Exhibit A, p. 8 (OSHA regulations).
[49] Exhibit A, p. 10; *compare with* Exhibit F generally.

that it was unsafe.[50] And most notably, Borison entirely disregards Brupbacher's express testimony that once plaintiff raised any safety concern to his foreman, he should have disobeyed the foreman's order to perform the job.[51]

In line with the governing law below concerning unhelpful and unqualified experts, Borison's opinions should be stricken in their entirety, and he should be precluded from testifying at the trial of this matter.

## Law and Analysis

### I. *Legal Standards under Federal Rule of Evidence 702*

Rule 702 of the Federal Rules of Evidence permits the admission of expert testimony if it "will assist the trier of fact to understand the evidence or to determine a fact in issue[.]" Fed. R. Evid. 702. To be admissible under Rule 702, expert testimony must be both relevant and reliable, and the person rendering the opinions must be qualified to do so. *Daubert v. Merrill Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 589 (1993); *Smith v. Goodyear Tire & Rubber Co.*, 495 F.3d 224, 227 (5th Cir. 2007); *Wilson v. Woods*, 163 F.3d 935, 937 (5th Cir. 1999) (quoting Fed. R. Evid. 702). "The threshold inquiry is whether the expert possesses the requisite qualifications to render opinion on a particular subject matter. … Having defined the permissible scope of the expert's testimony, a court next inquires whether the opinions are reliable and relevant." *Hunt v. McNeil Consumer Healthcare*, 297 F.R.D. 268, 272 (E.D. La. 2014) (internal citations omitted).

The party offering the expert – here, plaintiff – bears the burden of proving by a preponderance of the evidence that the proffered expert testimony satisfies the requirements of Rule 702. *Mathis v. Exxon Corp.*, 302 F.3d 448, 459–60 (5th Cir. 2002). "The party seeking to

---

[50] Exhibit E, p. 65:4-19, 66:6-16.
[51] Exhibit E, p. 73:15-22 ("Q: From a practical standpoint, having worked in the industry, Mr. Brupbacher, if Mr. Gusman expressed a concern to the foreman about the condition but he was, nevertheless, ordered to still perform his job, **would you expect him to disobey that order?** A: **Yes**.") (emphasis added).

offer expert testimony bears the burden of establishing, by a preponderance of the evidence, that (1) the expert is qualified; (2) the testimony is relevant to an issue in the case; and (3) the testimony is reliable." *Howard v. Offshore Liftboats, LLC*, 2016 U.S. Dist. LEXIS 11370, at *10 (E.D. La. Jan. 1, 2016) (Morgan, J.) (quotations omitted); *see also Mathis*, *supra*.

Importantly, the fact that this case is set for a bench trial does not shield Borison's testimony from scrutiny under *Daubert* standards. While Fifth Circuit district courts "recognize[] that [their] role as the 'gate-keeper' is diminished in a bench trial…, the mere fact that a case is being tried as a bench trial does not completely remove the Court's gate-keeping role." *Kinnerson v. Arena Offshore, LP*, 2019 U.S. Dist. LEXIS 104519, at *5 (W.D. La. June 21, 2019) (Fallon, J.); *see also Dalrymple v. United States*, 2020 U.S. Dist. LEXIS 254882, at *5 (E.D. La. July 20, 2020) (Vance, J.) ("*Daubert* still applies in bench trials, and this Court must ensure that the proffered testimony is reliable.") (citing *Gibbs v. Gibbs*, 210 F.3d 491, 500 (5th Cir. 2000)). In the non-jury context, "expert testimony should be excluded if the Court finds the proferred testimony deals only with common sense issues that the Court, in its role as trier of fact, needs no expert assistance to resolve." *Richardson v. SEACOR Lifeboats, LLC*, 2015 U.S. Dist. LEXIS 61251, at *7 (E.D. La. May 11, 2015) (Morgan, J.).

Because Borison is not qualified on the issue raised in his 6 May 2021 report, and his opinions are neither helpful nor reliable, he should be excluded from testifying at trial.

## ***II. Borison is not qualified to render expert testimony on the particular issues before the Court in this case involving a bulk carrier.***

### **a. A proffered expert must possess expertise on the issues specific to the particular case to meet the qualification requirement of Rule 702.**

While Rule 702 states that an expert may be qualified based on "knowledge, skill, experience, training, or education," the applicable jurisprudence illustrates that the experience must be in the particular field or on the given subject for which the testimony is presented, with

the goal of aiding the trier of fact. *See, e.g.*, *Hopper v. M/V UBC SINGAPORE*, 2010 U.S. Dist. LEXIS 70716, at *17 (S.D. Tex. July 14, 2010) (citing *Huss v. Gayden*, 571 F.3d 442, 452 (5th Cir. 2009)). "To qualify as an expert, the witness must have such knowledge or experience in his field or calling as to make it appear that his opinion or inference will probably aid the trier in his search for truth." *Boudreaux v. Scott's Boat Rentals, LLC*, 2016 U.S. Dist. LEXIS 203164, at *6 (E.D. La. Apr. 20, 2016) (Barbier, J.). "A district court should refuse to allow an expert witness to testify if it finds that the witness is not qualified to testify in a particular field or on a given subject." *Huss*, 571 F.3d at 452.

Importantly, the district courts do not consider "the qualifications of a witness in the abstract, but whether those qualifications provide a foundation for a witness to answer a specific question." *Burgett v. Troy-Bilt LLC*, 579 F. App'x 372, 376 (6th Cir. 2014). In order to qualify as an expert witness, "particular expertise, not potential expertise, must be demonstrated." *Lee v. AMTRAK*, 2012 U.S. Dist. LEXIS 4397, at *8 (S.D. Miss. Jan. 11, 2012); *see also Havenfield Corp. v. H & R Block, Inc.*, 509 F.2d 1263, 1273 (8th Cir. 1975) ("It is important that expert witnesses have experience in transactions that are as similar as possible to the transaction upon which they are being asked to comment."). Where the requisite experience or expertise concerning the subject of the testimony is not established, the witness is not qualified to render expert opinions. *See, e.g.*, *Wilson*, 163 F.3d at 938. As explained below, Borison lacks the requisite qualifications to offer the specific opinions he seeks to offer in this case, which requires that his report and testimony be excluded.

**b. Borison does not possess the requisite background or expertise on the specific issues he has been proffered in this personal injury case.**

As illustrated by the qualifications listed in his report and on his CV,[52] Borison lacks the

[52] See CV of Robert Borison, attached hereto as Exhibit I.

requisite experience to opine on a bulk carrier vessel crew's duties, as he attempts to do. The reliability and helpfulness problems with Borison's opinions are discussed at length below, but because Borison has no substantive experience aboard oceangoing cargo vessels and his experience has been centralized in the oil and gas industry, his prior experience is not germane to the actual issue upon which he opines, and he is therefore unqualified to render such opinions.

Simply put, Borison has no experience that would qualify him as an expert on the allocation of responsibilities – *i.e.*, duties – between vessel owner, stevedore, and longshoremen in a bulk cargo discharge operation like that on the KIRAN BOSPHORUS on 2 April 2019. His CV and stated qualifications revolve around the oil and gas industry, and his listed work history and training lacks any meaningful experience with longshoring and/or with bulk cargo carriers.[53] As seen in Exhibit I, his personal work experience was on production platforms, drilling rigs and shipyards, while his supposed "safety consultant" experience is grounded in the oil and gas industries, as well as construction.[54] Nowhere in his CV is there any indicia of expertise in bulk cargo operations of any kind, or anything suggesting any history with any kind of cargo operations on an oceangoing vessel.[55] There is simply nothing in Borison's background that allows him to opine on what Archer, the owner of the KIRAN BOSPHORUS, was required to do for this independent longshoreman.

The present case is similar to *Enna v. Crescent Towing & Salvage*, in which Judge Englehardt held that plaintiff's expert "[was] *not* qualified because of **his lack of specialized knowledge, skill, experience, training or education in the relevant field** (*i.e.*, naval architecture or marine structural/hull design)," and drew a distinction that the expert was "a

[53] See Exhibit I.
[54] See Exhibit I, pp. 1-3.
[55] *Id.*

mechanical engineer and not a naval architect or marine structural engineer." 2002 U.S. Dist. LEXIS, at *4, 6 (E.D. La. Aug. 19, 2002) (italics in original, other emphasis added). The issue in *Enna* concerned a trip-and-fall near the hatchway door on defendant's tug, and the court pointedly emphasized that the expert never worked on a harbor tug in any capacity, which made his opinion only "rank speculation unrooted in any factual basis or empirical data." *Id.* at *3. Because the expert lacked "the requisite qualifications in the appropriate area of expertise," the court excluded the expert, reasoning that "his testimony is simply a source of confusion, being grounded in landlubbers' standards, which find no parallel in the penumbras peculiar to specialty [at issue.]" *Id.* Borison similarly lacks the requisite qualifications in the area of expertise required for the present case, and ultimately renders only irrelevant (and legally erroneous) opinions that are improper and do not aid the Court, which is the trier of fact in the present case.

Numerous federal decisions illustrate that an expert must possess the requisite specialized knowledge regarding the topic(s) at issue in order to properly qualify as an expert under Rule 702, as "[a]n expert may not present opinion testimony that goes beyond the scope and extent of his expertise." *Hopper, supra* (citing *Goodman v. Harris County*, 571 F.3d 388, 399 (5th Cir. 2009)). And courts do not hesitate to exclude an expert for lack of qualification where his/her "résumé demonstrates precious little suggesting that her knowledge, skill, experience, training, or education entitle her to testify." *Lee, supra*; *see also Sport Dimension, Inc. v. Coleman Co.*, 820 F.3d 1316, 1323 (Fed. Cir. 2016) ("In light of Mr. Bressler's admitted inexperience and unfamiliarity with the very subject on which Coleman sought to rely on his testimony, the district court did not abuse its discretion in excluding his testimony."); *Natures Way Marine, LLC v. Everclear of Ohio, Ltd.*, 2014 U.S. Dist. LEXIS 158568, at *8 (S.D. Ala. Nov. 10, 2014) ("But after reviewing Mr. Rankin's qualifications, the Court finds that he does not have sufficient

specialized experience to offer expert opinion testimony about this charter agreement.”).

Because Borison lacks any background or relevant experience that would validly support his opinions in this maritime case concerning the legal duties of an oceangoing vessel crew to a longshoreman, he should be excluded from testifying to those opinions at the trial of this case.

### ***III. Borison’s opinions are unreliable, irrelevant and unhelpful to the trier of fact, and these deficiencies require that his opinions be stricken.***

#### **a. Expert testimony is inadmissible where it is irrelevant, unreliable and does not assist the trier of fact in understanding or determining a fact in issue.**

Under *Daubert*, expert testimony must be both relevant and reliable to be admissible under Rule 702 of the Federal Rules of Evidence, and it must assist the trier of fact. *Daubert*, 509 U.S. at 589. “[T]he proposed testimony must be relevant ‘not simply in the way all testimony must be relevant pursuant to Rule 402, but also in the sense that the expert’s proposed opinion would assist the trier of fact to understand or determine a fact in issue.’” *Shawler v. Ergon Asphalt & Emulsions, Inc.*, 2016 U.S. Dist. LEXIS 33210, at *6 (E.D. La. Mar. 15, 2016) (Africk, J.) (quoting *Bocanegra v. Vicmar Servs., Inc.*, 320 F.3d 581, 584 (5th Cir. 2003)).

Expert testimony is not relevant when it is nothing more than a party’s testimony “dressed up and sanctified as the opinion of an expert,” *Viterbo v. Dow Chemical Co.*, 826 F.2d 420, 424 (5th Cir. 1987), or when it provides the jury no “more than the lawyers can offer in argument.” *In Re Air Crash Disaster At New Orleans, Louisiana*, 795 F.2d 1230, 1233 (5th Cir. 1986). Courts generally exclude expert opinions that are “merely an attempt to supply the fact finder with no information other than what he believes the verdict should be.” *Watkins v. Schriver*, 52 F.3d 769, 771 (8th Cir. 1995) (internal quotation omitted).

Additionally, in order to be admissible under Rule 702, proffered expert testimony also must be “the product of reliable principles and methods.” Fed. R. Evid. 702(c). Reliability is determined by evaluating the validity of the reasoning or methodology underlying the testimony.

*Knight v. Kirby Inland Marine Inc.*, 482 F.3d 347, 352 (5th Cir. 2007).

"The *Daubert* reliability analysis applies to, among other things, the facts underlying the expert's opinion. In particular, an opinion based on insufficient, erroneous information fails the reliability standard." *Moore v. Int'l Paint, L.L.C.*, 547 F. App'x 513, 515 (5th Cir. 2013) (citations and quotations omitted). Thus, where the underlying basis for expert opinions is plainly incorrect, the testimony is unreliable. *See Paz v. Brush Engineered Materials, Inc.*, 555 F.3d 383, 389 (5th Cir. 2009); *Guillory v. Domtar Indus. Inc.*, 95 F.3d 1320, 1330–31 (5th Cir. 1996); *Martinez v. Porta*, 601 F.Supp.2d 865, 866 (N.D. Tex. 2009) (stating that expert testimony "cannot be based on an erroneous legal premise"). "Expert evidence based on a fictitious set of facts is just as unreliable as evidence based upon no research at all. Both analyses result in pure speculation." *Wagoner v. Exxon Mobil Corp.*, 813 F.Supp.2d 771, 807 (E.D. La. 2011) (quoting *Guillory, supra*) (stating also that "[w]hen an expert applies his methodology to the facts of the case, a district court must ensure that the expert opinion is not based on facts that are indisputably wrong").

And overarchingly, the district court's gatekeeping function requires it to examine whether the proffered testimony is helpful to the trier of fact. *See, e.g., Kovaly v. Wal-Mart Stores Tex., L.L.C.*, 627 F. App'x 288, 290 (5th Cir. 2015); *see also Kershenstine v. Martin*, 1999 U.S. Dist. LEXIS 19086, at *4 (E.D. La. Dec. 3, 1999) (Clement, J.) ("In other words, Rule 702 holds that unhelpful opinions are to be excluded."). And of course, "an expert may never render conclusions of law." *Goodman*, 571 F.3d at 399.

As explained below, the erroneous foundation upon which Borison's opinions hinge renders his testimony irrelevant, unreliable, and unhelpful, as he effectively seeks only to tell the Court what plaintiff wants the factual findings to be and what legal conclusions to deliver.

Therefore, his 6 May 2021 report and opinions should be excluded from the trial of this matter.

**b. Because Borison's factual premise relies largely on inaccurate, insufficient and unsupported "facts"/information, his opinions flowing from same are unreliable and irrelevant.**

As detailed in Background Section II, *supra*, each of Borison's three opinions in some way turn on inaccurate information and/or reflect a misunderstanding of the vessel's limited role in cargo discharge. These shortcomings render the testimony inadmissible.

With respect to his first opinion that purports to assign the Chief Officer with a duty "to establish a protocol," Borison posits that the crew "knew" a number of things that either no witness has testified to or the testimony describes differently.[56] For instance, though Borison baldly asserts that "Chief Officer Ciftci and the other officers on board this ship knew when the longshoring crew was finished each hold,"[57] the deposition testimony establishes otherwise. As Coastal's highest-ranking superintendent himself detailed, it is the Coastal and ADM supervisors that determine when they are finished with a hold.[58] C/O Ciftci also specifically explained that "In my plan, I only say we will discharge number 1, 2, 3, 4 or 5. I'm not including in the crane's moving operations or the crane moving operations. It depends on them. I just say you will discharge from number 2 or, just example, number 5, and then after 1,000 ton, you go number 3 again. Like that, I say."[59] He also confirmed he does not tell the stevedore when or where to move the crane barge – once the crane operator has discharged the appropriate amount from a given hold at whatever rate or speed the crane operator was going, the Coastal personnel instigate movement of the crane barge, *not* the vessel.[60] And curiously, Borison's repeated

---

[56] See Exhibit A, pp. 6-7.
[57] Exhibit A, p. 7.
[58] Exhibit E, p. 46:11 – 47:20, 48:10-14; Exhibit G, p. 27:23 – 28:7.
[59] Exhibit C, p. 36:2-14.
[60] Exhibit C, pp. 36-37 (at p. 37:18-20, "They just finish according to their calculation and they change it.").

emphasis on the fact that the Chief Officer and the crew "knew" that the product would fall to the deck really only serves to illustrate his unfamiliarity with the process, considering that all involved in this operation on all sides "knew" that the discharge operation for a granular bulk cargo like urea would result in some spillage.[61]

Borison's second and third "opinions" similarly suffer from flawed factual foundations. For one, he reaches conclusion that the ship did not provide the longshoremen "a walkway free from hazards,"[62] yet he recognizes that the KIRAN BOSPHORUS did indeed have such a walkway.[63] He also relies on generalized regulations to supposedly "bolster" this opinion, but problematically for Borison, the OSHA regulation specifically addresses an ***employer's*** duty to longshoremen whereas it is undisputed that plaintiff was employed by Coastal (not Archer), and the ABS regulation is inapposite.[64] And as noted earlier, Borison's third opinion stems from the myth that plaintiff had "attempt[ed] to use his Stop Work Authority," a premise for which there is no support whatsoever in plaintiff's testimony.

These shortcomings demonstrate the fallibility of Borison's opinions, and because expert opinions that ignore established testimony to the contrary and rest solely on unsupported and erroneous assertions or assumptions are unreliable, Borison's opinions must be excluded. *See, e.g.*, *Amin-Akbari v. City of Austin, Tex.*, 52 F.Supp.3d 830, 848 (W.D. Tex. 2014) (excluding expert opinions that ignored established facts of the case, and stating that "[t]he Court will not accept unsupported assertions as expert testimony"). As his testimony that fails the reliability and relevance standards associated with Rule 702 and *Daubert* guidance is inadmissible, Borison's unreliable opinions and testimony should be excluded from the trial of this matter.

---

[61] Exhibit E, p. 42:24 – 44:19; Exhibit C, p. 30:24 – 31:9, 45:3-6, 52:16-22; Exhibit D.
[62] The legal problem with this premise is addressed in Section IV, *infra*.
[63] Exhibit A, pp. 7-8.
[64] See Exhibit A, pp. 8-9.

**c. As Borison's opinions are unhelpful to the trier of fact in this uncomplicated slip-and-fall case, they are irrelevant and inadmissible.**

Simply put, the present case is not factually complicated – it is a garden variety slip-and-fall that happened to occur on a vessel. To state it bluntly, because no specialized expertise or knowledge is necessary to understand the mechanics of a human slipping and falling on a surface, expert testimony is futile. "Ultimately, expert testimony should be excluded if the Court finds the proffered testimony deals only with common sense issues that . . . the trier of fact needs no expert assistance to resolve." *Hicks v. Bp Expl. & Prod.*, 2018 U.S. Dist. LEXIS 243114, at *11 (E.D. La. Apr. 25, 2018) (Africk, J.) (quoting *Richardson*, *supra* at *2) (marks omitted). As Borison's purported expert opinions do not offer any expertise that is outside the common sense of any trier of fact, they are – by definition – unhelpful and inadmissible.

Courts within the Eastern District have repeatedly recognized that Borison's *modus operandi* of "self-styled safety opinion comments" are not helpful to a trier of fact and thus excludable, which is precisely the case here. *Hicks*, *supra* at *7 (excluding Borison); *see also Lewis v. Marquette Transp. Co., LLC*, 2019 U.S. Dist. LEXIS 62528, at *8 (E.D. La. Apr. 11, 2019) (Ashe, J.) (excluding Borison, reasoning that "these statements fall within the domain of common sense matters, upon which the jury requires no expert assistance"); *Tercero v. Oceaneering Int'l, Inc.*, 2018 U.S. Dist. LEXIS 235670, at *7 (E.D. La. Feb. 8, 2018) (Africk, J.) (excluding Borison because, *inter alia*, "[t]here simply is no expertise required for the opinions he reaches. Hence, his opinions and testimony are unnecessary."); *Marshall v. Supreme Offshore Servs.*, 2011 U.S. Dist. LEXIS 144455, at *6 (E.D. La. Dec. 15, 2011) (Vance, J.) (excluding Borison and stating that "[t]he Court finds that testimony of this sort would intrude upon the domain of common sense matters for which the Court requires no expert assistance. Nothing in the report requires expertise, and the report will not assist the Court in its role as trier of fact.");

*Thomas v. Glob. Explorer*, 2003 U.S. Dist. LEXIS 3365, at *6 (E.D. La. Feb. 28, 2003) (Vance, J.) ("Borison's report consists of conclusions and one-sided recitations of what plaintiff himself asserts are disputed factual issues. No expertise of any kind was required or used to render this opinion, and the opinion would not assist the jury to resolve any issue in this case.").

And notably, multiple sections within this Court have specifically aligned Borison's opinions with the "'common trend' in personal injury testimony in which 'expert testimony' is proffered concerning common sense issues with which the fact finders need no expert assistance," and pointed out that these reports follow a "typical" formulation that simply fixes supposed responsibility for the accident. *See, e.g.*, *Tercero, supra* at *7 (citing *Williams v. Eckstein Marine Servs., Inc.*, 1992 U.S. Dist. LEXIS 18789, at *1 (E.D. La. Dec. 9, 1992)); *Marshall*, *supra* at *5. Especially with a simple fact pattern like here, such "expert opinions" like Borison's are unnecessary, since "[a]fter the factfinder determines the actual facts of the case, the factfinder, with a proper application of the law, will be fully capable of determining the rights and obligations of the parties without his so-called 'expert' testimony." *Tercero, supra* at *7-8.

Therefore, because Borison's three opinions will offer this Honorable Court no more than the lawyers can offer and seeks only to tell the Court – in its role as factfinder – what he believes the verdict should be, his report and testimony should be excluded from the trial of this matter.

**d. Because Borison's opinions are thinly disguised conclusions of law, they are irrelevant, improper and inadmissible.**

It is evident from his report that Borison's opinions are premised wholly on his interpretation of Archer's supposed duties to this plaintiff. However, "whether a defendant owes a plaintiff a duty is a question of law." *Canal Barge Co., Inc. v. Torch Oil Co.*, 220 F.3d 370, 376 (5th Cir. 2000). And experts are not permitted to give opinions on issues of law. *See, e.g.*, *C.P. Interests, Inc. v. California Pools, Inc.*, 238 F.3d 690, 697 (5th Cir. 2001). Put another way,

"[t]he Court is tasked with the duty to render legal opinions," and expert opinions offering legal interpretations "invade the judicial function." *Bradley v. Phillips Chemical Co.*, 484 F.Supp.2d 604, 612 n.22 (S.D. Tex. 2007) (citing *C.P. Interests*, *supra*, and *Stearns Airport Equip. Co., Inc. v. FMC Corp.*, 170 F.3d 518, 531 n.12 (5th Cir. 1999)).

Plainly stated, "[o]pinions that are 'nothing more than legal arguments' are not admissible." *Virginia Coll., LLC v. Martin*, 2012 U.S. Dist. LEXIS 178132, at *4 (S.D. Miss. Dec. 17, 2012) (quoting *Snap–Drape, Inc. v. Comm'r of Internal Revenue*, 98 F.3d 194, 198 (5th Cir. 1996)). And where the trial is a bench trial, "the Court does not require an expert to apply the law to the facts, which is precisely what [the experts] endeavor[ed] to do." *Id.* at *2; *see also Fontenot v. United States*, 89 F.3d 205, 209 (5th Cir. 1996) ("The judge doesn't need an expert to tell him the law, directly or dressed as custom.").

As a result, courts within the Fifth Circuit have consistently excluded expert opinions on an opposing party's supposed duties. *See, e.g., Wyeth v. Rowan Companies, Inc.*, 2008 U.S. Dist. LEXIS 65160, at *5 (E.D. La. Aug. 26, 2008) ("Thus, because the issues of whether and to what extent a duty was owed …are questions of law, [expert] should be precluded from offering opinions as to those issues."); *Taylor Pipeline Construction, Inc. v. Directional Road Boring, Inc.*, 438 F.Supp.2d 696, 706 (E.D. Tex. 2006). Similarly, in *Shawler v. Ergon Asphalt, supra* at *28, this Court excluded plaintiff's expert's opinions regarding unseaworthiness, the vessel owner's negligence and causation, because the opinions "all cross[ed] into the realm of legal conclusions which are reserved for the trier of fact."

In the present case, plaintiff's proffered safety expert plainly violates the prohibition against experts giving legal opinions. Borison's report contains nothing more than unsupported legal conclusions as to purported responsibilities and "protocols" – *i.e.*, duties – of Archer, as

owner of the KIRAN BOSPHORUS, with respect to longshoremen involved in a cargo discharge operation. In his three listed "Opinions," Borison repeatedly makes bald assertions as to what he perceives Archer's responsibilities – *i.e.*, duties – to be, and then simply points the reader to his preferred legal conclusion. However, it is the job of this Court, and only this Court, to establish what Archer's responsibilities – *i.e.*, legal duties – were in the context of this case.

In sum, Borison's opinions as to what Archer was required to do for this plaintiff during ongoing cargo operations aboard the KIRAN BOSPHORUS are improper legal opinions, and should be stricken as irrelevant, especially because, as explained below, his opinions concerning Archer's supposed duties to this longshoreman are patently wrong and, as such, unreliable.

***IV. Borison's opinions regarding Archer's duties to this longshoreman-plaintiff are legally unreliable because they contradict the established jurisprudence, and are based on an improperly selective view of the evidence.***

**a. Expert opinions based on incorrect legal principles are unreliable.**

Again, in order to be admissible under Rule 702, proffered expert testimony also must be "the product of reliable principles and methods." Fed. R. Evid. 702(c). Reliability is determined by evaluating the validity of the reasoning or methodology underlying the testimony. *Knight, supra*. As noted above, where the underlying basis for expert opinions is plainly incorrect, the testimony is unreliable. *See Paz, supra*; *Guillory, supra*; *Martinez, supra*. And as explained below, Borison's proffered opinions are based on faulty underlying principles that are plainly incorrect. This renders his opinions legally unreliable and inadmissible under Rule 702.

**b. Borison's report and opinions contradict controlling jurisprudence and ignore critical evidence, which renders them unreliable and inadmissible.**

In addition to constituting impermissible legal opinions, Borison's opinions as to Archer's duties in this case constitute patent misstatements of the controlling law and, as such, are unreliable. Borison effectively accuses Archer of breaching duties it did not, and does not,

have under the law, including duties that the Supreme Court has specifically rejected. In fact, the Supreme Court and the Fifth Circuit have defined with great precision a vessel owner's duties in conjunction with ongoing stevedoring operations. Borison's opinions in the present case are directly contrary to these established legal principles, which makes them unreliable. *See, e.g.*, *Whitney Nat. Bank v. Air Ambulance by B & C Flight Mgmt., Inc.*, 516 F.Supp.2d 802, 817 (S.D. Tex. 2007) ("Incorrect assumptions critical to an expert's opinion make that opinion unreliable.") (citing *Moore v. Ashland Chemical*, 151 F.3d 269 (5th Cir. 1998)).

Under the Supreme Court's controlling jurisprudence, a vessel owner owes only limited duties to stevedores and longshoremen with respect to its vessel and equipment. *See Scindia Steam Nav. Co. v. De Los Santos*, 451 U.S. 156, 166–79 (1981); *Howlett v. Birkdale Shipping Co., S.A.*, 512 U.S. 92, 98–99 (1994). The longshoremen's employer and/or the stevedore have the primary responsibility for the longshoremen's safety, including a duty to provide the longshoremen a reasonably safe workplace aboard the vessel. *See Scindia*, 451 U.S. at 170 ("Section 41 of the Act, 33 U.S.C. § 941, requires the stevedore, the longshoremen's employer, to provide a "reasonably safe" place to work…"); *Randolph v. Laeisz*, 896 F.2d 964, 970 (5th Cir. 1990) ("The basic principle which emerges from *Scindia* is that the primary responsibility for the safety of the longshoremen rests upon the stevedore."). In contrast, the vessel owner's duties to longshoremen are "narrow." *See, e.g., Romero v. Cajun Stabilizing Boats Inc.*, 307 F. App'x 849, 851 (5th Cir. 2009).

Throughout his report, Borison attempts to create a continuing duty to inspect the stevedore's work area on the part of Archer.[65] But that supposed duty is explicitly foreclosed by the Supreme Court's *Scindia* decision. 451 U.S. at 168-69 ("It would be inconsistent with the Act

[65] *See* Exhibit A.

to hold [] that the shipowner has a continuing duty to take reasonable steps to discover and correct dangerous conditions that develop during the loading or unloading process.”). For example, contrary to Borison’s assertions, a shipowner does not have a responsibility “to provide a safe designated walkway free from slipping hazards” with respect to longshoremen.[66] The Supreme Court specifically recognized in *Scindia* that the longshoremen’s employer owes the longshoremen statutory duties to provide a reasonably safe workplace, **not** the ship. *Id.* at 170.

And Borison’s opinion that the vessel crew should have exercised stop work authority on behalf of plaintiff amounts to charging the crew with a duty to supervise the stevedore’s operations and work area, which federal jurisprudence roundly recognizes would defy the underlying rationale of *Scindia*. *See, e.g.*, *Hill v. Texaco, Inc.*, 674 F.2d 447, 451 (5th Cir. 1982) (“The shipowner need not monitor the stevedore’s operations; rather, the shipowner is entitled to rely on the stevedore’s expertise and reasonableness.”); *accord Perez v. Zim Isr. Nav. Co.*, 1995 U.S. App. LEXIS 11889, at *7 (9th Cir. May 18, 1995) (“If casual use was sufficient to impose a duty of care on the part of the vessel owner, it would effectively undermine the Supreme Court’s holding in *Scindia Steam* that the vessel’s crew does not have a continuing duty to inspect and investigate hazards that arise during cargo operations.”); *Derr v. Kawasaki Kisen K.K.*, 835 F.2d 490, 493 (3d Cir. 1987) (“*Scindia* compels the holding that the shipowner has no duty to supervise or inspect cargo loaded or unloaded by stevedores and therefore may not be held liable for injuries arising out the stevedore’s failure to perform his job properly.”).

Moreover, federal district courts have repeatedly found that cargo spillage on deck is to be expected during bulk cargo operations. *See Wilson v. Solomon Corp.*, 1997 U.S. Dist. LEXIS 8944 (E.D. La. Jun. 19, 1997); *Giacona v. Marubeni Oceano (Panama) Corp.*, 623 F.Supp.

---

[66] Exhibit A, pp. 7-8.

1560, 1564-66 (S.D. Tex. 1985); *Thompson v. Cargill, Inc.*, 585 F.Supp. 1332 (E.D. La. 1984); *see also Giganti v. Polsteam Shipping Co.*, 997 F.Supp.2d 182 (E.D.N.Y. 2013), *aff'd* 588 F. App'x 74, 75 (2d Cir. 2015). Given the normalcy of bulk cargo spillage during ongoing operations, courts have stated that "the slippery footing ... pose[s] only a limited and accepted hazard." *Thompson*, 585 F.Supp at 1335 (quoting *Stass v. American Commercial Lines, Inc.*, 720 F.2d 879, 884 (5th Cir. 1983)); *Wilson, supra* at *2 ("In fact, [the] accumulation of grain dust on the deck of a ship is viewed as a limited and acceptable risk inherent in loading grain.").

And importantly here, Fifth Circuit law directs that "[g]enerally, the Duty to Intervene does not arise for open and obvious transitory conditions ... that are created entirely by the independent contractor, are under its control, and related wholly to its own gear and operations." *Landry v. G.C. Constructors*, 514 F. App'x 432, 436 (5th Cir. 2013) (quoting *Futo, supra*) (internal quotation marks omitted); *see also Fontenot v. United States*, 89 F.3d 205, 209 (5th Cir. 1996) ("We held in *Futo* that this duty to intervene does not…extend to an open and obvious transitory condition created by the contractor."); *Hunter v. Intreprinderea de Explore Flott Mar. Navrom*, 868 F.2d 1386, 1388 (5th Cir. 1989). It cannot be disputed that the excess urea on the deck was a "open and obvious transitory condition," which precludes any duty to intervene.

Also problematic is Borison's reliance on OSHA regulations, which he cites as evidence of Archer's supposed duties to this longshoreman plaintiff. However, the OSHA regulations Borison cites are inapplicable to Archer. OSHA regulations govern only the longshoreman's employer's duties (here, Coastal), and Archer was **not** plaintiff's employer. *Melerine v. Avondale Shipyards, Inc.*, 659 F.2d 706, 712 (5th Cir. 1981); *In re M&M Wireline & Offshore Servs., LLC*, 2017 U.S. Dist. LEXIS 15321, at *21 (E.D. La. Feb. 3, 2017) (Brown, J.) (striking Borison's opinions that relied on inapplicable OSHA regulations). Further, the KIRAN BOSPHORUS is a

foreign-flagged vessel to which American "housekeeping" regulations under OSHA do not apply. *See Brown v. Mitsubishi Shintaku Ginko*, 550 F.2d 331, 333 (5th Cir. 1977) ("[T]he Longshoring Safety and Health Regulations apply only to employers; they do not automatically impose a duty on owners, operators, agents or masters of vessels unless such persons are acting as employers.") (quotation omitted); *Marant v. Farrell Lines, Inc.*, 550 F.2d 142, 151 (3d Cir. 1977) (Van Dusen, J., concurring).

Experts are precluded from giving legal opinions, especially erroneous ones. The jurisprudence demonstrates that Borison's conclusions are contrary to established legal principles, which renders the proffered opinions legally unreliable and inadmissible under Rule 702. As such, they should be stricken, and Borison should be excluded from testifying at trial.

## Conclusion

Robert Borison's proffered opinions reveal a trifecta of inadmissibility – he is not qualified, his opinions are not relevant or helpful, and his opinions are not reliable. First, he is not qualified because he lacks the requisite specialized knowledge and experience on the specific issues presented in this longshore personal injury case. Additionally, his conclusions and opinions are irrelevant because they are impermissible legal opinions that invade the province of the Court, as the trier of fact in this case. And his opinions are unreliable because they contradict controlling Supreme Court and Fifth Circuit jurisprudence establishing Archer's limited and narrow duties to this longshoreman and rely largely on demonstrably inaccurate information.

In sum, Borison's proffered opinions fall well short of meeting the standards for admissibility under Rule 702. Therefore, Archer respectfully submits that Borison's report and opinions should be stricken, and he should be excluded from testifying at trial.

Respectfully Submitted,

**MURPHY, ROGERS, SLOSS,
GAMBEL & TOMPKINS**

*/s/ Peter B. Tompkins*
Peter B. Tompkins #17832
ptompkins@mrsnola.com
Tarryn E. Walsh #36072
twalsh@mrsnola.com
701 Poydras St., Suite 400
New Orleans, LA 70139
Tel: 504.523.0400
***Attorneys for Archer Shipping Ltd.***

4821-9140-8369, v. 2