**TOTAL SAFETY SERVICES, INC.**
**218 MAGNOLIA STREET**
**LONG BEACH, MISSISSIPPI 39560**

**ACCIDENT INVESTIGATION – SAFETY CONSULTING - LITIGATION SUPPORT**

# LLOYD J. GUSMAN, JR.
# VERSUS
# ARCHER SHIPPING, LTD.,
# KIRAN INTERNATIONAL HOLDING COMPANY, LTD.,
# and KIRAN HOLDING AS

**DATE**
**May 6, 2021**

**CIVIL ACTION: 20-984**

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**
**JUDGE LANCE M. AFRICK***
**MAG. JUDGE VAN MEERVELD**

**Prepared for**

**MR. BARRETT R. STEPHENS**
**LEWIS & CAPLAN, APLC**
**3631 CANAL STREET**
**NEW ORLEANS, LOUISIANA 70119**

**TELEPHONE NO.:(504) 415-0945**
**111TOTAL@GMAIL.COM**

Exhibit A
Archer Motion to Exclude

# INTRODUCTION

This **preliminary** ROOT CAUSE ANALYSIS report investigates the accident that occurred aboard the ***KIRAN BOSPHORUS***, a Bulk Carrier ship, owned by Kiran Holding AS, located at the ADM Midstream facility, MM110, on the Mississippi River, on or about April 2, 2019, at or about 10:00 PM, and outlines the findings from that investigation.

# QUALIFICATIONS

***Please see my Curriculum Vitae for a further explanation of my qualifications as a Safety Professional.***

**QUALIFICATIONS:** A safety professional, in any given industry, is required to have a working knowledge of the various operations his company performs in that industry, as well as a working knowledge of the applicable governing regulations. I have over 50 years of safety experience in the industries relating to the exploration, production, and transport of oil and gas and the marine, general, and commercial industries. While working in these industries, I have developed expertise relating to safety issues on production platforms, barges (derrick, crane, pipe laying, dredging, drilling, jack-ups, lift-boats, spud, supply, deck, oil, tank, etc.), structural, fabrication yards, and vessels/boats (ship, MODU, tug, tow, supply, crew, etc.), and commercial and industrial buildings and building projects.

This on-the-job work experience began in the mid-sixties while working offshore in the Gulf of Mexico on production platforms and drilling rigs, performing the duties of a Roustabout, Rigger, Welder's Helper, and Wireline Operator. I also worked on the Mississippi River, worked in Fabrication yards and Shipyards as a Roustabout, Rigger, Welder's Helper, and Heavy Equipment, and Crane Operator. Further safety experience and expertise were derived from being the manager/supervisor of the Safety Department for Amerada Hess Corp. (Lafayette region); J. Ray McDermott, Inc. (Marine and Diving Divisions, Harvey Group), McDermott International, Inc. (Singapore, South East Asia Group) and the president or owner of Contract Safety Consultants, Preferred Employees, and Total Safety Services, Inc. Companies I worked for included, New Orleans Stevedores, Houma Welders, Smith Wallander, Boland Machine and Manufacturing. My safety consulting experience was gained by providing safety consultant services at the following: Gulf South Laboratories, Engineering Inspection and Investigation, Inc., Inspection Consultants, Inc., Ray Gibbins Industries, Allied Wireline, Western Wireline, Popich Brothers, Space, L&L Construction, Kaough & Jones, Kranco, Garza Welding, T & A Wireline, TCB Industries, Rembco, Foley Construction, Delta Coatings, Delta Temp, Inc., Cortex, Southern Environmental Control, Eagle Marine, American Marine, Mosby Enterprises, Total Marine Services, Vela Garage, Doomlar, Energy Drilling, Grady Crawford, Guilliot Construction, J & J Electric, Taylormade Enterprises, U. S. Abatement, Vogt Construction, Wescorp Construction, and Blake Drilling,

The companies I was employed by or contracted with followed the Federal regulations listed below and voluntarily followed the Industry Standards of Care as listed. As their safety officer, I was required to have a

working knowledge of those regulations and standards of care and the ability to apply them to the company's oil and gas exploration and productions and marine, general, industrial, and commercial work activities.

**Subcategories for each section are listed in more detail in my *Curriculum Vitae.***

**Working knowledge of Federal Regulations 29:**
1910 General Industry, 1926 Construction, 1915 Shipyard, 1918 Longshoring, 1919 Gear Certification

**Working knowledge of Federal Regulations 46:**
Subchapter C - Uninspected Vessels
Subchapter D – Tank Vessels
Subchapter H – Passenger vessels
Subchapter I - Cargo and Miscellaneous Vessels
Subchapter I-A - Mobile Offshore Drilling Units
Subchapter K – Small Passenger Vessels carrying more than 150 passengers
Subchapter L – Offshore Supply Vessels
Subchapter M – Towing Vessels
Subchapter T – Small Passenger Vessels

**Working knowledge of Federal Regulations 33:**
Subchapter B – Offshore
Subchapter N - Outer Continental Shelf Activities

**Working knowledge of the following industry standards:**
(API) American Petroleum Institute
(ANSI) American National Standards Institute
(ASME) American Society of Mechanical Engineers
(AWS) American Welding Society
(CGA) Compressed Gas Associations, Inc.
(ASTM) American Society for Testing and Materials
(ABS) American Bureau of Shipping
(NFPA) National Fire Protection Association
(NIOSH) National Institute for Occupational Safety and Health
(SAE) Society of Automotive Engineers
(UL) Underwriters Laboratories
(NEC) National Electrical Code
(AWO) American Waterways Operators
(ISM) International Safety Management
(SSPC) Steel Structures Painting Council.

## METHODOLOGY – ROOT CAUSE ANALYSIS

The evaluation tool I use to investigate and analyze an accident is based on widely recognized and accepted accident investigation analysis principles and methods employed in the safety profession: the **ROOT CAUSE ANALYSIS (RCA)**.

My **ROOT CAUSE ANALYSIS (EVENTS AND CAUSAL FACTOR ANALYSIS)** is used to investigate this accident and my report is a structured step-by-step technique and procedure for ascertaining and analyzing the causes of accidents. The PROBLEMS AND DEFICIENCIES listed below in my report are examples of the major accident categories that should have been included when the crew completes a **(JSA)** and would be included in a ROOT CAUSE ANALYSIS investigation:

**EXEMPLARY MAJOR ACCIDENT CATEGORIES**
**EQUIPMENT / MATERIAL PROBLEMS,**
**PROCEDURE PROBLEMS,**
**DESIGN PROBLEMS,**
**TRAINING DEFICIENCIES,**
**MANAGEMENT PROBLEMS.**

Examples of the accident subcategories listed in my report address the specific accident PROBLEMS AND DEFICIENCIES related to the accident:

**EXEMPLARY SUBCATEGORIES**
**DEFECTIVE TOOLS / EQUIPMENT,**
**PRE-EMPLOYMENT EMPLOYEE EVALUATION,**
**PRE-JOB / EMPLOYEE EVALUATION (JSA),**
**PERSONAL PROTECTIVE EQUIPMENT,**
**TRAINING / CERTIFICATION / LICENCES,**
**FEDERAL AND /OR STATE STANDARDS / INDUSTRY STANDARDS,**
**INDUSTRY SAFETY MANUALS AND PUBLICATIONS.**

# ROOT CAUSE ANALYSIS

## I. DATA COLLECTION



Exhibit A
Archer Motion to Exclude

The following documents were reviewed in preparation for this preliminary root cause analysis report:

**Deposition Testimony:**

- Mr. Lloyd Gusman
- Mr. Roy Burpbacker
- Mr. Melih Ciftci
- Mr. Dejuante Murray

**Miscellaneous documents:**

- **DEFENDANT'S ANSWERS TO CLAIMANT'S INTERROGATORIES**
- **EMPLOYER'S CARRIERS RESPONSES TO CLAIMANT'S REQUEST FOR PRODUCTION OF DOCUMENTS**
- **CLAIMANT'S ANSWERS TO INTERROGATORIES AND REQUEST FOR PRODUCTION OF DOCUMENTS**
- **CLAIMANT'S ANSWERS TO INTERROGATORIES AND REQUEST FOR PRODUCTION OF DOCUMENTS**
- **INTERROGATORIES**
- **PHOTOGRAPHS**
- **COMPLAINT**
- **FIRST REPORT OF INJURY**
- **DRAWING**
- **MR. LLOYD GUSMAN STATEMENT**

# II ACCIDENT DESCRIPTION

Mr. Lloyd Gusman was employed as a Laborer by Neeb-Kearney & Company, LLC., and was contracted out to Coastal Cargo Company to work aboard the ***KIRAN BOSPHOROUS***, a Bulk Carrier ship, being unloaded at the ADM Midstream facility at MM 110 on the Mississippi River. The Chief Officer of the ***KIRAN BOSPHORUS*** was Mr. Melih Ciftci. The Coastal Cargo Company's Supervisor was Mr. Roy Bnipbaclicr, and the Foreman was Mr. Robert Pack. Mr. Joseph Barrow and Mr. DeJaunte Murray were also witnesses to Mr. Gusman's accident.

Mr. Gusman was a crewmember aboard the ***C/B ELISA A***, an Industrial Vessel crane barge, owned and operated by Coastal Cargo Company, and was assigned to work aboard the ***KIRAN BOSPHOROUS***, during a cargo transfer procedure in conjunction with the ***C/B ELISA A***. Mr. Gusman and his fellow crewmembers were placed aboard the ship via a personnel carrier. At some point in time, Mr. Gusman and the other crewmembers



Exhibit A
Archer Motion to Exclude

were instructed to relocate the ***C/B ELISA A's*** shifting cable to another location on the ship so the barge's crane could have access to another hold in the ship. As Mr. Gusman was working with the cable he slipped on a foreign substance left on the ship's designated walkway and fell whereupon he sustained his injury.

Before he fell, Mr. Gusman testified that he had asked his supervisor to see if someone could clean the deck. The supervisor then asked someone on the ship to clean the deck but was ignored. The testimony indicates that Mr. Pack ordered the crew to return to work, moving the shifting cables, without first having the ship's crew clean the deck, and the designated walkway, of any foreign substance present during the cargo transfer. Mr. Gusman sustained his injury when he slipped on the deck while performing his assigned duties.

# III ASSESSMENT / OPINIONS

***The following opinions are preliminary and may be amended, added to, or changed as other discovery and deposition testimony is provided.***

# OPINION NO. 1

## FAILURE TO ESTABLISH A PROTOCOL PROBLEM

**MR. MELIH CIFTICI, THE CHIEF OFFICER OF THE *KIRAN BOSPHOROUS*, FAILED TO ESTABLISH A PROTOCOL FOR THE UNLOADING OF THE VESSEL'S HATCHES AND HOUSEKEEPING PRIORITIES OF THE DECKS.** It is my opinion based on my education, training, and experience that Mr. Ciftici failed to establish a protocol between the ***KIRAN BOSPHOROUS'*** supervisors and crew and the supervisors and crew of the ***C/B ELISA A*** to address the housekeeping activities of cleaning the deck of the Urea after the various hatches were unloaded, and before members of the longshoring crew boarded the vessel to move the crane barge.

- Chief Officer Ciftici knew the Urea was a small-hard- granular-bead-like product that when spilled onto the deck of his ship produced a hazardous slippery condition.
- Chief Officer Ciftici knew that it was the ship's crew's responsibility to clean the deck of any hazardous substances before allowing the longshoring crew to enter the ship.
- Chief Officer Ciftici knew that the longshoring crew had no choice but to walk through this hazardous slippery substance to move their crane barge.

Yet, Chief Officer Ciftici did not produce a protocol that abated this hazard by having the ship's crew clean the deck before allowing the longshoring crew to board the ship

- Chief Officer Ciftici testified that he produced a discharge plan for unloading the various holds on the ***KIRAN BOSPHORUS.***

- Chief Officer Ciftici testified that the discharge plan was provided to the longshoring supervisors.
- Chief Officer Ciftici testified that he was aware that the cargo moved by the longshoring crew would spill onto the ship's decks.
- Chief Officer Ciftici testified that at a convenient time after a hold was unloaded, he would send the ship's crew to go and clear the product from the deck.
- Chief Officer Ciftici testified that he had made calculations relating to the unloading process concerning the stability of the ship during discharging operations.
- Chief Officer Ciftici testified that he knew that the crane barge had to be moved from one hold to another to continue the discharging process on the ship.
- Chief Officer Ciftici testified that the longshoring crew would follow the discharge plan for each hold.
- Chief Officer Ciftici testified that if the ship's crew observed that the longshoring crew was not following the discharge plan, they would step in and stop the operation.
- Chief Officer Ciftici testified that he decides in which order the various cargo holds will be unloading and informs the longshoring crew through the discharge plan.

Chief Officer Ciftici and the other officers on board this ship knew when the longshoring crew was finished each hold. They knew that the product was spilling onto the deck. They knew the crane barge had to be moved to this next designated hold set out in the discharge plan. They were watching to make sure the longshoring crew followed the discharge plan. They knew the longshoring crew had to board the ship to move the crane barge. They knew the ship's crew was responsible for cleaning the deck.

Yet, Chief Officer Ciftici and the other officers on board this ship failed to clean the deck of this ship before allowing the longshoring crew to board the ship and move the crane barge.

**************************************************************************************

# OPINION NO. 2

## EQUIPMENT PROBLEM

### *KIRAN BOSPHOROUS* SUPERVISOR'S FAILURE TO PROVIDE MR. GUSMAN AND THE OTHER CREWMEMBERS FROM THE *C/B ELISA A* WITH A SAFE DESIGNATED

**WALKWAY FREE FROM SLIPPING HAZARDS.** It is my opinion based on my education, training, and experience that the supervisors of the ***KIRAN BOSPHOROUS*** failed to clean the deck of their vessel, or have it cleaned, before allowing the crew from the ***C/B ELISA A*** to walk/work on the deck full of a slippery foreign substance. Before he fell, Mr. Gusman testified that he had asked his supervisor to see if someone could clean the deck. The supervisor then asked someone on the ship to clean the deck but was ignored.

Photographic evidence shows that this ship had a designated walkway along the deck next to the cargo holds. This designated walkway is seen in the photographs as shown by two distinctive strips filled in with a contrasting color decking. A designated walkway is established by the vessel's owner to provide a safe means of transgressing the deck. It is specifically designed to assure any worker that the designated walkway is free from all hazards (slipping, tripping, etc.). The designated walkway establishes a safe walkway that the worker can use with the confidence of his/her safety.

## INDUSTRY STANDARDS USED TO BOLSTER MY OPINION:

**CODE OF FEDERAL REGULATIONS**
**TITLE 29 - LABOR**
**SUBTITLE B - REGULATIONS RELATING TO LABOR**
**CHAPTER XVII -- OCCUPATIONAL SAFETY AND HEALTH ADMINISTRATION**
**DEPARTMENT OF LABOR**
**PART 1918 - SAFETY AND HEALTH REGULATIONS FOR LONGSHORING**

**1918.91(a)**
**General**. Active work areas shall be kept free of equipment, such as lashing gear, and materials not in use, and clear of debris, projecting nails, strapping and other objects not necessary to the work in progress.
**1918.91(b) Slippery surfaces.** The employer shall eliminate conditions causing slippery walking and working surfaces in immediate areas used by employees.

**************************************************************************

**ASTM F1166-07 (Reapproved 2013)**
**STANDARD PRACTICE FOR**
**HUMAN ENGINEERING DESIGN FOR MARINE SYSTEMS, EQUIPMENT, AND FACILITIES1,2**



Exhibit A
Archer Motion to Exclude

11.12 *Walkways, Passageways and Alternate Means of Personnel Movement:*
11.12.1 *Walkways and Passageways:*
11.12.1.2 Walkways, passageways, decks and all other walking surfaces shall have a nonskid surface sufficient to provide a coefficient of friction (COF) of 0.6 or higher measured when the surface is wet.
*******************************************************************************************

**AMERICAN BUREAU OF SHIPPING
THE APPLICATION OF ERGONOMICS TO MARINE SYSTEMS**

**SECTION 10 Maintenance Considerations**
**2 Principles (1 August 2013)**
These maintainability and accessibility principles are directed toward the accomplishment of necessary maintenance tasks quickly, safely, accurately and effectively with minimum requirements for personnel, skills and special tools.

**2.2 Maintenance Task Access Analysis**
**2.2.1 Analysis**
An analysis of maintenance tasks should be performed for the purpose of sizing and outfitting maintenance workspaces. The analysis addresses concerns such as: design of maintenance platforms; **work surfaces**; work envelopes; tools, spare parts and spent part stowage; and consumables storage at a maintenance site during planned or corrective maintenance.

**2.2.2 Typical Analysis Steps**
A maintenance area task and requirements analysis typically includes the following steps:
Step 1 List (1) general and frequent maintenance tasks (such as **housekeeping** and routine or and recurring maintenance), and (2) list major planned maintenance or corrective maintenance actions

> i) Number of participants/maintainers involved for each task
> ii) List of major equipment/components to be removed, and replaced, or repaired in place or nearby for each task

**10 Walkways and Work Platforms (1 August 2013)**
**10.1 General Principles**
The principles listed below apply to the design of walkways and ramps and are not represented in the following figures or tables.

> vi) Walkways and ramps exposed to the elements should have additional slip resistance due to potential exposure to water and ice.



Exhibit A
Archer Motion to Exclude

*****************************************************************************************

# OPINION NO. 3

## FAILURE TO USE STOP WORK AUTHORITY PROBLEM

**THE OFFICERS OF THE *KIRAN BOSPHOROUS AND THE C/B ELISA A'S* FAILURE TO USE THEIR STOP WORK AUTHORITY TO STOP THIS JOB WHEN THEY ESTABLISHED THE EXISTENCE OF A HAZARD ON THE JOB.** It is my opinion based on my education, training, and experience that the officers and/or crewmembers aware of the slipping hazard on the deck of the ***KIRAN BOSPHOROUS,*** and the supervisors of the ***C/B ELISA A,*** should have used their STOP WORK AUTHORITY and stop this job when it was determined that a foreign substance was present on the deck during the moving of the ***C/B ELISA A*** using the barge's shifting cables. Both sets of officers/supervisors were aware that the barge had to be shifted using the shifting cables to gain access to another hold. This, of course, meant that certain crewmembers were going to be required to negotiate the ship's deck by the various deck fitting used to position the barge next to the ship. This deck area was not cleaned before ordering Mr. Gusman and other crewmembers to move the shifting cables. By not cleaning the deck, both sets of supervisors exposed these men and Mr. Gusman to known slipping hazards resulting in Mr. Gusman's accident.

Mr. Gusman, failing to have his attempt to use his Stop Work Authority addressed by Mr. Pack when he asked that the deck be cleaned, Mr. Gusman had no choice but to expose himself to the hazardous slippery condition on this ship's deck, or quit, and walk off of his job.

Mr. Murry backs up Mr. Gusman's thinking when he testified as follows:

Page 15: Q So, Mr. Murray, do you know what would have happened if any member of the crew would have disobeyed Mr. Pack's instruction to continue working?

Page 16: THE WITNESS: He would have got fired.

*****************************************************************************************

**FEE SCHEDULE:**

Hourly charges are from portal to portal.
All expenses are reimbursed by the client.
$1920.00 for deposition and trial testimony (a minimum 3-hour charge, includes preparation time)
$320.00 per hour for all other services provided (fees are subject to annual increases).
$ 0.86 per mile for travel

The opinions found in this report are professional safety opinions relating only to this accident. While the expert opinions concern factual circumstances, which may be found by the trier of fact to constitute fault, they are not intended to be legal conclusions, as this is a matter for the court to determine and the trier of fact to



Exhibit A
Archer Motion to Exclude

decide. These opinions are based solely upon my many years of experience in the field of safety as it relates to this particular accident and should not be compared to other opinions in other cases.

If further discovery, research, inspections, and/or review should develop additional information that would alter my opinion, the conclusions reached herein would be subject to my revision and this report amended as necessary.

Sincerely Yours



Robert E. Borison
President
Total Safety Services, Inc.

## APPENDIX

## DEPOSITION TESTIMONY USED TO FORM MY OPINION

***This pagination may not follow the transcript of the official depositions.***

**MR. LLOYD J. GUSMAN, JR. TESTIFIED AS FOLLOWS:**

Page 31: I mean, the accident that brings us here today happened on April 2nd, 2 019, I

Page 71: Q. Records that we've been provided seem to suggest that you started with Coastal on February 6th, 2019 or about two months before your accident. Does that sound right? A. Yes.

Page 86: Q. And when you started your shift or whatever would all six of y'all go on together? A. No. It was just three of us up there. There was just three. Q. And one of them was --

Page 87: A. And two -¬ Q. --a crane operator? A. No. The crane operator was already in the crane. Q. Right.

Page 88: All right. So had your crew taken the Q. place of another crew? A. Yes. All right. And is one called a day crew and one the night crew? A. Night crew, yes. So you're on the night crew? I was on the night crew.

Page 89: Q. So somebody's getting the instruction as to what hold or what job you need to do, and then they're relaying that to you? Yes.

Page 90: Q. What did you do on April 1st on that ship? A. We had got --we unloaded off the -- we didn't have to go on no ship. We unloaded off the side of the ship putting stuff out the ship into the plat -- I can't think of the name. But a platform. It was a platform that we had to move the covers and to take stuff off the ship to put on into the covers. So we had to go on side the water to unhook the covers for

the crane to move the -- the -- the things over that day. Q. So are you unloading cargo and putting that cargo in, like, a hopper barge next to the

Page 91: Ship? A. Next to the ship.

Page 92: Q. And was there anything -- what was the cargo; do you remember? What was the product being moved? A. Looked like sand. Q. Okay. And was it -¬

Page 93: Q. And for the first day you're on the hopper barge? Yeah. I'm on the hopper barge that A. day.

Page 94: Q. So day one all your time was spent on the hopper barge, not on the ship? A. Not on the ship.

Page 94: Q. Right. A. I mean, the first ship was another ship. 'Cause when I come back next there's a different ship, 'cause they got different product. I mean, the first ship was sand, you

Page 95: know. Q. Okay. A. The second ship was some white stuff. I don't know what that was. Q. All right. That's where my misunderstanding was. Okay. I thought you meant the white stuff that -¬ A. No. No. No. This two different ships. Q. Okay. So the first time you saw the ship that was involved in your accident was the day of your accident? A. Yes.

Page 95: Q. All right. I got you. And you're telling us that the crane operator picked you up -- to the ship that you were on the day of your accident they picked you up and put you on that deck? A. On that deck.

Page 96: Q. And what was the first instruction you received once you got on the ship? A. We got to move the lines to get to the second hold. Q. Okay. A. So they told me to go move that line. And that's when the guy -- I asked -- I asked the supervisor, Do we got to clean this up? He said, No. That's for the people on the ship to do. We just got to move the line for the barge. So he had told the dude that work on the ship. And he asked him, Is y'all going to clean it up? He laughed and kept walking. So I just got to the line. When I unhooked the line I walked to where it was safe. And I pulled it, and it got stuck. So I'm walking back. Let the line go, walking back. Next thing you know my legs just went completely underneath me 5 feet in the air. And I come

Page 97: down, blam. And that was that.

Page 99: A. The west, the West Bank. Q. And was the ship facing upriver, or was it facing down river; do you know? A. The ship was facing -- let me see. I guess that's upriver.

Page 100: MR. STEPHENS: Just for the record, if I get my nautical terms right, that would be the starboard side of the ship so.

Page 103: Q. Okay. So it's fair to say that at the

Page 104: time of your accident starboard, A. Q. you're on the right, or side of the ship -- Yes, sir. -- to do this work? Okay.

Page 104: Q. picture All of right. So I think I got a better all this now. So when you got on there and the supervisor you said we need to move, know, move the lines to adjust the barge, that's that of the first thing you were tasked to do night; is that right? Yes. Q. And at that point there's this white White Q. A. stuff stuff. -- on the deck? Yes. already some

Page 106: Q. Okay. Show me that on that photograph, if you will. A. Look like it's right here, 'cause I was moving -- the line was coming from here. The line was coming here. And it got hooked in here. So I had to walk back. Itried to -- I walked way over here. The line was long, 'cause it was not too -- it had too much stuff. It had too much stuff. And when I pulled the line it got stuck. So I had to go back to unhook it, to unhook it. So when I got to the thing next thing I know I was in the air.



Exhibit A
Archer Motion to Exclude

Page 107: Q. But were your feet on the green area or the red area when you slipped, if you remember? A. I don't remember.

Page 118: Q. I mean, but moving that line was the very first task that you were told to do as well. Correct? A. Yes.

Page 119: Q. All right. And did you-all talk about the white stuff that was on the deck at that point? A. Well, we saw the white -- that's when I asked the guy do we got to clean it up. Q. Right. A. And he said no, that's for the people on the ship to do so. Q. And you don't know the name of that guy? A. I don't know his name. Q. What was his title? A. He was the lead -- he was the --he had the red hat. He wore the red hat. So he was the inspector, the -- mostly inspector and the lead, you know. So he had kind of -¬ cause he been there 20 something years. Q. And that's a Coastal guy?

Page 119: A. Yeah, Coastal. Q. And you talked about a conversation

Page 120: with somebody that appeared to be a member of the ship's crew. Right? A. Yes. He had the conversation with the guy about -- I was right there by him when he asked the guy if they going to clean that up. Q. Okay. That was my question. You overheard him? A. Yeah, I overheard him say that. Q. And when he said, Are you-all going to clean this up the guy just kind of chuckled and he kept walking? A. And kept walking.

Page 121: Q. All right. And at the time of your accident, there's three Coastal guys on the A. On the ship. ship deck? Yeah? Yes. A.

Page 130: Q. Okay. And then the detailed description says, Mr. Gusman was aboard the vessel pulling the lines of the ELISA A rig up to shift the rig from hatch 5 to hatch 4 -- is the ELISA A the name of the vessel where the crane was? A. I guess.

Page 130: Q. And the statement that he was going from hatch 5 to hatch 4, do you know if that's the actual numbering or -¬ A. I don't – I thought it was 1, 2, and 3, me. I don't know. Q. Okay -- when he slipped on the loose cargo that was on the deck -- causing him to fall backwards. That's accurate. Right? A. Yes.

Page 132: Q. And then on this report -- and I'm just giving you these names to see if they ring a bell. It says foreman's name, Robert Pack. Do you remember if that's the lead man one way or the other? Do you know? A. The foreman -- the foreman will be the supervisor that's on the ship. Q. Okay. Does the name Robert Pack ring a bell from that night, or do you know? A. I mean, not really, I mean.

Page 175: Q. The ship's crew wasn't doing the actual cargo operations, were they? A. I mean, far as I know, I don't -- I don't know who the crane operator was. I know when --my crew we had a crane operator. But, now, for the second -- first crew, I don't know. Q. I understand. But if it was like your crew, It would've been another Coastal guy? A. Yeah, it'd been a Coastal guy. I mean, but by the time we got on this ship, if this stuff was on that deck, that should've been cleaned up before we got on that ship, cause it took us a hour and something -- I mean, it took us awhile before we got to this ship.

Page 180: So did you feel like when you fell Q. that you slipped because it was rolling under your shoe, or did it feel like it was liquid

Page 183: Thank you. Before you actually Q. slipped and fell had you had any near falls or feeling like you might slip that night? A. That night? Q. Yeah. A. Well, when you -- when you first walked on it you -- you know it was slippery. So you had to take your time. That's why I asked them do we have to clean it up, and they said that's for the people on the ship so.



Exhibit A
Archer Motion to Exclude

Page 197: Did I understand you correctly when you testified earlier that the first assignment that you were given to be performed on the ship's deck was that cable work you described? A. Yes. Q. Can you tell me -- and did I also understand you correctly that you and the fellow Coastal coworkers were on the ship's deck for a certain period of time before you started doing the cable work? A. Yes. Q. During that period of time did you stay in one spot on the ship's deck, or did you-all walk around on the deck? A. We stood in one -- not i n one spot. We were -- we walked towards the -- the deck that was clean -¬

Page 197: Q. Okay. A. --to the end. We were just checking out to see how far the barge had to go.

**MR. EMIL ROY BRUPBACHER TESTIFIED AS FOLLOWS:**

Page 10: A I worked for Coastal Cargo.

Page 10: Q What position did you hold at Coastal? A I first was a -- I started as a terminal manager and then moved up to general superintendent.

Page 15: Q Are you familiar with that location that's been identified as ADM midstream mile marker 110? A Yes.

Page 16: At the time of the

Page 16: incident we're here about today, do you recall which of those two positions you held? General superintendent.

Page 16: A General

Page 16: Q Mr. Brupbacher, were you aboard the Kiran Bosphorous at the time of Mr. Gusman's alleged incident? A I don't think so.

Page 17: Q The foreman? Can you tell from this form, sir, who the foreman was at the time of the incident that we're here about? A Yes. Robert Pack.

Page 18: Q Can you explain to us, sir, what your understanding of that term is? A Well, being as it's over at midstream, this tells me that they were probably -- they were shifting the wires so that they can shift -- they shift the wires from one hatch to the other or, depending on what location of the vessel, so that they can

Page 19: shift the floating crane from one hatch to the next so they can start working on the next hatch.

Page 19: Mr. Gusman was aboard the vessel,

Page 19: pulling the lines of the Elisa A rig up to shift the rig from hatch 5 to hatch 4, when he slipped on the loose cargo that was on the deck of the vessel, causing him to fall backwards. Do you see that section, sir? A I do.

Page 19: Q Are you familiar with the Elisa A rig? A I am.

Page 19: Q Was that a Coastal Cargo rig, or was that an ADM rig? A It's Coastal Cargo's floating crane.

Page 21: Q In your experience, sir, when Coastal is unloading cargo from a vessel such as the one described in this form, who's responsible for clearing the vessel's deck during the cargo operation? A That would be the ship's crew.

Page 22: Q It's just saying, to your knowledge, if you know in this particular instance. A Oh. Well, I mean, for any vessel, I mean, it's the ship's crew to make sure that the deck is clear during operations.

Page 23: But so you'll note on that exhibit, Mr. Brupbacher, that there's a big circle and then there are some arrows. I'd like to talk about the arrows first. I'll represent to you that, in his deposition, Mr. Gusman



Exhibit A
Archer Motion to Exclude

indicated that the arrows are pointing to where the wires would have been located that they had to shift. In your experience, is that the general area where wires would be located? A Yeah, somewhere around there.

Page 24: Q From what's depicted in that photograph, sir, would you agree with me that the vessel's deck is entirely covered by the product?

Page 24: THE WITNESS: The majority of it.

Page 24: Q Based on that photograph and your experience, sir, can you identify any practical way that Mr. Gusman could have avoided the product on the deck and still performed his duty in shifting the wires?

Page 25: A No. This should have been cleared before they started pulling wires.

Page 25: Q But as it appears here, it was not cleared, but based on what you've seen or you see in this photograph and your experience, can you identify any way that Mr. Gusman could have avoided the product and still performed his job? A No.

Page 25: Q So, stated another way, sir, based on the photograph and your experience, you would agree that Mr. Gusman had no choice but to walk on the product that's depicted on the deck in order to perform his duties in shifting the wires?

Page 25: THE WITNESS: That's correct.

Page 25: Q Okay. Also, Mr. Brupbacher, you indicated and we've talked about that you've had experience unloading urea, which appears to be depicted in this exhibit. Can you

Page 26: describe the consistency of that product? Is it like sand? Is it granular? Is it bead-like? It's a granular, small bead (indicating), a little bit bigger than sand, depending on,

Page 26: you know -- a little bit bigger than a grain of sand, but not much.

Page 34: Q Would the Coastal foreman have any of his own paperwork or JSA's for an off-load like this? A No.

Page 35: Q Does Coastal have an employee manual or safety manual that an employee like

Page 36: Mr. Gusman would be given? A They do training with the foremans.

Page 38: In terms of hierarchy

Page 38: for vessel operations, vessel loading and unloading, you'd be the top in terms of operations -- A Correct. Q -- in your role? And then you have a vessel superintendent? A Correct. Q And below him would be a foreman like Mr. Pack? A Right. Q And below Mr. Pack would be the workers like Mr. Gusman and his other laborers? A Correct.

Page 38: Q And who would have been the vessel superintendent involved, if you know, for the Kiran Bosphorous' unloading in April of 2019? A That would be an ADM employee. Because the ADM employee -- this is ADM's vessel, and we would send a crew to assist them in unloading their vessels. So whatever ADM superintendent was in charge of that vessel that day, he would be in charge of my crews.

Page 39: Q And whoever that ADM superintendent was for this particular job that we're here about, you don't know who that was? A I don't know.

Page 39: Q So the urea cargo that we've been talking about, you described it to some extent, and I'm just going to probe a little bit more. Have you ever stepped on it, yourself? A I have. It's very slippery. Q Okay. And that's part of my question. Is it -- when you step on it, does it maintain its shape and integrity, or does it flatten out? A No, it pretty much maintains its integrity.

Page 41: Q And you know they have multiple cargo holds -- A Correct. Q -- running from the bow all the way back to the house, for example, right? A Correct. And sometimes behind the house. Q Yes, and sometimes behind. And so the Coastal Cargo crane barge -- which in this case is the Elisa A, correct? A Correct. Q -- moves up and down the side of the ship, correct, to get alongside the hold that it's going to be working? A Correct. Q And if it's a bulk cargo like urea, is it like a clam bucket that's used to get the cargo out of the hold? A That's correct.

Page 44: Q Okay. So the best crane operator with the best bucket and no wind is still going to have some amount of urea come out, correct? A Yes.

Page 44: Q Now, when the crane operator is doing the operation and he's in position, the crane barge is in position, where are your guys typically standing? A Once they get all the lines hooked up and moved, my guys get off the vessel and go

Page 45: back to the floating crane.

Page 46: Q All right. And then is there some communication that typically happens when a hold is finished where your guy calls the ship officer or crew member and says, We're finished with hold 3, we want to move to hold 4? A Well, that would be the ADM supervisor's call of where they would shift them to. They had radios that they would contact, they would contact the ADM supervisor, let them know, Hey, we're almost finished hatch 5. And then the ADM supervisor would say, Okay, I need y'all to switch over to this hatch, y'all are going to work this hatch next.

Page 47: Q Right. And I'm trying to figure out how does the ship get word that we're finished and we're ready to move? A The foreman is supposed to let the ADM supervisor know that we're finished in that hatch, and then the -- because the ADM supervisor would usually sit in an office inside of here (indicating). Q What are you pointing at when you say here? A Just at the house, there are some offices or some stuff like a -- it's called a -- I call it a superintendent's office.

Page 48: We would notify them, letting

Page 48: them know we're almost finished. They would notify the ship's crew, Hey, we're going to shift from here to there. They would notify my guys where to shift to.

Page 49: Q Okay. So if Gusman gets up there and he's told it's time to shift the lines and this stuff is on the deck, he ought to say, What are we doing here, is somebody going to clean this up before he makes that walk? A Well, he's supposed to notify the ship's crew.

Page 49: Q So you don't know whether the ship's crew was even aware that somebody from the longshore crew was moving lines when Gusman was actually moving line, do you? A I don't.

Page 49: Q Or you don't know if anybody from the ship's crew was aware that they may have finished with one particular hold and were ready to go to another hold. You don't know that either, right? A I don't.

Page 51: Q And if you were the foreman, you would want to make sure, whether it's the vessel crew or one of your guys, that they would clean up an area before sending a guy out to work on a deck like that, correct? A If I was the foreman, absolutely. Q In other words, you would tell -- you would

Page 52: tell Gusman, Hold up until we get this area cleaned up, we don't want to go walking across this stuff, correct? A Correct.

Page 68: Q All right. So would that indicate that, in that type of scenario, when a hold is complete and the crane barge needs to be shifted, would that be the time period for the vessel's crew to clear the deck of any loose cargo? A Correct.

Page 68: Q And so would you agree with me that by the time Coastal's employees get back on the deck of the vessel, the deck should already be cleared by the vessel's crew of any of that loose cargo? A Correct.
Page 69: Q Do you recall ever seeing the Coastal crew sweeping cargo off of a vessel deck while midstream at the ADM mile marker 110? A I do not.
Page 73: Q From a practical standpoint, having worked in the industry, Mr. Brupbacher, if Mr. Gusman expressed a concern to the foreman about the condition but he was, nevertheless, ordered to still perform his job, would you expect him to disobey that order? A Yes.MR.

**MR. DEJUANTE ANTONIO MURRAY TESTIFIED AS FOLLOWS:**
Page 7: Q How long were you employed at Coastal Cargo? A Three years. Q What was your job title at Coastal? A Well, I was a rigger, rigging, doing longshoreman work.
Page 12: Q Mr. Murray, do you know who was responsible for cleaning loose cargo off the deck of the vessel? A The shipmate. Q When you say the shipmate, do you mean the ship's crew, sir? A Yeah.
Page 13: Q Okay. So when you and the crew got on the deck that night and observed that that cargo was on there, did anyone on the crew express concern that the cargo was there? A Yeah. Q Do you recall who it was that did that? A If I'm not mistaken, I think it was Joseph Barrow or Robert Pack. It was either Barrow or Pack.
Page 13: Q In your experience at Coastal, sir, was the vessel's crew supposed to have that product cleared from the deck by the time you got on the vessel? A Yeah.
Page 14: Q All right. When you say nothing, sir, what happened after somebody expressed concern? What did you and the rest of the crew do? A We asked, all right, one of the supervisors, called on the radio and asked -- you know, told him that they got leave can argue up there and we about to pull the lines up, and nothing happened. And, you know, we're on -- you know, we had to move; you know, we couldn't just sit up there and wait. So --
Page 14: Q When you say that it was radioed in, was it radioed in to a Coastal supervisor or an ADM supervisor?
Page 14: A An ADM supervisor. You know, because all
Page 14: of us have radios -- not everybody, but I had a radio, and I overheard someone saying that it's a lot of cargo on top of the ship and we needed someone to clean it up, you know, sent to clean it up.
Page 15: Q Who instructed -- after that radio call was made, who instructed the crew to proceed with working? A I think it was -- whoever the supervisor was, got up there and told us, you know, what to do, you know, told us to pull the lines up.
Page 15: Q If the records we have indicate that Mr. Robert Pack was the foreman that night, would that sound correct to you? A Right.
Page 15: Q So, Mr. Murray, do you know what would have happened if any member of the crew would have disobeyed Mr. Pack's instruction to continue working?
Page 16: THE WITNESS: He would have got fired.
Page 16: Q Say that again, sir. A He would have got fired, he probably got fired or got taken off the schedule or sent home, you know, for not complying.



Exhibit A
Archer Motion to Exclude

Page 16: Q Okay. So is it fair to say, then, sir, that on the night of April 2nd, 2019, after Mr. Pack instructed the crew to return to work, your options were either to return to work or, effectively, to leave the job? A Yeah.

Page 19: Q Okay. Sir, based on your experience and the photograph that we just showed you and also what you observed on the night of the accident, was there any practical way that Mr. Gusman could have avoided the product on the deck and still performed his duties in shifting wires? A It would have been impossible for him to perform.

Page 19: Q And so, stated another way, based on what you observed on the night of the accident, you would agree that Mr. Gusman had no choice but to walk on that product in order to perform his duties? A Yes, sir.

Page 20: Q Okay. Just to make sure I didn't miss anything, sir, you said that on the night in question, the responsibility for cleaning that material off of the deck belonged to the crew of the vessel? A Yes.

Page 22: Q Did ADM have a supervisor out on scene on the night of the accident? A Yeah, they had someone there. Q Do you remember the guy or girl's name? A I think it was Chris. I think it was Chris if I'm not mistaken. Q Chris? A Yeah.

Page 24: Q But did Coastal, for example, have something called stop work authority?

Page 25: A No.

Page 25: Q You ever heard of stop work authority? A No, sir.

Page 30: Q Were you helping move or shift the lines from your rig to the ship? A Yes, sir. Q Did you have to walk on that same cargo? A Yeah.

**MR. MELIH CIFTCI TESTIFIED AS FOLLOWS:**

Page 14: Q All right. And it's my understanding that at the time of the accident we're here about today, you were the chief officer of

Page 15: the Kiran Bosphorus? A Yes.

Page 19: A But I sign contract with Archer Shipping.

Page 24: Q Now, Melih, if you could explain to me, so it's my understanding that at the time of the incident that we're here about today, the Kiran Bosphorus was anchored at the ADM mile marker 110 midstream in the

Page 24: Mississippi River.

Page 25: A Yes, I remember, because we discharging urea, I remember that one.

Page 25: Q It's basically like the white beady stuff for fertilizer, right? A Right. Correct.

Page 26: Q And so, in your experience, and in particular relating to the Kiran Bosphorus, is it safe to say that, as the chief officer, you are working hand in hand with the cargo crew to discharge the cargo? A Yes.

Page 26: Q Okay. And so on April 2nd, 2019, you would agree that you were actually aboard the Kiran Bosphorus during those cargo operations? A Yes. Q Is it also fair to say that on that night, you, as the chief officer, had developed this discharge plan that we just discussed and provided it to whatever company was actually discharging the cargo? A Yes.

Page 30: Q All right. In your experience, Melih, when bulk cargo is being discharged from a

Page 31: vessel like the Kiran Bosphorus, is it true that sometimes that cargo will spill onto the deck of the ship? A Yes.
Page 31: Q In your experience, when that happens, who is responsible for cleaning the loose cargo from the deck of the ship? A It depends on the -- which country you are. It depends on the -- which port you are.
Page 33: Q No, I think that's fair. So, at least on April 2nd, 2019, the action that you were taking as the chief officer is if you saw loose cargo on the deck, you would send the ship's crew members to go and clear it from the deck? A Yes, in convenient time, I sent the guys to clean the deck.
Page 37: Q Okay. And so I understand you don't tell them how to move the crane barge, but you would agree with me that to get from one hold to another on the vessel, the crane barge would have to be moved? A Yes.
Page 37: Q Yes. Absolutely. A In fact, I do not say when they finish one step in the discharging sequence. They just finish according to their calculation, and they change it. So when they change it, I don't say -- I mean, every step, I don't call anybody and change it. It's just automatic -- Q Yes, sir. A They just go --
Page 38: Q And that's what I understood it to mean, is that when you put the plan together, you're not saying, Okay, you hit a thousand pounds; I'm ordering you to go to the next one. You basically give them the plan, and then as they progress according to the plan, they just automatically do that, correct? A Yes. But as the ship's crew and the ship's officers, we follow the plan and if we see it does not fit with the plan, of course, I can say, No, no, no, don't discharge number 2, go back again on number 3.
Page 38: Q Right. A It's also -- how can I say -- my authority. I decide which to discharge.
Page 39: Q And would you agree with me that when a cargo company is discharging bulk cargo from the vessel, that company's employees would have to board the vessel in order to move the crane barge's wires that would allow the crane barge to access another hold? A Mostly, yes.
Page 40: Q Sure. Sure. Now, in the instances where the cargo company's employees have to get on the vessel so the crane barge can be moved, would you agree with me that if there's loose cargo on the ship's deck before those cargo company employees get on the vessel, that the ship's crew is responsible for clearing the deck? A Yes.
Page 40: Q Would that be the same protocol on the Kiran Bosphorus on the night of April 2nd, 2019? A Yes, we prepared the ship for the discharge operation, that's our responsibility.
Page 41: Q So, hypothetically, on April 2nd, 2019, if
Page 41: you would have been the officer on watch and would have seen loose cargo on the deck, you would have ordered your crew members to clear the deck of that loose cargo before the cargo company employees got on the ship? A Yes, but it depends on the loose cargo's position. If the loose cargo is on the crane working area, I cannot order that kind of thing.
Page 43: Q Did you see, in that photograph, that the deck appears to be coated with a white substance? A Yes.
Page 44: Q Sure. Does the substance in that photograph appear to be urea from what you observed? A Yes.
Page 44: Q And what I'll submit to you, it appears
Page 45: that the deck is pretty well covered in that substance, correct? A Yes. But, I mean, in normal cases, we got more cargo on deck, not like that. You know, sometimes you can't see the red place or the green place.

Page 45: Q Okay. And with the cargo being located where it is on the deck -- because what I want to do, Melih, is get back to that question I had for you about when you would order the ship's crew to go sweep the deck and clear the loose cargo. In the situation as depicted in that photograph, would you order the ship's crew to sweep the deck of that loose cargo before the cargo company's employees boarded the vessel? A Yes, in this situation, I order.

Page 51: Q That's fine. It's not a problem. Like I said, Melih, one thing I tell everybody is I don't recall is a fair answer if that is the truth. Okay? Do you recall if on April 2nd, 2019, when necessary, the cargo company's employees

Page 52: would board the Kiran Bosphorus in order to shift the crane barge's wires so that another hold could be accessed? A I just recall some guys coming and moving the barge and asking for some cargo-related questions, yes, but I don't exactly remember what time they come or what date they come, though.

Page 53: A As I said before, it depends on the crane operating area and, also, it depends on because our crew have other jobs, just checking mooring lines and other duties they have. So I ordered that, I can say time by time, when you find time, just keep the deck clean.

Page 53: Q Okay. But you would agree with me that of the duties that you just described, one of the duties of the ship's crew would be to keep the deck clear of loose cargo, correct? A Yes, correct.

Page 55: Q Okay. If the photograph that I showed you depicts the condition of the deck when Mr. Gusman and his co-employees boarded the Kiran Bosphorus, would you agree with me, then, that means that the deck was not cleared by the ship's crew prior to Mr. Gusman boarding the vessel? A I mean, the picture that you showed me, it's not too much cargo, but, yes, it's supposed to be clean, especially in the green line because the green line is the walking line.

Page 55: Q Okay. So the green line -- and we'll attach that photograph as Exhibit 1. And so the green line that's running down the middle of deck is the walking line? A Yes, it's the walking line. Q And in your experience, is that walking line supposed to remain clear of loose cargo? A Yes, supposed to remain clear of the cargo, but it also have nonskid surface.

Page 57: Q All right. And, Melih, if upon boarding the Kiran Bosphorus on April 2nd, 2019, either Mr. Gusman or one of his co-employees asked a ship's crew member to clear the deck of loose cargo, would you have expected that crew member to do that? A Yes, if they ask to clean the deck, they supposed to clean the deck.

Page 58: Q All right. In your experience, the brooms and shovels that you described, are those available to the cargo company employees? A Yes, if they ask it for, we can give them, no problem.

Page 61: Q That's fair. That's fair. Melih, I think the last question I have for you is would you agree with me that if any member of the

Page 62: Kiran Bosphorus crew witnessed a potentially dangerous condition on the ship's deck on April 2nd, 2019, that crew member should have called a stop to the cargo operation until the condition was corrected? A Yes, but I just want to make an explanation. The deck crew, if they see something wrong with the cargo operation, they call the duty officer, and that duty officer can stop it, but if it is more serious, the duty officer is supposed to call me as a chief officer, so I stop the cargo operation. And if it is beyond my authority, so I call the master, this is how it works.



Exhibit A
Archer Motion to Exclude

Page 64: Q All right, Melih. Just a few questions for me, and I might be jumping around a little bit. So on the day of the accident that we're talking about here, April 2nd, did anybody from the cargo company or any of the stevedores ask you to clean the deck? A No, nobody ask it to me.

Page 64: Q Are you aware of anybody asking your crew members to do so? A No. I think -- as I said, no, I don't remember nobody ask it to me or I don't remember asking to our crew to clean the deck or something else.

Page 65: Q Okay. And when stevedores or the cargo company employees are on the deck of the ship, are they supposed to remain in that green walkway? A Yes, they supposed to remain on the green walkway.

Page 65: Q And if the stevedores were going to unhook the barge wire, could they have done that by walking in the green walkway? A Yes. Yes.

Page 66: Q Okay. A We just supervising the operation, we just following the operation. Q Okay. Kind of just keeping an eye on it, is that fair? A Yes, make calculations and just following the steps with the guys.

Page 67: So Ms. Walsh asked

Page 67: you about whether you recall any crew member being asked to clean the deck, and you said that you did not, correct? A Yes, I don't recall nobody asking me to clean the deck or something, yes.

Page 67: Q But you testified earlier and would agree with me that had a member of the Kiran Bosphorus crew been asked to clean the deck of the loose cargo, it was their responsibility to do that, correct? A I mean it is -- how can I say? It's not a particle of paper or particle of order, it's general in our trainings, we speak about the cargo operations trainings, and I

Page 68: always teach them, I always tell them to keep the deck clean.

Page 69: Q Melih, you were reading my mind. You didn't, personally, receive it, but you can't speak for every crew member of the Kiran Bosphorus that was aboard the vessel on April 2nd, correct? A Yes.

# *Statement of Facts*

## *MV KIRAN BOSPHORUS*

4739 UTICA STREET, SUITE 103
METAIRIE, LOUISIANA 70006 USA
PHONE: 504 455-8462
FAX: 504 455-8650
EMAIL: MISSRIVER@BLUEWATERSHIPPING.COM
WWW.BLUEWATERSHIPPING.COM

ASBA Cerfitied Agents

***DATED:****MARCH/APRIL 2019*

MV: KIRAN BOSPHORUS
MASTER: IN: E. TERZI OUT: F. BAYAR
FLAG: MALTA - MT (229)
REGISTERED NET TONS: 21,610
REGISTERED GROSS TONS: 36,353
SUMMER DEAD WEIGHT: 63,549
IMO #: 9576997 CALL SIGN: 9HA3609
CLASS:
SATCOM: EMAIL: kiranbosphorus@pasifikgemi.com TEL 7739 14 864
VOYAGE CHARTERERS: SABIC
TIME CHARTERERS: PACIFIC BULK SUPERMAX
Stevedores: ARTCO
REGISTGERED OWNER: ARCHER SHIPPING LTD.
BERTH/S: ARTCO MILE 121.0 BUOYS
DESTINATION: PASCAGOULA, MS
CARGO: UREA

************************************************************************************************************

SATURDAY
MARCH 09, 2019

**0920 DROPPED ANCHOR SWPASS PER PILOTS INSTRUCTIONS (DUE TO CONGESTION); NOR TENDERED**
0920-2400 VESSEL IDLE AWAITING ANCHORAGE AVAILABILITY

SUNDAY
MARCH 10, 2019

0000-2400 VESSEL IDLE AWAITING ANCHORAGE AVAILABILITY

MONDAY
MARCH 11, 2019

0000-2400 VESSEL IDLE AWAITING ANCHORAGE AVAILABILITY

TUESDAY
MARCH 12, 2019

0000-2400 VESSEL IDLE AWAITING ANCHORAGE AVAILABILITY

WEDNESDAY
MARCH 13, 2019

0000-2400 VESSEL IDLE AWAITING ANCHORAGE AVAILABILITY

THURSDAY
MARCH 14, 2019

0000-2400 VESSEL IDLE AWAITING ANCHORAGE AVAILABILITY

# Statement of Facts

## MV KIRAN BOSPHORUS

FRIDAY
MARCH 15, 2019

0000-2400 VESSEL IDLE AWAITING ANCHORAGE AVAILABILITY

SATURDAY
MARCH 16, 2019

0000-0450 VESSEL IDLE AWAITING ANCHORAGE AVAILABILITY
0450 ANCHORS AWEIGH
0620 ARRIVED PILOT STATION - PILOT BOARDED
0652 ENTERED BREAKWATER
0925 CHANGED PILOTS AT PILOTTOWN
1610 DROPPED ANCHOR AT MAGNOLIA ANCHORAGE (NO SPACE UPRIVER ANCHORAGES)
1630 FINISHED WITH ENGINES
**ARRIVAL CONDITIONS:** HSFO. 434.0 MT LSFO. 99.3 MT LSMGO. 87.30 MT FW. 215.0
DRAFTS: FWD 12.42 AFT 12.48
1630-2400 VESSEL IDLE AT MAGNOLIA ANCHORAGE AWAITING BERTH AVAILABILITY

SUNDAY
MARCH 17, 2019

0000-1420 VESSEL IDLE AT MAGNOLIA ANCHORAGE AWAITING BERTH AVAILABILITY
1420 PILOT ON BOARD FOR RE-ANCHORING AS PER MASTER'S REQUEST (DUE TO STRONG CURRENT VESSEL PUSHED CLOSE TOO CLOSE TO OTHER VESSEL)
1450 ANCHOR HEAVE UP / CLEAR
1510 DROPPED BOTH ANCHORS
1550 RE-ANCHOR COMPLETE
1550-2400 VESSEL IDLE AT MAGNOLIA ANCHORAGE AWAITING BERTH AVAILABILITY

MONDAY
MARCH 18, 2019

0000-1230 VESSEL IDLE AT MAGNOLIA ANCHORAGE AWAITING BERTH AVAILABILITY
1230 ENGINE STANDBY
1440 PILOT ON BOARD
1450 STARTED HEAVING UP ANCHOR
1520 ANCHOR IS CLEAR (BOTH OF ANCHOR)
1530 STARTED RE-ANCHORING (DROPPED ANCHOR)
1630 COMPLETED RE-ANCHORING
1700 PILOT OFF
1700-2400 VESSEL IDLE AT MAGNOLIA ANCHORAGE AWAITING BERTH AVAILABILITY

TUESDAY
MARCH 19, 2019

0000-2400 VESSEL IDLE AT MAGNOLIA ANCHORAGE AWAITING BERTH AVAILABILITY

WEDNESDAY
MARCH 20, 2019

0000-2400 VESSEL IDLE AT MAGNOLIA ANCHORAGE AWAITING BERTH AVAILABILITY

THURSDAY
MARCH 21, 2019

0000-2400 VESSEL IDLE AT MAGNOLIA ANCHORAGE AWAITING BERTH AVAILABILITY

# Statement of Facts

## MV KIRAN BOSPHORUS

FRIDAY
MARCH 22, 2019

0000-2400 VESSEL IDLE AT MAGNOLIA ANCHORAGE AWAITING BERTH AVAILABILITY

SATURDAY
MARCH 23, 2019

0000-2400 VESSEL IDLE AT MAGNOLIA ANCHORAGE AWAITING BERTH AVAILABILITY

SUNDAY
MARCH 24, 2019

0000-2400 VESSEL IDLE AT MAGNOLIA ANCHORAGE AWAITING BERTH AVAILABILITY

MONDAY
MARCH 25, 2019

0000-2400 VESSEL IDLE AT MAGNOLIA ANCHORAGE AWAITING BERTH AVAILABILITY

TUESDAY
MARCH 26, 2019

| | |
|---|---|
| 0000-2345 | VESSEL IDLE AT MAGNOLIA ANCHORAGE AWAITING BERTH AVAILABILITY |
| 2345 | PILOT ORDERED FOR RE-ANCHORING OR SHIFTING ANOTHER ANCHORAGE FOR SAFETY DUE TO VESSEL DRAGGING ANCHORS DUE STRONG CURRENT/HIGH RIVER |
| 2345-2400 | AWAITING PILOT FOR RE-ANCHORING |

WEDNESDAY
MARCH 27, 2019

| | |
|---|---|
| 0000-0235 | AWAITING PILOT FOR RE-ANCHORING |
| 0235 | PILOT BOARDED |
| 0310 | ANCHORS AWEIGH |
| 0645 | DROPPED ANCHOR DOCKSIDE ANCHORAGE |
| 0655 | FINISHED WITH ENGINES |
| 0655-2400 | VESSEL IDLE AWAITING BERTH AVAILABILITY |

THURSDAY
MARCH 28, 2019

0000-2400 VESSEL IDLE AWAITING BERTH AVAILABILITY

FRIDAY
MARCH 29, 2019

| | |
|---|---|
| 0000-1245 | VESSEL IDLE AWAITING BERTH AVAILABILITY |
| 1245 | MASTER ADVISED THAT VESSEL NEEDS PILOT ASAP FOR RE-ANCHORING DUE TO STRONG CURRENT VESSEL WAS PUSHED TOO CLOSE TO OTHER VESSEL |
| 1245-1430 | AWAITING PILOT FOR RE-ANCHORING |
| 1430 | PILOT ON BOARD |
| 1435 | ANCHORS UP - START MANEUVERING |
| 1630 | COMPLETED MANEUVERING |
| 1710 | PILOT AWAY |
| 1710-2400 | VESSEL IDLE AWAITING BERTH AVAILABILITY |

# Statement of Facts

## MV KIRAN BOSPHORUS

SATURDAY
MARCH 30, 2019

| | |
|---|---|
| 0000-2400 | VESSEL IDLE AWAITING BERTH AVAILABILITY |

SUNDAY
MARCH 31, 2019

| | |
|---|---|
| 0000-2400 | VESSEL IDLE AWAITING BERTH AVAILABILITY |

MONDAY
APRIL 01, 2019

| | |
|---|---|
| 0000-0400 | VESSEL IDLE AWAITING BERTH AVAILABILITY |
| 0400 | PILOT ON BOARD |
| 0432 | ANCHORS AWEIGH |
| 0432-0727 | TRANSIT MISS RIVER |
| 0727 | CHANGED PILOTS PASSING NEW ORLEANS GENERAL ANCHORAGE |
| 0727-1003 | TRANSIT MISS RIVER |
| 1003 | TWO (2) TUGS ALONGSIDE |
| 1040 | FIRST LINE OUT |
| 1200 | ALL FAST MILE 110.0 MIDDLE BUOYS |
| 1205 | TWO (2) TUGS RELEASED |

MONDAY
APRIL 01, 2019 (CONT'D)

| | |
|---|---|
| 1205-1335 | VESSEL AT BERTH AWAITING CRANE |
| 1335 | RIG ALONGSIDE |
| 1335-1445 | STANDBY - STEVEDORES PREPARING RIG FOR CARGO OPERATIONS |
| **1445** | **COMMENCED DISCHARGE OPERATIONS** |
| 1445-2030 | CONTINUOUS CARGO OPERATIONS |
| 2030-2400 | STANDBY FOR RAIN |

TUESDAY
APRIL 02, 2019

| | |
|---|---|
| 0000-0005 | STANDBY FOR RAIN |
| 0005-2400 | CONTINUOUS CARGO OPERATIONS |

WEDNESDAY
APRIL 03, 2019

| | |
|---|---|
| 0000-1855 | CONTINUOUS CARGO OPERATIONS |
| 1855 | FIRST RIG OFF |
| 1855-2400 | CONTINUOUS CARGO OPERATIONS |

THURSDAY
APRIL 04, 2019

| | |
|---|---|
| 0000-0055 | CONTINUOUS CARGO OPERATIONS |
| 0055-0145 | STANDBY - CRANE MAINTENANCE |
| 0145-0530 | CONTINUOUS CARGO OPERATIONS |
| 0530-2400 | STANDBY FOR RAIN |

FRIDAY
APRIL 05, 2019

# Statement of Facts

## MV KIRAN BOSPHORUS

0000-1030 STANDBY FOR RAIN
1030-1855 STANDY FOR RAIN / FOG
1855-2125 CONTINUOUS CARGO OPERATIONS
2125-2335 STANDBY DUE TO FOG
2335-2400 CONTINUOUS CARGO OPERATIONS

SATURDAY
APRIL 06, 2019

0000-0005 CONTINUOUS CARGO OPERATIONS
0005-1025 STANDBY DUE TO FOG
1025-2400 CONTINUOUS CARGO OPERATIONS

SUNDAY
APRIL 07, 2019

0000-0210 CONTINUOUS CARGO OPERATIONS
0210-0750 STANDBY DUE TO FOG
0750-0955 STANDBY DUE TO RAIN
0955-1440 CONTINUOUS CARGO OPERATIONS
1440-1900 STANDBY DUE TO RAIN
1900-1925 CONTINUOUS CARGO OPERATIONS
1925-2400 STANDBY DUE TO RAIN

MONDAY
APRIL 08, 2019

0000-0110 STANDBY DUE TO RAIN
0110-0710 CONTINUOUS CARGO OPERATIONS
0710-0715 STANDBY: VESSEL OPENING HOLD
0715-1410 CONTINUOUS CARGO OPERATIONS
1410-1500 STANDBY DUE TO RAIN

MONDAY
APRIL 08, 2019 (CONT'D)

1500-2200 CONTINUOUS CARGO OPERATIONS
2200-2330 STANDBY DUE TO RAIN
2330-2400 CONTINUOUS CARGO OPERATIONS

TUESDAY
APRIL 09, 2019

0000-1040 CONTINUOUS CARGO OPERATIONS
1040 SECOND CRANE SECURE
1040-2400 CONTINUOUS CARGO OPERATIONS

WEDNESDAY
APRIL 10, 2019

0000-2400 CONTINUOUS CARGO OPERATIONS

THURSDAY
APRIL 11, 2019

0000-0220 CONTINUOUS CARGO OPERATIONS
0220 FIRST CRANE OFF
0220-0255 CONTINUOUS CARGO OPERATIONS

# *Statement of Facts*

## *MV KIRAN BOSPHORUS*

| | |
|---|---|
| 0255 | DRAFT SURVEY COMMENCED |
| 0255-0300 | CONTINUOUS CARGO OPERATIONS |
| **0300** | **CARGO OPERATIONS COMPLETE. PILOT ORDERED FOR 1100 HRS DUE TO EARLIEST AVAILABLE PILOT.** |
| 0435 | DRAFT SURVEY COMPLETED |
| 0435-0615 | VESSEL IDLE AWAITING REMOVAL OF SECOND CRANE |
| 0615 | SECOND CRANE OFF |
| 0615-1045 | VESSEL IDLE AWAITING SAILING PILOT |
| 1045 | PILOT ON BOARD |
| 1045-1315 | STANDBY - WAITING TERMINAL TUGS/LINESMEN |
| 1315 | 2 TUGS ALONGSIDE |
| 1320 | START UNMOORING |
| 1345 | LAST LINE RELEASED |
| 1515 | TURNED FOR SEA, 2 TUGS RELEASED – PROCEEDING SOUTHBOUND TO SWPASS<br>**DEPARTURE CONDITIONS:** FUEL OIL: 1534.00 MT LSMGO: 87.90 MT FWATER: 50.00 MT<br>DRAFT FWD : 4.06 M DRAFT AFT : 8.36 M |
| 1515-1627 | TRANSIT MISS RIVER |
| 1627 | CHANGED PILOTS PASSING ALGIERS POINT |
| 1627-2140 | TRANSIT MISS RIVER |
| 2140 | CHANGED PILOTS PASSING PILOTTOWN |
| 2140-2300 | TRANSIT MISS RIVER |
| 2300 | DROPPED LAST OUTBOUND PILOT |

# *Statement of Facts*

## ***MV KIRAN BOSPHORUS***

# Statement of Facts

## MV KIRAN BOSPHORUS

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

******************************

| | |
|---|---|
| LLOYD J. GUSMAN, JR. | C. A. NO. 20-984 |
| VS. | SECTION "I-1" |
| ARCHER SHIPPING, LTD., KIRAN INTERNATIONAL HOLDING COMPANY, LTD., AND KIRAN HOLDINGS AS. | |

******************************

Deposition of MELIH CIFTCI taken on Wednesday, April 28, 2021, at the Law Offices of Lewis & Caplan, 3631 Canal Street, New Orleans, Louisiana 70119, via Zoom videoconference.

considered an Archer employee, or are you just a chief officer that Archer can contact to put under contract for one of those six-month rotations?
A I cannot understand your question exactly.
Q Sure. Before we bring Suleyman in, I'm going to try to explain this. So on a period like right now, where you're waiting to be assigned to a vessel, would you consider yourself an Archer employee? Like do you work for Archer right now when you're not under contract?
A No. As I said, I can sign from another company or another ship. I'm just free.
Q Okay. That explains it. So you basically, once you --
A I'm not connected, not connected with Archer Shipping anymore.
Q Understood. Okay. So, Melih, you said that you got your degree in the transportation and management engineering in 2012. Is it fair to say that since that time, you have been working in the maritime industry as a chief officer?
A No. I was working as a chief officer since

2017, I think, 2017. I'm not exactly sure the date, but must be beginning of 2017, I upgrade my license.
Q All right. So from that period from 2012 to 2017, were you working in the maritime industry?
A Yes.
Q What position were you working in in the maritime industry?
A Chief officer, oceangoing chief officer.
Q And let's clarify that a little bit. Because you said that it was in 2017 that you upgraded your license to chief officer, correct?
A Yes, 2017.
Q And so my appreciation, from what you said earlier, is that until you upgrade your license, you can't serve as a chief officer. Am I incorrect with that?
A You are correct. If you not upgrade your license to chief officer, you cannot serve as a chief officer.
Q Okay. So in that period from 2012 to 2017, what position were you serving in in the maritime industry?

A Some part of them, I was third officer and I was second officer.
Q Did you say "third officer"?
A Yes, third officer and the second officer.
Q Melih, can you do me a favor and explain to me what are the duties of a third officer aboard a shipping vessel like the Kiran Bosphorus?
A Third officer duty is keeping the watch, the navigational watch. And the third officer also responsible to help chief officer for safety and cycle the occupants maintenance. And he is on the bridge when maneuvering.
Q On the bridge with what, Melih?
A "Maneuvering." When maneuvering operations, third officer stay on the bridge.
Q "Monitoring"?

THE INTERPRETER:

No. During the maneuver work. Docking --

MR. STEPHENS:

"Maneuvering."

THE INTERPRETER:

"Maneuver." The third officer is on the bridge, yes, along with captain.

BY MR. STEPHENS:

Q Okay. Now, if you could, Melih, tell me what are the duties of the second officer aboard a shipping vessel like the Kiran Bosphorus?

A Second officer is a navigation officer. He keeps the charts up-to-date, prepares the voyage plan and keep also the navigational watch.

Q Now, you testified a moment ago that on April 2nd, 2019, you were the chief officer aboard the Kiran Bosphorus. Is that correct?

A Yes, correct.

Q Is it fair to say, Melih, that at that time you were serving under one of those six-month contracts that you previously described?

A Yes, correct.

Q What were your duties as the chief officer aboard that vessel?

A Also chief officer keeps navigational

watch, also is the safety officer of the ship and he leads the deck party for maintenance, also he is responsible for the ballast operations.
Q For what operations?
A Ballast operations.
Q "Ballast." Okay.
A Ballast operations, also for the cargo calculations, ship stability is also chief officer responsibility.
Q Now, Melih, if you could explain to me, so it's my understanding that at the time of the incident that we're here about today, the Kiran Bosphorus was anchored at the ADM mile marker 110 midstream in the Mississippi River. Do you recall being anchored on that day with the Kiran Bosphorus?
A I recall being anchored, but I don't remember the place that we anchored.
Q All right. And I'll represent to you that my understanding is that on that date and at that time, a cargo operation was taking place where cargo was being unloaded from the Kiran Bosphorus. Do you have any

specific recollection of that?
A Yes, I remember, because we discharging urea, I remember that one.
Q Urea or however it's pronounced?
A Urea.
Q It's basically like the white beady stuff for fertilizer, right?
A Right. Correct.
Q Okay. Got you. Now, let me ask you, during a cargo operation like that, what are the chief officer's duties aboard a vessel like the Kiran Bosphorus?
A Chief officer's duty is to prepare a discharge plan and also ballasting plan.
Q What would be involved in preparing a discharge plan?
A In discharge plan, you consider how many gangs they will use, and you have to consider your ballasting time, ballasting operation, and you also make the vessel always seaworthy according to some rules, and you have to keep the stability in the limits.
Q And once, as the chief officer, you develop that plan, would you provide the plan to

whatever company or crews were actually discharging the cargo?
A Yes, we present the plan to agent and the stevedore company and who ask for it, I can give the discharging plan, that's all.
Q And so, in your experience, and in particular relating to the Kiran Bosphorus, is it safe to say that, as the chief officer, you are working hand in hand with the cargo crew to discharge the cargo?
A Yes.
Q Okay. And so on April 2nd, 2019, you would agree that you were actually aboard the Kiran Bosphorus during those cargo operations?
A Yes.
Q Is it also fair to say that on that night, you, as the chief officer, had developed this discharge plan that we just discussed and provided it to whatever company was actually discharging the cargo?
A Yes.
Q All right. Prior to April 2nd, 2019, had you ever participated in any cargo operation where cargo was being discharged

from a vessel?
A From any vessel?
Q Any vessel, yes, sir.
A Yes. Yes.
Q All right. And prior to April 2nd, 2019, had you participated in a cargo operation where cargo was being discharged from a vessel as a chief officer?
A Sorry. I don't understand.
Q Let me ask it another way because I know that was pretty long-winded. It defeated my attempt to ask a simple question.
Was April 2nd, 2019, the first time that you were acting as a vessel's chief officer during a cargo discharge operation?
A No.
Q All right. Prior to April 2nd, 2019, had you ever acted as the Kiran Bosphorus chief officer during a cargo discharge operation?
A Let me think. No. That was our first discharging operation on the Kiran Bosphorus.
Q But on other vessels, before April 2nd, 2019, you had acted as the chief officer for a cargo discharge operation?

A Yes.
Q And is it fair to say that, in those instances, you similarly prepared a cargo discharge plan such as the one you've already described?
A Yes.
Q All right. And you mentioned the cargo that was being discharged on April 2nd, 2019, was urea, correct?
A Yes, it was urea.
Q And you would agree with me, that is bulk cargo, correct?
A Yes, correct.
Q Meaning that it's just loose cargo, it's not packaged or in a container?
A Yes, correct.
Q Prior to April 2nd, 2019, had you ever acted as a vessel's chief officer when the cargo being discharged was bulk cargo?
A Yes.
Q So April 2nd, 2019, was not your first time preparing a cargo discharge plan for bulk cargo?
A Yes, it was not the first time.
Q All right. So you had participated in that

process as a chief officer before April 2nd, 2019?
A Yes. In other ships, yes.
Q Yes, in other ships. And just as you would have on the Kiran Bosphorus, on those other vessels, you worked hand in hand with the cargo company actually discharging the material, correct?
A Yes.
MS. WALSH:
Object to the form of the question.
BY MR. STEPHENS:
Q Sure. And when I say "work hand in hand," Melih, I'm not saying that you're actually out there operating the crane. I'm saying that you're developing the discharge plan, you're providing that to the cargo company, and --
A Yes, sir.
Q -- there's that communication and interaction, correct?
A Yes, but only one thing. Yes, I'm head for the cargo discharge operation, but I am not on duty for 24 hours. Like the

navigational situation, in discharging, we also have watch with the other officers, second officer and third officer.
Q Right.
A We make part by part, and they have their own duty to follow the cargo discharge operation.
Q And that's a fair clarification. So to try to get the stepping stones put together, as the chief officer for the vessel, you would develop the discharge plan, correct?
A Yes, correct.
Q All right. And then you would provide that to the company or crew that would actually be the ones to put that plan into action?
A Yes. Also I represent this plan to captain and other officers, so in their duty, they follow that plan.
Q All right. And then after you submit the plan to the crew that's discharging, during the operation, other officers would share the watch?
A Yes, correct.
Q All right. In your experience, Melih, when bulk cargo is being discharged from a

vessel like the Kiran Bosphorus, is it true
that sometimes that cargo will spill onto
the deck of the ship?
A Yes.
Q Is it fair to say that you had actually
seen that happen firsthand prior to April
2nd, 2019?
A Yes, I have seen that kind of spills
before.
Q In your experience, when that happens, who
is responsible for cleaning the loose cargo
from the deck of the ship?
A It depends on the -- which country you are.
It depends on the -- which port you are.
Q So we'll narrow the scope since we're -- I
know -- I'll put it this way, Melih: I'm
ignorant to how many countries there are in
the world, but let's narrow it to the U.S.
because the incident that we're here about
today occurred in the United States and, in
particular, in Louisiana.
And so let me ask, I guess, a question to
lay the foundation first. Had you ever
acted as a chief officer for a cargo
discharge operation in the United States

A Yes, yes.
Q So the cargo discharge plan that you, as the chief officer, would put together, would dictate when the crane would move from one hold to another to discharge cargo?
A In my plan, I only say we will discharge number 1, 2, 3, 4 or 5. I'm not including in the crane's moving operations or the crane moving operations. It depends on them. I just say you will discharge from number 2 or, just example, number 5, and then after 1,000 ton, you go number 3 again. Like that, I say.
Q Right. And that's what I was meaning, is that you would basically prepare the plan that says, all right, we're going to discharge however many pounds from this hold --
A Yes.
Q -- and once we reach that amount, the next hold that's going to be unloaded is whichever one you designate, they'll unload a certain amount. And so basically you prepare the plan for them that tells them

which holds are going to be unloaded in what order --
A Yes.
Q -- and then how many pounds as they move along, correct?
A Yes, correct.
Q Okay. And so I understand you don't tell them how to move the crane barge, but you would agree with me that to get from one hold to another on the vessel, the crane barge would have to be moved?
A Yes.
Q All right. Look, Melih, you're doing a great job --
A Can I make an addition?
Q Yes. Absolutely.
A In fact, I do not say when they finish one step in the discharging sequence. They just finish according to their calculation, and they change it. So when they change it, I don't say -- I mean, every step, I don't call anybody and change it. It's just automatic --
Q Yes, sir.
A They just go --

Melih, you're doing a great job because I can promise you there's a lot of witnesses I depose where English is their first language and they don't understand what I'm trying to ask. So you're doing awesome. Okay?
A Thank you.
Q In your experience, Melih, when discharging bulk cargo from a vessel like the Kiran Bosphorus, is it the ship's crew that would discharge it, or does another company come in to actually discharge it?
A Another company come and discharge, not ship crew.
Q And would you agree with me that when a cargo company is discharging bulk cargo from the vessel, that company's employees would have to board the vessel in order to move the crane barge's wires that would allow the crane barge to access another hold?
A Mostly, yes.
Q Now, in your experience, while the cargo is actually being discharged, would the cargo company's employees stay on the crane

barge?
A I don't remember. Sometimes they stay on board; sometimes they stay on the crane barge. But the crane drivers, discharging guy, was on the crane barge. I recall like that, yes, he was on the crane barge (indicating).
Q Sure. Sure. Now, in the instances where the cargo company's employees have to get on the vessel so the crane barge can be moved, would you agree with me that if there's loose cargo on the ship's deck before those cargo company employees get on the vessel, that the ship's crew is responsible for clearing the deck?
A Yes.
Q And was that the case on April 2nd, 2019, with the Kiran Bosphorus?
A I don't understand what you're asking.
Q Would that be the same protocol on the Kiran Bosphorus on the night of April 2nd, 2019?
A Yes, we prepared the ship for the discharge operation, that's our responsibility.
Q And so, to state it another way, you would

agree with me that the ship's crew was responsible for clearing the deck of loose cargo before the cargo company employees boarded the ship to move the wires for the crane barge?
A Yes, but, as I said, it depends on the agreement with the chief foreman, it depends on the agreement with the chief foreman. In my experience, as I say, I made the guys clear the deck, close the hatch covers, et cetera, et cetera.
Q So, hypothetically, on April 2nd, 2019, if you would have been the officer on watch and would have seen loose cargo on the deck, you would have ordered your crew members to clear the deck of that loose cargo before the cargo company employees got on the ship?
A Yes, but it depends on the loose cargo's position. If the loose cargo is on the crane working area, I cannot order that kind of thing.
Q Right. And I don't mean the crane. I just mean on the deck of the ship, like the walkway of the ship.

A I mean --
(Zoom videoconference connection interrupted.)
(Off-the-record discussion)
Q So you were explaining, Melih, that it kind of depends on where the loose cargo is located, right?
A Yes.
Q All right. I'm going to show you a picture, which I'll represent to you has been provided to us and has also been represented as depicting what the deck of the Kiran Bosphorus looked like on the night in question. Okay? And I don't have a fancy way to put it up on your screen, so I'm just going to hold it up here. Can you see it, Melih (indicating)?
A Yes, I can see the picture.
Q Now, does that appear to you to be the deck of the Kiran Bosphorus, as best you can tell?
(Zoom videoconference connection interrupted.)
(Off-the-record discussion)
Q Do you recognize that as being the deck of

that the deck is pretty well covered in that substance, correct?
A Yes. But, I mean, in normal cases, we got more cargo on deck, not like that. You know, sometimes you can't see the red place or the green place.
Q Okay. And with the cargo being located where it is on the deck -- because what I want to do, Melih, is get back to that question I had for you about when you would order the ship's crew to go sweep the deck and clear the loose cargo. In the situation as depicted in that photograph, would you order the ship's crew to sweep the deck of that loose cargo before the cargo company's employees boarded the vessel?
A Yes, in this situation, I order.
Q All right. Now, Melih, I'd like to talk to you specifically about the April 2nd, 2019, accident that we're here about. Prior to being notified, I guess, either by Archer or your attorneys in this case about the accident, did you know that it had occurred?

A No.
Q Do you recall when you first learned about Mr. Gusman's accident aboard the Kiran Bosphorus?
A Maybe two months ago.
Q Do you recall how it is you were notified about the accident?
A Mr. Rafet called me and told me about the accident, and he request me to share my knowledge, share my experience with the lawyers, company's lawyers.
Q All right. Do you recall being aboard the Kiran Bosphorus on April 2nd, 2019?
A Yes, I recall I was on board.
Q And at that time, you were the vessel's chief officer, correct?
A Yes, correct.
Q And so, based on your earlier testimony, as the vessel's chief officer, you prepared the cargo discharge plan?
A Yes, correct.
Q And is it also correct that the Kiran Bosphorus was anchored midstream in the Mississippi River during that cargo discharge?

would board the Kiran Bosphorus in order to shift the crane barge's wires so that another hold could be accessed?
A I just recall some guys coming and moving the barge and asking for some cargo-related questions, yes, but I don't exactly remember what time they come or what date they come, though.
Q Okay. In your experience, though, it would be customary for the cargo company employees to board the vessel in order to shift the wires so the crane barge could move to the next hold according to the cargo plan?
A Yes.
Q Melih, based on your recollection, on April 2nd, 2019, while that bulk cargo was being discharged from the Kiran Bosphorus, was cargo spilling onto the deck of the ship?
A Yes, because they were using the crane's grip. Yes, I think there was some spillage.
Q In the photograph that I showed you -- which I won't try to show you again -- does that appear to depict the spillage of cargo

onto the deck of the Kiran Bosphorus?
A Yes, looks similar.
Q All right. And you testified previously that if the deck of the Kiran Bosphorus appeared as it does in that photograph, you would have ordered the ship's crew to sweep that cargo off the deck before the cargo company's employees boarded the vessel to shift wires for the crane barge. Is that a fair summation?
A It's fair, but I want to make an addition.
Q Sure.
A As I said before, it depends on the crane operating area and, also, it depends on because our crew have other jobs, just checking mooring lines and other duties they have. So I ordered that, I can say time by time, when you find time, just keep the deck clean.
Q Okay. But you would agree with me that of the duties that you just described, one of the duties of the ship's crew would be to keep the deck clear of loose cargo, correct?
A Yes, correct.

Q And I know you talked about, like, the crane area and stuff, but at least the photograph that I showed you, you would agree with me that that's one of the areas that the ship's crew would be responsible for clearing the loose cargo before the cargo crew got on board to shift wires, correct?
A Yes, but -- yes, but my personal opinion, as I said, it depends on the time because, you know, ship is very big, it's about 200 meters, and it's difficult to keep clean deck area for all the time.
Q Sure.
A It's very, very big area.
Q Sure.
A I mean, and anytime I can find some area to make it clean, but I have only one guy for this duty. So it means one guy doing his best to keep deck clean (indicating).
Q Okay. Now, are you aware that on April 2nd, 2019, the Kiran Bosphorus deck was not cleared of loose cargo prior to Mr. Gusman or his co-employees boarding the ship?
A I don't know. I mean, I don't remember, in

your patience. I'm going to take a look at my notes.

Tarryn, if you have any questions --

MS. WALSH:

Yes, I've got a couple. So do you want me to go now while you're --

MR. STEPHENS:

Yes, go ahead. That's fine.

EXAMINATION

BY MS. WALSH:

Q All right, Melih. Just a few questions for me, and I might be jumping around a little bit. So on the day of the accident that we're talking about here, April 2nd, did anybody from the cargo company or any of the stevedores ask you to clean the deck?

A No, nobody ask it to me.

Q Are you aware of anybody asking your crew members to do so?

A No. I think -- as I said, no, I don't remember nobody ask it to me or I don't remember asking to our crew to clean the deck or something else.

Q And Barrett may have asked this, but did

anybody notify you that an accident had occurred?
A No.
Q I'm sorry. On April 2nd?
A Yes, I understand you. No. I just heard it two or three months ago by Mr. Rafet Saygin.
Q And we talked a little bit about the green walkway on the deck.
A Okay.
Q And so the paint for that walkway, am I correct in understanding that it's a nonskid paint?
A Yes, it's nonskid.
Q Okay. And when stevedores or the cargo company employees are on the deck of the ship, are they supposed to remain in that green walkway?
A Yes, they supposed to remain on the green walkway.
Q And if the stevedores were going to unhook the barge wire, could they have done that by walking in the green walkway?
A Yes. Yes.
Q I think we talked a lot about this, as

well. But your job -- or one of your
duties was to develop the discharge plan
for the cargo discharge. Correct?
A Correct.
Q Okay. But the ship's crew is not involved
in conducting the actual discharge
operation?
MR. STEPHENS:
Objection to form.
THE WITNESS:
That's correct.
BY MS. WALSH:
Q Okay.
A We just supervising the operation, we just
following the operation.
Q Okay. Kind of just keeping an eye on it,
is that fair?
A Yes, make calculations and just following
the steps with the guys.
Q And, now, if one of the cargo company
employees or stevedores, if they don't
believe it's safe to walk on the deck, are
they free to wait until the deck is clear?
MR. STEPHENS:
Object to the form.

THE WITNESS:
Yes, they free to wait.
MS. WALSH:
Okay. I think that's all I've got. Thank you.

EXAMINATION

BY MR. STEPHENS:
Q Melih, I'm going to tell you one of the most dangerous things an attorney ever tells a witness: I think I only have one more question. Okay? So Ms. Walsh asked you about whether you recall any crew member being asked to clean the deck, and you said that you did not, correct?
A Yes, I don't recall nobody asking me to clean the deck or something, yes.
Q But you testified earlier and would agree with me that had a member of the Kiran Bosphorus crew been asked to clean the deck of the loose cargo, it was their responsibility to do that, correct?
A I mean it is -- how can I say? It's not a particle of paper or particle of order, it's general in our trainings, we speak about the cargo operations trainings, and I

WITNESS' CERTIFICATE

I, MELIH CIFTCI, have read or have had the foregoing testimony read to me, pursuant to Rule 30(e) of the Federal Rules of Civil Procedure and/or Article 1445 of the Louisiana Code of Civil Procedure, and hereby certify that, to the best of my ability and understanding, it is a true and correct transcription of my testimony.

(Check one)

____ Without corrections.

✓ With corrections as reflected on the errata sheet(s) prepared by me and made a part hereof.

DATED: 20 May 2021 SIGNED: [signature]
MELIH CIFTCI



Exhibit C
Archer Motion to Exclude

TRANSCRIPT AMENDMENT SHEET

4/28/2021 Deposition of: **MELIH CIFTCI**

| Page No. | Line No. | Correction |
| --- | --- | --- |
| 42 | 1 | Insert crane working area explanation as |
| | | follows after "I mean --": "crane working |
| | | area means an area under a working crane |
| | | boom where considered working and passing |
| | | inside of that area is dangerous and not |
| | | permitted." |
| 52 | 21 | Insert "grab" in lieu of "grib" |
| 43 | 9-10 | Insert punctuation as follows: ...but I |
| | | cannot say exactly "yes, it's the Kiran |
| | | Bosphorus." ... |

**UNITED STATES DISTRICT COURT**

**EASTERN DISTRICT OF LOUISIANA**

| | | |
|---|---|---|
| **LLOYD J. GUSMAN, JR.** | * | **CIVIL ACTION NO. 20-984** |
| | * | |
| **VS.** | * | **SEC. I(1)** |
| | * | |
| **ARCHER SHIPPING, LTD., KIRAN INTERNATIONAL HOLDING COMPANY, LTD., and KIRAN HOLDING AS** | * * * * | **JUDGE LANCE M. AFRICK** **MAG. JUDGE van MEERVELD** |

**************************************

**DECLARATION OF MELIH CIFTCI PURSUANT TO 28 U.S.C. §1746**

1. My name is Melih Citfci, I am of the age of majority, and I have personal knowledge of all matters stated herein.
2. In April 2019, at all times pertinent to the captioned lawsuit, I served as the Chief Officer aboard the M/V KIRAN BOSPHORUS, a bulk cargo carrier owned by Archer Shipping Ltd.
3. At the times pertinent to the captioned lawsuit in April 2019, the KIRAN BOSPHORUS was moored in the Mississippi River and undergoing midstream cargo discharge operations for the bulk urea cargo the vessel was carrying on that voyage.
4. While in my role as Chief Officer aboard the KIRAN BOSPHORUS at that time she was moored in New Orleans, I took the three (3) photographs attached to this Declaration as Exhibits D-1, D-2 and D-3.
5. The first photo (labeled Exhibit D-1) was taken on 2 April 2019, as confirmed by the photo's file properties. This photo illustrates that cargo discharge operations were occurring on the starboard side of the KIRAN BOSPHORUS, and the barge pictured



Exhibit D
Archer Motion to Exclude

alongside is the stevedore's crane barge. Also pictured in Exhibit D-1 is the bulk cargo of urea in the cargo hold.

6. The second photo (labeled Exhibit D-2) was taken on 6 April 2019, as confirmed by the photo's file properties. This photo shows the crane barge along the starboard side of the KIRAN BOSPHORUS. Suspended from the crane is the ste4vedore's red clambucket used to discharge the bulk urea from the vessel's cargo holds. That clambucket scoops the urea from the vessel cargo hold, then swings back over the deck of the vessel and unloads the cargo into the midriver barges moored to the far side of the crane barge.
7. The third photo (labeled Exhibit D-3) was taken on 9 April 2019, as confirmed by the photo's file properties. This photo shows the red clambucket in action during the cargo discharge operation, suspended over the portion of the deck in front of the cargo hold that it was discharging.
8. In all of the photos attached hereto, the pictured green walkway that is outlined in yellow paint is the non-skid walkway on the KIRAN BOSPHORUS.
9. I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed at Atlantic Ocean, on this 13 day of July, 2021.

[signature]

**MELIH CIFTCI**

4849-0366-5904, v. 1



Exhibit D
Archer Motion to Exclude




Exhibit D-1



Exhibit D-2




Exhibit D-3

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

```
*****************************
                            *
LLOYD J. GUSMAN, JR.        *
                            *  C.A. NO. 20-984
     VS.                    *
                            *  SECTION "I"(1)
ARCHER SHIPPING, LTD., KIRAN *
INTERNATIONAL HOLDING       *
COMPANY, LTD., AND KIRAN    *
HOLDINGS AS.                *
                            *
*****************************
```

Deposition of EMIL ROY BRUPBACHER, JR., taken on Friday, April 9, 2021, at the Law Offices of Lewis & Caplan, 3631 Canal Street, New Orleans, Louisiana 70119.

A I worked for Coastal Cargo.
Q How long did you work for Coastal?
A I was at Coastal from -- I'd say a little over two years.
Q What position did you hold at Coastal?
A I first was a -- I started as a terminal manager and then moved up to general superintendent.
Q What were your responsibilities as a terminal manager at Coastal Cargo?
A As a terminal manager, I oversaw the daily operations of the terminal, loading of trucks, unloading of trucks, loading railcars, unloading barges, loading barges. You know, not necessarily barges that were attached to the vessel; just basically cargo that came out of the terminal, into barges as opposed to the vessels.
Q Where did you work prior to Coastal Cargo?
A New Orleans Terminal.
Q How long did you work there, sir?
A Ten years.
Q And, backing up, you said you were also general superintendent at Coastal Cargo. What were your duties in that position,

sir?
A That was overseeing the vessel operations.
Q And when you say "vessel operations," would that be loading and unloading cargo from vessels to barges or from barge --
A Vessel -- sorry.
Q -- or from barge to vessel?
A Vessel to dock, dock to vessel, vessel to barge, barge to vessel, you know, anything -- anything to deal with going from and to the water with the vessel included in it. Sometimes we had vessels where you had some cargo came to the dock and other cargoes went into the vessels.
Q All right. Now, you said that prior to Coastal Cargo, you were employed at New Orleans Terminal for approximately ten years. What position or positions did you hold at New Orleans Terminal?
A So, vessel superintendent, rail operations manager, warehouse operations manager, facility security officer, customs operations manager.
Q Can you identify which of those positions would have included duties such as the ones



Exhibit E
Archer Motion to Exclude

A I did.
Q Would you and Mr. Pack work simultaneously, I guess, with shifts or different Coastal crews?
A Yeah, I would -- I actually gave Robert Pack the promotion to foreman. He -- he would be -- he would run several -- you know, he would run my crews all the time, whether it be at ADM or on a vessel at the dock at Napoleon Avenue.
Q All right. If you look, Mr. Brupbacher, on the left side of the page, it says, "Engaged in what work when injured," and it indicates, "Shifting wires on vessel." Are you familiar with what they mean by "shifting wires"?
A I am.
Q Can you explain to us, sir, what your understanding of that term is?
A Well, being as it's over at midstream, this tells me that they were probably -- they were shifting the wires so that they can shift -- they shift the wires from one hatch to the other or, depending on what location of the vessel, so that they can

shift the floating crane from one hatch to the next so they can start working on the next hatch.
Q Then, sir, if you look at the portion of that exhibit, it says, "Detailed Description of Accident." And I'll just read it briefly, and you can follow along. It says, "Mr. Gusman was aboard the vessel, pulling the lines of the Elisa A rig up to shift the rig from hatch 5 to hatch 4, when he slipped on the loose cargo that was on the deck of the vessel, causing him to fall backwards." Do you see that section, sir?
A I do.
Q Are you familiar with the Elisa A rig?
A I am.
Q Was that a Coastal Cargo rig, or was that an ADM rig?
A It's Coastal Cargo's floating crane.
Q Had you, prior to April 2nd, 2019, ever supervised Coastal Cargo crews that were working aboard the Elisa A?
A I have.
Q Prior to April 2nd, 2019, had you ever supervised Coastal crews that would shift

If you're coming on for your night shift, let's call it, the 12-hour night shift, is there some type of toolbox talk or safety meeting that the guys have before they get started?
A Over at ADM, they do a safety brief at the dock before they even go onto the boat to be transported out to --
Q The midstream?
A -- the midstream, out to the Elisa A.
Q And when you say "they," you mean "they" Coastal crew or "they" ADM plus Coastal?
A ADM. And they would hold a safety meeting at the main building that's right there by the dock where the ferry takes them from. Everybody is required to attend that safety meeting before they even get on the boat to go to the vessels or the cranes.
Q And is that safety meeting run by --
A ADM.
Q Right. Mindi or somebody else from ADM?
A Probably whoever the supervisor on that shift was.
Q Do you know whether typically there would be minutes kept where the people attending

would sign off on it?
A I don't know.
Q Did Coastal have its own pretour or preshift safety meetings?
A We did not do those since they were already doing safety briefs prior to getting on the ferry.
Q In April, 2019, if Coastal was working a job like this at a midstream location, would Coastal do its own JSA type paperwork?
A "JSA" meaning?
Q Job safety analysis or anything like that?
A This (indicating), we basically go with this, the injury report.
Q No. I'm talking about before the job. In other words, we just arrived, there's the ADM safety meeting you talked about.
A Right.
Q Would the Coastal foreman have any of his own paperwork or JSA's for an off-load like this?
A No.
Q "No"?
A "No."

Q Have you ever attended an ADM safety meeting like you would have anticipated they would have had in April of 2019?
A I did not.
Q Not that night, but have you ever been to that facility and attended their safety meetings?
A No, I have not attended their safety meetings.
Q So what about -- let's talk bigger picture from Coastal standpoint. Did Coastal workers like Mr. Gusman get any type of safety training other than what a company like ADM would offer them?
A Well, yeah. They -- well, what do you mean by "safety training"? Are you talking about -- they do first aid classes, they do --
Q Housekeepings, lifting, toxic gases, you know, anything that a worker could --
A No.
Q Coastal didn't offer that to them?
A No.
Q Does Coastal have an employee manual or safety manual that an employee like

Mr. Gusman would be given?
A They do training with the foremans.
Q But I want to go back to Coastal and ask for records that may pertain to safety, and I'm trying to figure out what to ask for.
A No, I understand. I understand.
Q Is there any -- like, if I went to them and said, "Give me the safety manual you would have given Gusman," do you think there's such a manual for its employees?
A If there is, I didn't see one.
Q And is there, to your knowledge -- whether it's at ADM or anywhere -- does Coastal have a toolbox talk form or a JSA form that says, "Hey, this is what you might encounter off-loading urea from a ship to a barge; let's watch out for X, Y or Z"? Is there such a form that you're aware of?
A No, there is not. What we did at Coastal was the superintendents would have a safety brief before they entered or boarded any vessels before going to work. They would basically go down and let them know what's going on for the day, what to watch out for, you know, make sure everybody had all

his PPE on, you know, and then the foremans would take their guys and they would team, say, the new guys up with more experienced guys, saying, "I need you to train them on this, I need you to train this one on that," and it's more of an OJT thing than anything.

Q And when you say "superintendent," do you mean Coastal, or do you mean ADM in this case?

A Coastal.

Q Is that you?

A No.

Q Which superintendent would you be --

A My vessel superintendents. I was the general superintendent.

Q Over everything?

A Over everything. And then I would have my vessel superintendents who would run the vessels. And then they would have the foremans that work for them, and they would work each -- like, you'd have this foreman in charge of this hatch and this foreman in charge of that hatch (indicating).

Q All right. So I should have probably

started with that. In terms of hierarchy for vessel operations, vessel loading and unloading, you'd be the top in terms of operations --
A Correct.
Q -- in your role? And then you have a vessel superintendent?
A Correct.
Q And below him would be a foreman like Mr. Pack?
A Right.
Q And below Mr. Pack would be the workers like Mr. Gusman and his other laborers?
A Correct.
Q And who would have been the vessel superintendent involved, if you know, for the Kiran Bosphorous' unloading in April of 2019?
A That would be an ADM employee. Because the ADM employee -- this is ADM's vessel, and we would send a crew to assist them in unloading their vessels. So whatever ADM superintendent was in charge of that vessel that day, he would be in charge of my crews.

Q And that might be the person who ran the meeting and gave the safety --
A That would probably be the person that ran the meeting.
Q Whereas if a job like this were being done at a Coastal facility as opposed to ADM, then you'd have your own vessel superintendent?
A That's correct.
Q And whoever that ADM superintendent was for this particular job that we're here about, you don't know who that was?
A I don't know.
Q ADM did that, correct?
A Correct.
Q So the urea cargo that we've been talking about, you described it to some extent, and I'm just going to probe a little bit more. Have you ever stepped on it, yourself?
A I have. It's very slippery.
Q Okay. And that's part of my question. Is it -- when you step on it, does it maintain its shape and integrity, or does it flatten out?
A No, it pretty much maintains its integrity.

Q So if it's granular, it's got a little roundness to it?
A Correct.
Q And it won't collapse flat when you step on it?
A No.
Q All right. And does it -- would it leak? Like, is there any liquid capacity to it that it would leak?
A It's not that it leaks. No, there's no liquid capacity to it.
Q Okay. So, in that sense, it's more like sand?
A Correct.
MR. STEPHENS:
Object to the form.
BY MR. TOMPKINS:
Q Well, I mean, sand doesn't leak, for example, right?
A Correct.
Q So you've got a ship like you see in the photograph in front of you, Exhibit 2, and I assume you've been on those kinds of ships for many years, correct?
A Correct.

Q And you know they have multiple cargo holds --
A Correct.
Q -- running from the bow all the way back to the house, for example, right?
A Correct. And sometimes behind the house.
Q Yes, and sometimes behind. And so the Coastal Cargo crane barge -- which in this case is the Elisa A, correct?
A Correct.
Q -- moves up and down the side of the ship, correct, to get alongside the hold that it's going to be working?
A Correct.
Q And if it's a bulk cargo like urea, is it like a clam bucket that's used to get the cargo out of the hold?
A That's correct.
Q Whose clam bucket is it?
A It would be -- well, it all depends. If the bucket that was on the Elisa A was damaged, sometimes they would borrow one from ADM, and ADM will let them borrow theirs.
Q Okay. So either ADM or Coastal, right?

A Correct.
Q So now I'm trying to picture this because I believe what we have established in this case is that the crane barge was on the starboard side of the ship, and then the barge to which the cargo was going to be transferred was on the starboard side of the crane barge, more midstream.
A Correct.
Q Can you envision what I'm saying?
A Yes. So it would be vessel, crane, barge (indicating).
Q Okay. So the vessel's crane reaches up and over the railing and over the hopper opening or whatever, to the hold?
A Right.
Q Drops the bucket in there, correct?
A Grabs a bucketful.
Q With an open jaw, so to speak, closes the jaws, correct? Picks it up, swings it back over the edge of the vessel, across the crane barge and over to the loading barge?
A Correct.
Q And when the bucket is doing that operation and coming across the crane barge

(indicating), is some of this urea going to come out of that bucket?
A Sometimes.
Q Is the crane operator able to prevent it from getting on the deck?
A It's hard to.
Q Okay. What causes or allows urea to come out of the bucket and onto the deck?
A Well, sometimes in the bucket -- depending on what cargo you're working, sometimes you use a sealed bucket, sometimes you use a nonsealed bucket. The nonsealed bucket is the one they use for the cargo that's of larger capacity, that it wouldn't be able to flow like water or something through a crack. The sealed bucket is the ones that you would use for, say, urea or sand or stuff like that, because it's so fine and so granular that it leaks from the bucket like water. So, you know, this looks like it could have leaked through the bucket onto the deck.
Q So, effectively, the bottom edge of the bucket where the jaws would close, right, what you're talking about?

A All the way around (indicating).
Q All the way around?
A Yes.
Q I see what you mean. And what about if it's windy, does it sometimes blow out of the top?
A That is correct.
Q So what we're looking at in this photograph, does that seem like a typical amount of urea to land on the deck after the Coastal crane operator is picking it up and moving it over, or is that more or less than typical?
A That looks like a typical deck whenever you're working urea for any crane operator.
Q Okay. So the best crane operator with the best bucket and no wind is still going to have some amount of urea come out, correct?
A Yes.
Q Now, when the crane operator is doing the operation and he's in position, the crane barge is in position, where are your guys typically standing?
A Once they get all the lines hooked up and moved, my guys get off the vessel and go

back to the floating crane.
Q So they're not even on the deck while --
A You might have one guy on the vessel who's watching inside the hold in case the crane operator can't see, to guide him to where there's more cargo for him to get a better scoop.
Q But would that guy typically be on the side opposite from where the cargo is being transferred? In other words, in this case, would he be on the port side, looking in?
A He would not be standing on the side where the bucket travels over because, obviously, he don't stand underneath the bucket while it's traveling over. So he can be on either one of the side (indicating), the forward or aft of the hold or on the port side of the hold, you know, wherever the crane operator and the guy decide for him to stand for best visibility.
Q So out of harm's way, essentially?
A Correct.
Q Because you don't want any of your men, from a safety standpoint, being underneath that load and having anything potentially

break or drop on them, correct?
A Correct.
Q And, obviously, with Mr. Gusman, you have no idea where he was as this cargo is being transferred, correct?
A Well, I don't know where he was while the cargo was being transferred. I mean, he -- like I said, everybody should have been on the floating crane, itself, while the cargo is being transferred.
Q All right. And then is there some communication that typically happens when a hold is finished where your guy calls the ship officer or crew member and says, "We're finished with hold 3, we want to move to hold 4"?
A Well, that would be the ADM supervisor's call of where they would shift them to. They had radios that they would contact, they would contact the ADM supervisor, let them know, "Hey, we're almost finished hatch 5." And then the ADM supervisor would say, "Okay, I need y'all to switch over to this hatch, y'all are going to work this hatch next."

Q All right. So just like you wouldn't want your crew in the area under which the clam bucket is passing overhead, you wouldn't expect the ship crew to be standing there during those operations, either, correct?
A That's correct.
Q So what I'm trying to figure out is you told Barrett earlier that it's the responsibility of the ship to clean up the area once the operation is over, right?
A Well, it's to make sure it's clear so they can continue to do the operations.
Q Right. And I'm trying to figure out how does the ship get word that we're finished and we're ready to move?
A The foreman is supposed to let the ADM supervisor know that we're finished in that hatch, and then the -- because the ADM supervisor would usually sit in an office inside of here (indicating).
Q What are you pointing at when you say "here"?
A Just at the house, there are some offices or some stuff like a -- it's called a -- I call it a superintendent's office.


Exhibit E
Archer Motion to Exclude

Q I'm just saying because when you say "here" on the record, we won't know what you're pointing at.
A I'm sorry. They would sit in an office that's attached to the house.
Q Of the ship?
A Of the ship, right. Or they would be in their office onshore. I don't know -- you know, depending on which supervisor was working. We would notify them, letting them know we're almost finished. They would notify the ship's crew, "Hey, we're going to shift from here to there." They would notify my guys where to shift to.
Q And would your guys have been trained that if they're going to shift lines, they shouldn't be walking on urea like that, because it could be slippery?
A As far as training, no, but as far as being told, yes.
Q Explain what you mean by that.
A Meaning there's no formal training class to say, "Hey, this is the dos and the don'ts." But your foremen are instructed to make sure that nobody walks in these things and



Exhibit E
Archer Motion to Exclude

make sure they get it clear before we have to do the shifting of any lines.
Q Okay. So if Gusman gets up there and he's told it's time to shift the lines and this stuff is on the deck, he ought to say, "What are we doing here, is somebody going to clean this up" before he makes that walk?
A Well, he's supposed to notify the ship's crew.
Q And what happened on this night, you have no idea?
A I do not.
Q So you don't know whether the ship's crew was even aware that somebody from the longshore crew was moving lines when Gusman was actually moving line, do you?
A I don't.
Q Or you don't know if anybody from the ship's crew was aware that they may have finished with one particular hold and were ready to go to another hold. You don't know that either, right?
A I don't.
Q But typically the way that would happen is

the supervisor from ADM would convey that to the ship's officer overseeing the operation?
A Right.
Q And then have you ever been around to observe the ship's crew when they're sweeping up or cleaning up urea like that?
A I have.
Q How do they do it? Do you know?
A I have -- I notice at Coastal -- they just take some brooms and they sweep it to the side. And then once they're finished doing what they're doing, they pretty much they leave it in the pile, and I guess they let it wash off when they go to sea or something.
Q Have you ever seen Coastal workers just grab a broom and do it because they need to get somewhere quick and just clean it up so it would be safer for the guys walking?
A I have.
Q And does Coastal come out there with its own brooms or sweeping devices, or would they just grab one from the vessel?
A Well, I haven't witnessed it at ADM,

per se, but I have witnessed it at the Coastal dock.
Q Could urea get off-loaded at the Coastal dock? In other words, is that something that happens occasionally?
A Well, I think -- I believe we've done it there already, but it goes, yeah, straight from vessel to barge.
Q So if it's done at the Coastal dock, is there anything different about the vessel's involvement in cleaning it up?
A No.
Q But you've seen at Coastal's dock where Coastal will grab its own broom or something and clear an area off so the men could go work in an area that had just been part of a cargo operation?
A Correct.
Q And if you were the foreman, you would want to make sure, whether it's the vessel crew or one of your guys, that they would clean up an area before sending a guy out to work on a deck like that, correct?
A If I was the foreman, absolutely.
Q In other words, you would tell -- you would

tell Gusman, "Hold up until we get this area cleaned up, we don't want to go walking across this stuff," correct?
A Correct.
Q And "If it takes an extra 30 minutes to get somebody rustled up to do it, then it takes an extra 30 minutes, but that's what we should be doing from a safety standpoint"?
A I put it in my log book as standby time, waiting for the vessel to clean up the mess.
Q Kind of like a protest, "It's not our fault we took this long; the vessel didn't clean this up real quick." Is that correct?
A Right.
MR. STEPHENS:
Objection to the form.
BY MR. TOMPKINS:
Q Do you ever make a protest or note an entry to the vessel that "We're not responsible for delays"? Is that something --
A Have I ever made a protest?
Q Yes. Does Coastal ever go to the vessel and say, "Hey, we're letting you know, we're not responsible for X, Y or Z here;

getting this (indicating) turned in, and then she would do all of the follow-up after the fact.
Q Okay. And I know you said you don't remember whether you went on board the Kiran Bosphorous after this accident was reported to you, correct?
A Correct.
Q Do you know if anybody from Coastal or ADM, for that matter, let anybody from the vessel know that Mr. Gusman had slipped and fallen on the ship?
A I do not know.
Q Would that be part of the expected policies or procedures of Coastal if somebody had fallen on a ship, to notify the ship?
A Yes.
Q Why -- if you know, why was that a policy, to notify the ship?
A Well, it's obvious, that way you let the vessel know that somebody was hurt on their vessel. You know, I guess you would call it more of a common courtesy than anything.
Q Let them see what it looked like and investigate for themselves, correct?



Exhibit E
Archer Motion to Exclude

do they expect their laborers to be in good physical condition?
A For the most part. I mean, there's no physical requirement, you know, like no typical, "Okay, I need a guy that is 6-foot-2, 240 and full of muscles." All shapes and sizes.
Q Understood, but in terms of you wouldn't want a guy with a bad neck, bad back and bulging disk out there doing that job, would you?
A No. Absolutely not. No.
Q Do you know whether or not he had that or not, one way or the other, before this accident?
A I do not. I do not.
Q So you wouldn't be aware, because of any conversations with Mr. Gusman, that he had had what's called "medial branch nerve blocks" in his back -- L3, L4 and L5 -- on March 20th, 2019, roughly two weeks before this incident? You wouldn't be aware of that?
MR. STEPHENS:
Objection to the form.

You can answer.

THE WITNESS:

I don't remember.

BY MR. TOMPKINS:

Q I mean, you would be surprised to hear that if it's true, correct?

A I would.

Q Because these guys are expected to do some heavy things, correct?

A Correct.

Q And if a guy comes on with a bad back or bad neck and bulging disks, they could hurt themselves just doing routine work, couldn't they?

MR. STEPHENS:

Object to the form.

THE WITNESS:

Yes.

BY MR. TOMPKINS:

Q And that's what you'd want to avoid, correct?

A Without a doubt.

Q I take it, from our hierarchy discussion, there was no counterpart to you; you were theoretically 24/7 even though you kept

A No, I did not.
Q Do you ever go to a midstream facility like ADM while the cargo operations are going on just to check on things?
A I do.
Q So let's say hypothetically you had gotten on board the Kiran Bosphorous at 9:50, ten minutes before this accident happened, and you saw the scene, what it looks like in this photograph, and it came time for the crane barge to shift. What would your instructions have been to your crew?
A I would have made them clean it up before we moved anything.
Q Would have made who clean it up, the vessel?
A First, I would have talked to the ADM supervisor.
Q And told him, "We got to get this cleaned up before we can get out there"?
A Right.
Q And that would protect your crew as long as it needed until it was cleaned up?
A Oh, without a doubt.
Q And you wouldn't send a guy out there in

the meantime, saying, "We're in a rush, go out there and do it," right?
A I would not.
Q If the foreman -- you would expect the foreman to know what these guys are doing, wouldn't you?
A I would.
Q Okay. So if the foreman for Coastal that evening, Mr. Pack --
A Right.
Q -- you wouldn't have expected him to insist that Mr. Gusman go walk across that deck to move that line unless and until that was going to be cleaned up, would you?
A I would not.
Q You'd say, "Wait up, get this thing cleaned one way or another before we send these guys out there," correct?
A Correct.
Q And the vessel crew, as a practical matter, they have no control over your men in terms of directing them what to do and what not to do, correct?
MR. STEPHENS:
Objection to form.

THE WITNESS:
No. They kind of work hand in hand, but, no, they do not have any direct supervisory over those people.

BY MR. TOMPKINS:

Q The safety of Coastal Cargo's men is with the Coastal Cargo foremen and supervisors, correct?

A And it is also a part of the ship's crew, and, yes, it is.

Q Yeah. But I mean, in other words, if the Coastal Cargo supervisor sees that there's a dangerous condition that hadn't been addressed yet, he tells his guys, "Stand off until this is fixed," correct?

A He should, yes.

Q I'm just reaching here to fill in gaps as I look at my notes.

A No, I understand. It's all good.

Q Did you speak with anyone that night or in the days after Mr. Gusman's accident that talked about the accident or having seen it or anything like that, that you can recall?

A I don't recall. I'm pretty sure I probably checked on Lloyd to see how he was doing.

condition that Mr. Gusman was presented with on the night in question, there was no practical way for him to avoid that condition and still move the wires?

MR. TOMPKINS:

Object to the form.

You can answer.

THE WITNESS:

No, he couldn't have avoided it. If he -- I mean, if he was made to go and move the wires while all of this is there, there's no way to avoid this cargo.

BY MR. STEPHENS:

Q From a practical standpoint, having worked in the industry, Mr. Brupbacher, if Mr. Gusman expressed a concern to the foreman about the condition but he was, nevertheless, ordered to still perform his job, would you expect him to disobey that order?

A Yes.

Q Do you know why Mr. Gusman was instructed to still perform his job with the deck being in the condition that is depicted in

In the Matter of:

*Lloyd J. Gusman, Jr.*

*vs.*

*Archer Shipping, Ltd., Kiran International Holding Company, Ltd., and Kiran Holding AS*

# Lloyd J. Gusman, Jr.

February 23, 2021

CURREN COURT REPORTERS

**504-833-3330**
www.currenland.com

job, tell you the truth, you know. So getting hurt wasn't on my agenda to doing.

Q. And what was the title of the job you held when you had your accident?

A. The title was every -- I mean, I could do forklift or I could do manual. I mean, I could do labor. So I was a -- I was a man -- a laborer and a forklift.

Q. And can you break it down for me in terms of percentages how much time were you doing manual labor versus operating a forklift?

A. I never -- they never -- I never did the forklift. Everything I did was labor, I mean, 'cause they already had guys that been there longer than me that had seniority on forklift. So I never got a shot until you get on the forklift.

Q. What was your hourly rate of pay?

A. I think I was making $14.

Q. $14 an hour?

A. Yeah.

Q. Plus overtime?

A. Yes.

Q. And was there one work location for you, or did the work location vary too?

ahead to an accident report. It says time employee began work, 6 p.m., time of accident, 10 p.m. Does that sound about right?
A. About right.
Q. Okay. So you would've started at around 6 p.m. Correct?
A. We got on that ship around 6 p.m.
Q. All right. When did you leave the Coastal office to get to the ship?
A. Oh, that was earlier.
Q. Okay. And when you got on the ship at 6 p.m. had they already had cargo operations going on on the ship?
A. No. It was -- had car -- they had cargo leaving off the ship, and then we get on the ship to go on there.
Q. All right. So had your crew taken the place of another crew?
A. Yes.
Q. All right. And is one called a "day crew" and one the "night crew"?
A. Night crew, yes.
Q. So you're on the night crew?
A. I was on the night crew.
Q. And is there kind of a handoff? Do

you guys cross each other's paths and exchange pleasantries --
A. Yeah.
Q. -- as they're getting off and you're getting on?
A. I mean, you'll see each other. You'll see each other.
Q. Okay. And to your knowledge -- and tell me if you don't know -- but do either the supervisors or the lead men kind of exchange information about what's been going on during the day crew's work and what you guys need to start doing when you get on at night?
A. As far as -- I think. Yeah. I mean, that's how it's supposed to go.
Q. Okay. But you're not part of that conversation?
A. I'm not part of that conversation, no.
Q. So somebody's getting the instruction as to what hold or what job you need to do, and then they're relaying that to you?
A. Yes.
Q. Is that the lead man?
A. That's the supervisor.
Q. The supervisor. And you don't know

who that was on this one?
A. I can't think of his name, 'cause that was my first time working with him.
Q. Was the night of your accident the first night you had ever been aboard this ship?
A. No.
Q. You had been aboard that ship days previously?
A. The day before.
Q. Okay. So on April 1st?
A. Yes.
Q. What did you do on April 1st on that ship?
A. We had got -- we unloaded off the -- we didn't have to go on no ship. We unloaded off the side of the ship putting stuff out the ship into the plat -- I can't think of the name. But a platform. It was a platform that we had to move the covers and to take stuff off the ship to put on into the covers. So we had to go on side the water to unhook the covers for the crane to move the -- the -- the things over that day.
Q. So are you unloading cargo and putting that cargo in, like, a hopper barge next to the

ship?
A. Next to the ship.
Q. And then that hopper barge would fill up and --
A. Yeah.
Q. -- move out?
A. And then we cover it back up. Then we'd cover it up to fill it up. Then -- then that'll be moved out. But it ain't going to move out that day, I mean, 'cause it going to take a couple of days to fill that up.
Q. To load that barge?
A. Yeah.
Q. But your all's job would be to remove the hopper covers to open up the barge to receive the cargo coming off the ship?
A. Yeah. To receive the cargo that's coming off the ship, yes.
Q. All right. So you had done part of that work on the day before on the 1st?
A. Yes. But we didn't -- I didn't have to go on the ship this day. We just stood -- I had to stay on the ground that -- not on the ground. I had to stay below instead of going on the ship.

Q. And was there anything -- what was the cargo; do you remember? What was the product being moved?
A. Looked like sand.
Q. Okay. And was it --
A. That day it looked like sand.
Q. Was it in any kind of container box, bag, anything like that?
A. No, it wasn't in no box or nothing.
Q. Is it get -- it's getting scooped out?
A. Getting scooped out.
Q. With something that's attached to the end of the crane that's got a scoop --
A. Yeah. They got --
Q. -- at the end of --
A. -- a scooper that -- that -- that put that in there.
Q. Okay. All right. So if I'm picturing this right, all right, you got the ship here. You got the barge next to it with the crane on it. Right?
A. Then you got something else on the other side.
Q. On the other side of the crane barge?
A. On the other side of the crane.

Q. So the guy operating the crane drops a scoop into one of the ship holds?
A. Yeah.
Q. Scoops up the cargo. Right?
A. Yes.
Q. Swings that load around to the other side of his barge that he's on to load that cargo into a hopper barge?
A. Yes.
Q. And for the first day you're on the hopper barge?
A. Yeah. I'm on the hopper barge that day.
Q. And what do you do to help facilitate that?
A. I'm the one on un -- making sure we unhooking the covers off the thing, off the -- off -- for the hold.
Q. Got you. Okay.
A. I mean, half the time you -- I mean, you do that. Once you do that you just hanging around until they finish.
Q. And then you're going to put that cover back on?
A. And then you put that cover back on.

crew on the deck of the ship or on the dock or on --
A. On the dock.
Q. Okay. So when you went up on the ship it was just your crew at that point?
A. Yes, just our crew. Yes.
Q. And what was the first instruction you received once you got on the ship?
A. We got to move the lines to get to the second hold.
Q. Okay.
A. So they told me to go move that line. And that's when the guy -- I asked -- I asked the supervisor, "Do we got to clean this up?" He said, "No. That's for the people on the ship to do. We just got to move the line for the barge." So he had told the dude that work on the ship. And he asked him, "Is y'all going to clean it up?" He laughed and kept walking. So I just got to the line. When I unhooked the line I walked to where it was safe. And I pulled it, and it got stuck. So I'm walking back. Let the line go, walking back. Next thing you know my legs just went completely underneath me 5 feet in the air. And I come

time of your accident you're on the right, or starboard, side of the ship --
A. Yes, sir.
Q. -- to do this work? Okay.
MR. TOMPKINS:
We'll make this Exhibit 2. And it's not to scale.
MR. STEPHENS:
Sure.
MR. TOMPKINS:
What did I say the first time, A? Let's make it B.
BY MR. TOMPKINS:
Q. All right. So I think I got a better picture of all this now. So when you got on there and the supervisor said we need to move, you know, move the lines to adjust the barge, that's the first thing you were tasked to do that night; is that right?
A. Yes.
Q. And at that point there's already some of this white stuff --
A. White stuff.
Q. -- on the deck?
A. Yes.

A. That same night.
Q. Before or after your accident?
A. After. I think after.
Q. Okay.
A. 'Cause that -- you can see the spot where I fell.
Q. Okay. Show me that on that photograph, if you will.
A. Look like it's right here, 'cause I was moving -- the line was coming from here. The line was coming here. And it got hooked in here. So I had to walk back. I tried to -- I walked way over here. The line was long, 'cause it was not too -- it had too much stuff. It had too much stuff. And when I pulled the line it got stuck. So I had to go back to unhook it, to unhook it. So when I got to the thing next thing I know I was in the air.
Q. Okay. All right. So the first thing I'm going to ask you to do is just point with your finger where you think your feet were when you slipped.
A. I would say right up in here.
Q. Inside the green painted area?
A. Inside -- just inside on -- I mean, I

can't say.
Q. Well, it may or may not be important. But part of the deck is kind of a reddish color. Right?
A. Yeah. But it's all -- it's all iron, I mean, everything.
Q. I know it's all iron. I get that. I'm just trying to figure out were you inside --
A. But I never paid attention -- I never really paid attention to the color, that they had color on this ground. I just was just mainly just trying to make sure I just do my job.
Q. Okay. So if the answer's I don't remember, that's fine.
A. I don't remember, yes.
Q. But were your feet on the green area or the red area when you slipped, if you remember?
A. I don't remember.
Q. Okay. And over here where I've drawn this arrow, is that where the line was kind of tangled up or caught?
A. It was in -- inside of here somewhere,

in -- it was inside of here somewhere.
Q. But in the back where I've got the arrow more or less?
A. No. Over up in here some --
Q. More in here?
A. More in here somewhere.
Q. Okay. All right. And what is the line made out of?
A. God dog it. What they call this line? Steel? I mean, 'cause it's -- look like -- I can't recall. I know it's -- it's hard and -- and -- and it ain't going to pop. It ain't something that'll pop.
Q. Is it metal?
A. It's metal. Not metal. It's iron. Metal iron? It ain't something that you can just pop, though. It ain't -- it's that hard.
Q. It doesn't look like rope?
A. It look like a rope. It look like a rope, but it's iron. I mean, it's metal like.
Q. Okay. All right. And did it -- looking at this photograph, did it pass through these handrails?
A. Yeah. It went through the handrails, 'cause it's coming from the -- it's coming from

the ship, from -- from the barge to hold that barge to the ship so it don't move.

Q. All right. And you were trying to move it from the position where the arrow was further --

A. Further --

Q. -- forward?

A. Further forward.

Q. Forward. About how many feet did you have to move it, if you remember?

A. I can't say how many feet, I mean, because I just had to unhook it and the lead man was going to do the rest. He was going to put it where it need to go, 'cause the supervisor told him where everything need to go at.

Q. Did you take the end of the line off of the cleat or bit or whatever? Did you pick that up over the edge of that?

A. Over the edge?

Q. I'm sorry. I thought -- maybe I'm not following you. I thought you said that the line would circle over these -- these --

A. Well, the line was stretched out to the -- to the barge, to this thing here. You

didn't have to take it -- you didn't have to take it off of here.

Q. Right.

A. You just had to unhook it from the ship.

Q. Right.

A. Then once you move that then the ship already -- once you hook it to another hook, once you move that, it's already still sturdy.

Q. Right. But would it attach to these circles that we have on the side?

A. No. No. No. Ain't nothing attached to no -- ain't nothing attached to -- I don't know what these circles is.

Q. Oh, okay.

A. It was, like, what I'm showing you on there it was hooked to the --

Q. Yeah, inside there?

A. -- ship. Inside there.

Q. Okay. But where it hooked was there an eye in the line that it hooked onto, or did it wrap around something? How did it hook to the ship?

A. It wrapped to the -- it wrapped on the bottom.

Q. Okay.
A. It wrapped to the -- to the -- to the thing. But to the ship it hooked to the -- to that iron -- to that iron thing on that thing standing up, I mean, that thing where you got the arrow at. They had a little thing you could come -- you could put through and you -- and you clamp it. And that's that. But you have to unclamp it to take it out.
Q. And you had unclamped it already?
A. I unclamped it. But when I went to stretch to come pull it out it stuck, got stuck. So that mean I had to drop it to go back, back over there.
Q. Okay. And as we look at this photograph C there isn't a particular spot you would -- or is there a big enough area you could circle to be comfortable it was somewhere in a certain vicinity where you slipped? Could you draw a bigger circle as you need to say I feel like it was somewhere in this area?
A. Yeah. I feel like it was -- I feel it was around up in here.
Q. Okay. All right.
A. 'Cause I think the line was coming

A. No. But it don't -- it don't look like a Coastal life jacket.
Q. Okay. Do you know one way or another if this is a ship crew member or not?
A. I couldn't -- I couldn't say.
Q. Okay. Let me make that Exhibit G. It's the black and white photo. You really don't know anything about this photo, do you?
A. No.
Q. Okay. About what time did your accident happen?
A. I really can't say.
Q. Okay. How long do you think you'd been on the deck of this ship before your accident happened?
A. I really can't say that neither, 'cause I know we ain't start right away. I know we sat in that office for a minute, for a little while before we got started. So I can't say what time we started.
Q. The office that was on the crane barge?
A. Yeah, the office on the crane barge. 'Cause I really wasn't worried about time, 'cause I knew I was going to be there until the

next morning, you know. So I don't worry about time.

Q. But in terms of -- I think you told us this was the first task that you were given once you got onto the deck of the ship. Right?

A. Yeah. That was the first time I got on top of that ship to go do that.

Q. I mean, but moving that line was the very first task that you were told to do as well. Correct?

A. Yes.

Q. Okay. So it all depends on what time you actually got on the ship that would tell you about what time at night it happened. Correct?

A. Yes.

Q. Okay. But had you been on the deck more than five minutes when your accident happened?

A. On that -- on -- on top the ship?

Q. On the ship deck, yeah.

A. Yeah. 'Cause we was already in a clear spot waiting to get our orders what to do. We didn't know what to do yet. We was still waiting on the supervisor to tell the

lead man what they got to do.

Q. So when you were on the deck of the ship what were you doing before you got the instructions?

A. Just standing up there.

Q. All right. And did you-all talk about the white stuff that was on the deck at that point?

A. Well, we saw the white -- that's when I asked the guy do we got to clean it up.

Q. Right.

A. And he said no, that's for the people on the ship to do so.

Q. And you don't know the name of that guy?

A. I don't know his name.

Q. What was his title?

A. He was the lead -- he was the -- he had the red hat. He wore the red hat. So he was the inspector, the -- mostly inspector and the lead, you know. So he had kind of -- 'cause he been there 20 something years.

Q. And that's a Coastal guy?

A. Yeah, Coastal.

Q. And you talked about a conversation

with somebody that appeared to be a member of the ship's crew. Right?
A. Yes. He had the conversation with the guy about -- I was right there by him when he asked the guy if they going to clean that up.
Q. Okay. That was my question. You overheard him?
A. Yeah, I overheard him say that.
Q. And when he said, "Are you-all going to clean this up" the guy just kind of chuckled and he kept walking?
A. And kept walking.
Q. Did he laugh? Is that what you said?
A. Yeah. He smiled and kept walking. So I don't know if he understand what he was saying or -- I don't know. I don't know if the guy -- he asked him that, and he just kept walking.
Q Do you know the nationality of the man that your Coastal lead man was talking to?
A. Well, he was a foreigner.
Q. I know, but do you know what nationality?
A. No, I don't.
Q. Do you know if he spoke English?

A. No, I don't.
Q. Okay. How long after that comment was made to the ship crew member did your accident happen?
A. How long since he asked the guy about cleaning it up?
Q. Yeah. Until your accident?
A. I -- I don't -- it wasn't right -- it wasn't right then and there. So I don't know really what time.
Q. All right. And at the time of your accident there's three Coastal guys on the --
A. On the ship.
Q. -- ship deck? Yeah?
A. Yes.
Q. To your knowledge, did any of the other guys from Coastal have a problem with their footing on the deck that night?
A. I don't know.
Q. What kind of shoes were you wearing?
A. Steel toe.
Q. Okay. The brand of them, do you remember that?
A. Well, it ain't -- I don't know what brand it was. But one -- one thing, it was

Q. Did the goggles impair your vision at all?
A. No.
Q. Do you still have the goggles?
A. Like I said, if it's anything there, it's at the house.
Q. Okay.
A. If she ain't throw them away.
Q. Do you know if anybody on the ship -- meaning the ship crew, not the Coastal crew. Did anybody from the ship see you fall?
A. No, not that I know of.
Q. Did any of your coworkers at Coastal see you fall?
A. They -- I don't think they saw me, but they heard. 'Cause soon as I fell they -- 'cause they wasn't too far. They was, like, from where I'm at to -- they was a little farther from where you at, but they wasn't that much farther. And when I fell they heard it, I guess. And they turned around quick and said, "Man, you all right?" 'Cause I know when I fell my hard hat just almost fell off the ship, 'cause that's how far the hard hat went and stuff like that.

MR. STEPHENS:
Objection to form.
BY MR. TOMPKINS:
Q. Day crew?
A. Yes.
MR. STEPHENS:
Objection to form.
MR. TOMPKINS:
What's the objection?
MR. STEPHENS:
Well, it's based off belief so it's speculative but. I mean, I'm allowing him to answer. I'm not telling him not to answer.
MR. TOMPKINS:
Okay. I appreciate it.
BY MR. TOMPKINS:
Q. You weren't there when this landed on the deck, were you?
A. No.
Q. It was just on there when you got on there?
A. Yeah.
Q. And how long it had been on there --
A. I don't know.

Q. -- you don't know for sure?
A. I don't know.
Q. But the person -- not by name, but by company, the person that was operating the crane to grab the cargo out of the hold was Coastal's guy. Right?
A. Yes.
Q. The ship's crew wasn't doing the actual cargo operations, were they?
A. I mean, far as I know, I don't -- I don't know who the crane operator was. I know when -- my crew we had a crane operator. But, now, for the second -- first crew, I don't know.
Q. I understand. But if it was like your crew, it would've been another Coastal guy?
A. Yeah, it'd been a Coastal guy. I mean, but by the time we got on this ship, if this stuff was on that deck, that should've been cleaned up before we got on that ship, 'cause it took us a hour and something -- I mean, it took us awhile before we got to this ship.
Q. I understand. During the time you were on this ship until you had your fall did

you ever see anybody from the ship engaged in any of the cargo operations?

A. I don't know what you mean.

Q. Okay. In other words, you said there's, like, a scooper attached to the crane and that's what would pick up --

A. Yeah, pick up the --

Q. -- this cargo?

A. -- cargo. Yes.

Q. And if it was your ship, it would be the Coastal guy operating a crane --

A. Crane.

Q. -- and that scooper. Right?

A. Yeah.

THE COURT REPORTER:

Please wait until he finishes the question.

BY MR. TOMPKINS:

Q. We're getting down to the homestretch. We're both trying to get out of here. The Coastal crane operator would operate the crane and the scooper to pick up the cargo out of the ship hold and put it on the barge hatch opening --

A. Yes.

Q. -- correct? On your crew?
A. Yes.
Q. My question is: At any time while you were out there did you ever see any of the ship's navigational crew operate any of the equipment that was moving cargo?
A. Since I was out there? No.
Q. Correct. Correct.
A. No.
Q. Did you hear anybody from the ship's crew, not the Coastal crew, giving any instructions to anybody at Coastal about how to do their job?
A. No. I mean, to go back about the ship -- people on the ship, only thing I ever saw the ship people do on the ship is open the -- open these ledges, because they the ones that got to operate that. We don't do nothing with that. To open the hatch, the covers, that's -- they do that. So they do -- everything that's on that ship that's what they supposed to do. So whether they were supposed to clean up, don't know, I mean. I know they open up every -- they -- they work the ship, 'cause that's they -- that's what they supposed to do.

Q. Right. But when you --
A. I saw them do that.
Q. Okay. Meaning open up the hatches?
A. Open up hatches.
Q. But in terms of moving the cargo, that was Coastal, to your knowledge?
A. That's Coastal, yes, to my knowledge.
Q. And was your only encounter with one of the ship's crew members the one you told us about earlier where somebody said are you cleaning -- are you guys going to clean this up and he just kept on walking?
A. Yes.
Q. Is that the only encounter --
A. Yes.
Q. -- with the ship --
A. Yes.
Q. The white cargo that we see on the deck in photo C, had you ever seen that cargo in the two months you had worked for Coastal before?
A. No.
Q. What did it -- did you pick it up? Did you touch it, feel it?
A. I ain't never -- I ain't pick it up or

that day?
A. I don't -- I know I sent my lawyer a couple of pictures.
Q. Any ones that you have would you send him --
A. Yeah.
Q. -- the original for me?
A. Yes.
Q. Thank you. Before you actually slipped and fell had you had any near falls or feeling like you might slip that night?
A. That night?
Q. Yeah.
A. Well, when you -- when you first walked on it you -- you know it was slippery. So you had to take your time. That's why I asked them do we have to clean it up, and they said that's for the people on the ship so.
Q. If the answer from your supervisor had been yeah, we need to clean this up, did Coastal have brooms or mops or whatever it would take to clean that up?
A. I don't know if they had it or not. But I'm pretty sure if they said yeah, we had to clean it up, I'm pretty -- they would've had

it from the tight spot or whatever --
A. Yes.
Q. -- right? All right. So you were just hands free? Your hands were free. And you were trying to just walk carefully to that spot, and you slipped?
A. Yes.
Q. Just like you had walked earlier, but this time it just didn't work. Right?
A. Yes.
Q. Okay. And when you say, you know, you knew you had to walk carefully, does that mean you would just take smaller, slower steps to try to maintain your balance earlier before your fall?
A. You had to take your time. You really had to take your time, I mean, because if you were running, you wouldn't make it.
Q. Right.
A. I mean --
Q. But that's how you avoided slipping --
A. I mean, you take your time because the ship's so high. I mean, you really don't want to fall off the ship, to tell you the truth, you know. So that's why you going to take your

# First Report of Injury

Coastal Cargo Company, 1555 Poydras Street, Suite 1600, New Orleans, LA 70112

| ACCIDENT OCCURRED |
|---|
| Date: 04/02/19 |
| Time: 10:00 pm |
| Time EE Began Work: 6:00 pm |

**Email to safety due within 1 hour of incident**

**Report due to Human Resources within 24 hours of incident**

| INJURED EMPLOYEE'S INFORMATION | | | |
|---|---|---|---|
| Name: Lloyd J. Gusman, Jr | Social Security # : 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 | | DOH: 02/06/19 |
| Address: 2408 Van Arpel Drive | City: LaPlace | State: LA | Zip: 70068-6345 |
| Home / Cell Phone #: 972-803-7030 | | Job Class Code: 7309 Stevedoring LA | |
| Occupation (when injured) : Laborer | Employee # : 25419 | | DOB: 12/05/64 |

| Engaged in what work when injured: | Nature and Extent of Injury: | PPE Worn: "X" (means yes) | |
|---|---|---|---|
| Shifting Wires on vessel | Contusion, lower back | Hard Hat: | X |
| | | Steel Toe Shoes: | |
| | | Steel Toe Boots: | X |
| | | Safety Vest: | X |
| | | Safety Glasses: | X |
| | | Safety Gloves: | X |
| | | Life Vest: | X |

| | |
|---|---|
| Witnesses ( if none, write none – Name & Employee # ): Joseph Barrow (24807) and DeJaunte Murray (25172) | |
| | |
| Job Location of Accident: ADM Midstream MM110, aboard M/V Kiran Bosphorous | Job Number: 201119 |

| Detailed Description of Accident: |
|---|
| Mr. Gusman was aboard the vessel pulling the lines of the Elisa A rig up to shift the rig from hatch 5 to hatch 4 when he slipped on the lose cargo that was on the deck of the vessel causing him to fall backwards. |

| |
|---|
| Name & Address of doctor/hospital/clinic: On 04/02, Ochsner Baptist ER, 2700 Napoleon Ave, New Orleans, LA 70115 |
| On 04/03, Ochsner Occupational Clinic, 3530 Houma Blvd., Suite 201, Metairie, LA 70006 |
| Who transported EE (name & EE #): Roy Brupbacher, 24948 |

| Accident Reported To: | Time Reported: | Date Reported: |
|---|---|---|
| Print Name: Roy Brupbacher | 10:02 pm | 04/02/19 |
| EE #: 24948 | Did Injured Leave Work? | Time Left: 10:48 pm |
| | YES | Date Left: 04/02/19 |

| | | | | |
|---|---|---|---|---|
| Injured Party & Employee # | Lloyd Gusman, 25419 | Injured Party Signature: | | Date: 04/03/19 |
| Supervisor's Name & Employee # | Roy Brupbacher, 24948 | Supervisor's Signature: | | Date: 04/03/19 |
| Foreman's Name & Employee # | Robert Pack, 24927 | Foreman's Signature: | | Date: 04/03/19 |
| Investigated By & Employee # | Roy Brupbacher, 24948 | Investigator's Signature: | | Date: 04/03/19 |



EXHIBIT H

PENGAD 800-631-6989

Exhibit F, Archer Motion to Exclude

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

******************************
*
LLOYD J. GUSMAN, JR. *
* C.A. NO. 20-984
VS. *
* SECTION "I"(1)
ARCHER SHIPPING, LTD., KIRAN *
INTERNATIONAL HOLDING *
COMPANY, LTD., AND KIRAN *
HOLDINGS AS. *
*
******************************

Deposition of DEJUANTE ANTONIO MURRAY, SR., taken on Monday, April 12, 2021, via Zoom videoconference.

Q So is it fair to say that you were familiar with that work location, sir?
A Yes.
Q Were you aboard the Kiran Bosphorous at the time of Mr. Gusman's accident, sir?
A Yes.
Q Did you actually witness Mr. Gusman's accident?
A Yes and no. I was working. And when I turned around, I seen Gusman on the ground.
Q Okay.
A Yeah.
Q So is it fair to say that you didn't actually see him fall?
A Yeah, I didn't actually see him fall.
Q All right. But when you turned around, you witnessed him on the ground --
A On the ground, in pain, you know.
Q Mr. Murray, the report that we have indicates that the work that was going on at the time of Mr. Gusman's accident was shifting wires on the vessel. Does that sound correct to you?
A Yes.
Q Are you familiar with the process of

Q And were you able to hear on your radio any response to that call-in?
A No.
Q "No"?
A I heard no response.
Q Who instructed -- after that radio call was made, who instructed the crew to proceed with working?
A I think it was -- whoever the supervisor was, got up there and told us, you know, what to do, you know, told us to pull the lines up.
Q If the records we have indicate that Mr. Robert Pack was the foreman that night, would that sound correct to you?
A Right.
Q Now, refreshing your recollection on that, do you recall that it was Mr. Pack that instructed the crew to commence work?
A Yeah. Yeah.
Q So, Mr. Murray, do you know what would have happened if any member of the crew would have disobeyed Mr. Pack's instruction to continue working?
MR. TOMPKINS:

to go retrieve those brooms before instructing you to return to work?
A I can't remember. I can't remember him telling us if he did.
Q All right. But you recall Mr. Pack --
A Well, look, it still would have been -- defeated the purpose, because the crane operator, you know, he still was bringing, and when the loads are still -- you know, cargo was still coming out the crane, you know, out the bucket of the crane.
Q So, to kind of recap, so Mr. Pack instructed the crew to return to work, and that's what happened?
A Yeah.
Q All right. Sir, taking a look at this photograph again, can you see that circle that's right there (indicating)?
A Yeah.
Q I'll represent to you Mr. Gusman testified that's approximately where he fell on the deck.
A It is.
Q Based on what you --
A When I looked back, that's where he was at.

might have.

EXAMINATION

BY MR. TOMPKINS:

Q Mr. Murray, can you hear me? My name is Peter Tompkins.

A How you doing?

Q I'm doing fine. I represent a company called Archer Shipping, who is the owner of the Kiran Bosphorous, the ship you guys were working on back on April 2nd, 2019. Okay?

A Yes, sir.

Q Was Coastal Cargo working for ADM at the time?

A Yes, sir.

Q Did ADM have a supervisor out on scene on the night of the accident?

A Yeah, they had someone there.

Q Do you remember the guy or girl's name?

A I think it was Chris. I think it was Chris if I'm not mistaken.

Q "Chris"?

A Yeah.

Q We're having a hard time hearing you.

A I'm sorry about that.

Q Okay. So the ADM supervisor -- just getting back since we can hear you better -- was somebody you think was named Chris, right?
A Yeah.
Q Did Chris have some type of prejob safety meeting around 6:00 p.m. or whenever you all arrived that evening?
A Let's see. I don't recall the safety meeting.
Q Would there normally be one before you would start working on a ship like that?
A Yeah.
Q Who would hold the meeting, normally?
A Someone from ADM. By being, like, the contractor, like, working outside of ADM, we usually get there, you know, get on the tugboat and go straight to work.
Q Okay. Did Coastal have its own safety meeting and safety rules?
A Yeah, but I don't remember no one calling a safety meeting. I don't remember a meeting that night.
Q But did Coastal, for example, have something called "stop work authority"?

A No.
Q You ever heard of stop work authority?
A No, sir.
Q Okay. So Coastal had never trained its workers to look out for safety issues and avoid them if possible?
A No.
Q Is that something that you have been trained on ever, about safety --
A Really -- yeah. Mainly, certain things, you know, whether or not to do, you know, what to do and not to do.
Q Do you remember a guy named "Roy Brupbacher"?
A Yeah.
Q Who was Roy Brupbacher?
A That was our supervisor.
Q Okay. So if Roy testified that ADM should have had a safety meeting before the work started that night, do you think he's right or wrong?
A He's right.
Q Okay. And the safety meeting, that included you guys that night?
A Right.

Q What did you all discuss at the safety meeting?
A Like I said, I don't recall having one, you know.
Q Have you ever had a safety meeting that you attended where the cargo was the same kind of cargo that we saw in that photograph?
A Yeah.
Q And was part of the safety discussion to try to avoid walking on that cargo?
A Yeah.
Q "Yeah"?
A Uh-huh (affirmative expression).
Q Is part of the safety meeting, don't get under the crane as it's swinging the cargo from the ship's hold over to the cargo barge, don't get under it?
A You're breaking up. Can't hear you.
Q Can't hear you. You need a mike adjustment.
A Can you hear me?
Q No.

MR. STEPHENS:

What about now, Mr. Murray? Can you hear us?

THE WITNESS:
Yeah, I can hear now.
MR. STEPHENS:
Okay.
BY MR. TOMPKINS:
Q Was part of the instruction not to be working on the deck of the ship while the cargo was being transferred from the ship to the barge?
A I don't remember them saying anything like that, but, yes, that's how it -- but, when transferring the cargo to the ship or whatever -- or the cargo to the barge, we out the way.
Q Are you on the rig where the crane is, or are you on the ship that's being off-loaded?
A The rig where the crane is.
Q And so do you wait on that rig until the hold is emptied and then move up to shift the lines?
A Yeah.
Q Okay. And who's giving you the instruction that it's time to move up to the ship?
A Usually, it's the crane operator or, you

know, someone, a supervisor tell us, yeah, we about to move, about to shift, about to move to another hatch, another hold or whatever.

Q So that would come from somebody at Coastal, right?

A Yeah, or ADM, somebody at ADM.

Q Okay. That night, were you part of any conversations with anybody on the ship's crew?

A What you say?

Q On April 2nd, 2019, when Mr. Gusman had his accident, did you ever have any direct conversations with anybody on the ship's crew?

A No.

Q Those conversations would be between the ADM supervisor and the ship's crew?

MR. STEPHENS:

Objection to form.

THE WITNESS:

No.

BY MR. TOMPKINS:

Q Do you know who would communicate with the ship's crew from the stevedoring side?

Exhibit H, Archer Motion to Exclude

# In the Matter Of:

GUSMAN, JR. V. ARCHER SHIPPING

2020-LHC-634

---

## DR. SUNEIL JOLLY

*June 09, 2021*

---

*Part 1*

ESQUIRE
DEPOSITION SOLUTIONS
800.211.DEPO (3376)
EsquireSolutions.com

the back pain as being six years in duration; is that right?
A. Correct.
Q. And if it's 2018, that would suggest that the back pain has been with him since 2012; right?
A. Yes.
Q. And if that history is true, we'd certainly be in a situation where you would call the shoulder and back pain as chronic in nature, would you not?
A. Yes.
Q. And I know I'm not there to show you this record, but if Memorial Medical Center's records show that in 2003, specifically April 24th, 2003, that he had, he reported chronic back, neck, and shoulder pain as being present for seven years, or back to 1996, that would be new news to you, first of all; correct?
A. Yes. I would say, I mean, it's news. I don't know if -- you're saying that if he had pain since '96?
Q. Yes.
A. Yes, that would be, you know, longer than the six years reported there.
Q. Right. And while chronic is chronic, it

would suggest to you that he's had back pain for over twenty years by the time you saw him; correct?
A. Correct.
Q. Okay. Did you get the x-rays that you recommended?
A. On that initial visit, it doesn't appear so. Let me just see when those came in. Got the MRI of the cervical spine, that came in on, it was done November 26th, 2018.
Q. Okay. And I'm sorry, doctor, let me just back up one second. There is one note I missed of my own. In the area of the chart where the patient questionnaire is, at least in my file, there is a reference to a cervical epidural steroid injection with the handwritten note, TENS unit, T-E-N-S, unit, maybe right before that questionnaire. Do you see that?
A. Which page?
Q. Doesn't have a page number. At the very top of the page says services ordered, then below that, patient name, and today's date.
A. I don't really see that sheet here.
MR. STEPHENS:
In your copy of that document, is the date legible?

Q. I mean, I may be oversimplifying it, so tell me if I'm wrong.
A. That's correct. We take the needle and insert it right over the medial branch nerve, and we heat it for ninety seconds, up to eighty to ninety degree Celsius, and essentially burn the pain fibers so that it prevents sending a pain signal throughout the entire region.
Q. On March 7th, 2019, when you were discussing scheduling that with him, do you know if a date had actually been selected for that?
A. I don't think the actual date was scheduled. But I can see the procedure was completed.
Q. When was it completed?
A. It was completed on March 18th -- sorry, March 20th, 2019, and then it was completed again for a second time on April 3rd, 2019.
Q. Okay. Let's talk first about March 20th. Were you able to do it bilaterally at the three levels that he had talked about earlier?
A. Yes.
Q. And when he completed that procedure on March 20th, was he scheduled then to come back for a follow-up one?

A. Yes, he was.
Q. And is that the one that was performed on April 3rd?
A. Yes.
Q. All right. What was the reason to order a follow-up of that medial branch nerve block and ablation procedure if the first one gave him some relief, at least?
A. Sometimes insurances will require two test blocks. Other insurances require one or none. But because of the requirement of two test blocks, we proceeded with the second test block.
Q. Oh, I see. So both these procedures you were doing the test blocks, you hadn't actually done the ablation; is that right?
A. Correct.
Q. And you personally did these blocks; is that right?
A. That's correct, yes.
Q. When you did the block on April 3rd, were you aware that he had claimed that he had been involved in an accident the day before?
A. No, not on the day that I performed the procedure on April 3rd.
Q. Would you have visited with the patient

**ROBERT E. BORISON**
**218 MAGNOLIA ST**
**LONG BEACH, MISSISSIPPI 39560**

## FEE SCHEDULE:

Hourly charges are from portal to portal.
All expenses will be reimbursed by the client.
$1920.00 for deposition and trial testimony (minimum 3-hour charge)
$320.00 per hour for all other services provided
$ 0.86 per mile for travel

## CURRICULUM VITAE

### EXPERIENCE

A safety professional, in any given industry, is required to have a working knowledge of the various operations his company performs in that industry, as well as a working knowledge of the applicable governing regulations. I have over 50 years of safety experience in the industries relating to the exploration, production, and transport of oil and gas and the marine, general, and commercial industries. While working in these industries, I have developed expertise relating to safety issues on production platforms, barges (derrick, crane, pipe laying, dredging, drilling, jack-ups, lift-boats, spud, supply, deck, oil, tank, etc.), structural, fabrication yards, and vessels/boats (ship, MODU, tug, tow, supply, crew, etc.), and commercial and industrial buildings and building projects.

This on-the-job work experience began in the mid-sixties while working offshore in the Gulf of Mexico on production platforms and drilling rigs, performing the duties of a Roustabout, Rigger, Welder's Helper, and Wireline Operator. I also worked on the Mississippi River, worked in Fabrication yards and Shipyards as a Roustabout, Rigger, Welder's Helper, and Heavy Equipment, and Crane Operator. Further safety experience and expertise were derived from being the manager/supervisor of the Safety Department for Amerada Hess Corp. (Lafayette region); J. Ray McDermott, Inc. (Marine and Diving Divisions, Harvey Group), McDermott International, Inc. (Singapore, South East Asia Group) and the president or owner of Contract Safety Consultants, Preferred Employees, and Total Safety Services, Inc. Companies I worked for included, New Orleans Stevedores, Houma Welders, Smith Wallander, Boland Machine and Manufacturing. My safety consulting experience was gained by providing safety consultant services at the following companies:

**Ray Gibbins Industries** – provided lease operators, riggers, crane operators, roustabouts, and roughnecks to Shell, Chevron, Texaco, Conoco, and Freeport McMoran, and other smaller oil companies for their production and drilling operations in the Gulf of Mexico. We also supervised and operated the Marine Terminals/docks for Shell, Chevron, Texaco, and Conoco in Venice, LA.

**Cortex** - provided lease operators, riggers, crane operators, roustabouts, and roughnecks to Shell, Chevron, Texaco, Conoco

**Allied Wireline** – Owned jack up wireline barges and performed wireline work in the Gulf and inland waters.
**Western Wireline** - Owned wireline units and performed wireline work in the Gulf and inland waters.
**Gulf South Laboratories** –Quality Control company that worked for various governmental parishes for welding, building construction, concrete installations, asphalt installations, sandblasting, and painting, and failure investigations.
**Engineering Inspection and Investigation, Inc.** – Expert Witness in safety and investigated failures in buildings and structures.
**Inspection Consultants, Inc.** – Owner. Expert Witness in safety and investigated failures in buildings and structures.
**Popich Brother** – Offshore Supply vessel and passenger vessel operator in the Gulf of Mexico for the major oil companies.
**Space** – Worked as a contractor for various at the United States Department of Energy at the various Strategic Petroleum Reserve facilities in Louisiana and Texas. General construction, tank cleaning, pipeline, and equipment installation.
**L&L Construction -** Worked as a contractor for the United States Department of Energy at the various Strategic Petroleum Reserve facilities in Louisiana and Texas. General construction, electrical installation, pipeline, and equipment installation.
**Kaough & Jones** -Worked as a contractor for the United States Department of Energy at the various Strategic Petroleum Reserve facilities in Louisiana and Texas. General construction, electrical installation, pipeline, and equipment installation
**Kranco**-Worked as a contractor for the United States Department of Energy at the various Strategic Petroleum Reserve facilities in Louisiana and Texas. Crane installation, maintenance, and load testing.
**Garza Welding** – proved welding, fabrication, pipeline installation, equipment installation, and repairs for the major oil companies in the Gulf of Mexico.
**T & A Wireline** – Offshore Wireline company and operated a portable well treatment barge.
**TBC Industries, Inc. -** provided lease operators, riggers, crane operators, roustabouts, and roughnecks to some of the major oil companies for their production and drilling operations in the Gulf of Mexico.
**Rembco -** Worked as a contractor for the United States Department of Energy at the various Strategic Petroleum Reserve facilities in Louisiana and Texas.
**Foley Construction -** Worked as a contractor for the United States Department of Energy at the various Strategic Petroleum Reserve facilities in Louisiana and Texas.
**Delta Coatings** –Sandblasting and painting contractor who worked for most of the major oil companies in the Gulf of Mexico.
**Delta Temp Services** – A temporary labor provided for Longshoremen on the Mississippi River.
**Southern Environmental Control** – Operated a garbage container distributor for the Venice, LA area.
**Eagle Marine** – Vessel operator in the Gulf of Mexico
**American Marine**– Vessel operator in the Gulf of Mexico
**Mosby Enterprises –** Offshore construction company for the major oil companies in the Gulf of Mexico.
**Total Marine Services** – Shipyard and repair yard. Fabricated and repaired barges.



Exhibit I
Archer Motion to Exclude

**Vela Garage** –provided lawn care and vehicle maintenance for the offshore oil companies.
**Doomlar** – Dredging company
**Energy Drilling** – Drilling and workover company
**Grady Crawford**- Worked as a contractor for the United States Department of Energy at the various Strategic Petroleum Reserve facilities in Louisiana and Texas. Removed from service the Weeks Island Salt Doom facility.
**Guilliot Construction**- Worked as a contractor for the United States Department of Energy at the various Strategic Petroleum Reserve facilities in Louisiana and Texas.
**J & J Electric**- Worked as a contractor for the United States Department of Energy at the various Strategic Petroleum Reserve facilities in Louisiana and Texas.
**Taylormade Enterprises**- Worked as a contractor for the United States Department of Energy at the various Strategic Petroleum Reserve facilities in Louisiana and Texas.
**Apache Well Services** - Drilling and workover company
**U. S. Abatement –** Sandblasting and painting company working offshore for the major oil companies.
**Wescorp Construction**- Worked as a contractor for the United States Department of Energy at the various Strategic Petroleum Reserve facilities in Louisiana and Texas.
**Blake Drilling** – Drilling and workover company.

The companies I was employed by or contracted with followed the Federal regulations listed below and voluntarily followed the Industry Standards of Care as listed. As their safety officer, I was required to have a working knowledge of those regulations and standards of care and the ability to apply them to the company's oil and gas exploration and productions and marine, general, industrial, and commercial work activities.

**Subcategories for each section are listed in more detail in my *Curriculum Vitae.***
**Working knowledge of Federal Regulations 29:**
1910 General Industry, 1926 Construction, 1915 Shipyard, 1918 Longshoring, 1919 Gear Certification

**Working knowledge of Federal Regulations 46:**
Subchapter C - Uninspected Vessels
Subchapter D – Tank Vessels
Subchapter H – Passenger vessels
Subchapter I - Cargo and Miscellaneous Vessels
Subchapter I-A - Mobile Offshore Drilling Units
Subchapter K – Small Passenger Vessels carrying more than 150 passengers
Subchapter L – Offshore Supply Vessels
Subchapter M – Towing Vessels
Subchapter T – Small Passenger Vessels

**Working knowledge of Federal Regulations 33:**
Subchapter B – Offshore
Subchapter N - Outer Continental Shelf Activities

**Working knowledge of the following industry standards:**



Exhibit I
Archer Motion to Exclude

(API) American Petroleum Institute
(ANSI) American National Standards Institute
(ASME) American Society of Mechanical Engineers
(AWS) American Welding Society
(CGA) Compressed Gas Associations, Inc.
(ASTM) American Society for Testing and Materials
(ABS) American Bureau of Shipping
(NFPA) National Fire Protection Association
(NIOSH) National Institute for Occupational Safety and Health
(SAE) Society of Automotive Engineers
(UL) Underwriters Laboratories
(NEC) National Electrical Code
(AWO) American Waterways Operators
(ISM) International Safety Management
(SSPC) Steel Structures Painting Council.

**SPECIAL SKILLS**

Accepted as an expert in both Federal and State Courts. Trial, deposition, and case experience includes safety issues in the following fields of work: Welding safety, pipe laying safety, crane and rigging procedures, ladder safety, stairway safety, confined space entry, scaffolding safety, gangway safety, personnel net transfers safety, swing rope transfers safety, manual material handling safety, excavator/backhoe/industrial truck operation safety, watertight door safety, lock mooring safety, dock and wharf safety, production equipment safety, sandblasting and painting, fire prevention, hurricane evacuation procedures, mooring vessels safety, slip and fall safety, hand tools safety. Hand tool safety, machine guarding, personnel floatation devices.

Approved by the United States of America, Department of Energy as a qualified safety professional in construction and maintenance procedures. Placed on their site emergency safety task force team.

The companies I worked for or contracted with followed the Federal regulations listed below and voluntarily followed the Industry Standards of Care found below. As their safety officer, I was required to have a working knowledge of those regulations and standards of care and to apply them to the company's oil and gas exploration and production and marine activities.

**WORKING KNOWLEDGE OF FEDERAL REGULATIONS 29:**
**1910 GENERAL INDUSTRY, 1926 CONSTRUCTION, 1915 SHIPYARD, 1918 LONGSHORING, 1919 GEAR CERTIFICATION**

**GENERAL AREAS OF EXPERTISE FOR CFR 29 LABOR REGULATIONS and 1910- GENERAL INDUSTRY AREAS OF EXPERTISE FOR ALL SUBCHAPTERS INCLUDES, BUT NOT LIMITED TO:** ladders, stairways, slippery conditions on walking and working surfaces, dockboards, scaffold, fall protection, fire prevention plans, powered platforms, vehicle-mounted elevating platforms, manlifts, ventilation, noise, compressed gases, storage and handling



Exhibit I
Archer Motion to Exclude

of liquefied petroleum gases, hazardous waste operations, process safety management, personal protective equipment (eye, face, respiratory, head, foot electrical, hand), sanitation, temporary labor camps, color codes for physical hazards, accident prevention signs and tags, permit-required confined spaces, control of hazardous energy (lockout/Tagout), medical services and first aid, fire brigades, fire extinguishers, firefighting extinguishing systems, firefighting training, powered industrial trucks, cranes and rigging, slings, machine guarding, hand and power tools, welding and cutting tools and equipment, electrical safety, diving operations safety, signs and labels, first aid,

**1915 - SHIPYARD:** cold work, hot work, mechanical paint removers, painting, flammable liquids, ventilation, welding and cutting, scaffolding, guarding of deck openings, access to vessels, access to dry docks, access to cargo spaces, working surfaces, ropes, chains, slings, shackles, hooks, chain falls hoisting and hauling equipment, qualification of operators. Powered industrial truck, portable electric and hand tools, abrasive wheels, internal combustion engines, ship's piping system, ship's deck machinery, portable air receivers, electrical circuits, fire safety plan, precautions for hot work, fire extinguishing systems, fire training,

**1917 – MARINE TERMINALS:** slinging, stacking of cargo, line handling, movement of barges and railcars, open fires, hazardous cargo, hazardous atmospheres, hazard communication, powered industrial trucks, vehicles, cranes and derricks, winches, conveyors, hand tools, guarding of edges, heights, platforms and skids, elevators and escalators, manlifts, ladders, stairways, illumination, guarding of hazards, machine guarding, welding and cutting, spray painting, compressed air, fuel handling and storage, battery charging,

**1918 – LONGSHORING:** gangways, Jacob's ladders, ladders, bridge plates, and ramps, access to barges, hatch covering, stowing cargo, open hatches, weather deck rails, barges, coaming clearances, hatch beams, and covers, winches and rigging, cranes, and rigging, mechanically powered vehicles, Hazard communication, Housekeeping, Illumination, Hazardous atmospheres and substances, Ventilation and atmospheric conditions, mooring barges, Hazardous cargo, Sanitation, Maintenance and repair work in the vicinity of longshoring operations, First aid and lifesaving facilities, Qualifications of machinery operators and supervisory training, Emergency action plans, personal protective equipment (eye, face, respiratory, head, foot electrical, hand),

**1926 – CONSTRUCTION**: Housekeeping, Illumination, Sanitation, Means of egress, noise, gases, vapors, fumes, dust, mists, process safety management, fire protection and prevention, fall protection, cranes and rigging, hand tools, powered hand tools, mooring barges, abrasive wheels, jacks, welding and cutting, electrical, scaffolding, material hoist, conveyors, pile driving, site clearing, marine operations, excavations, concrete construction, steel erection, underground construction, caisson, cofferdams, compressed air, demolition, stairways and ladders, diving, confined spaces, cranes and rigging, cold work, hot work.

**WORKING KNOWLEDGE OF FEDERAL REGULATIONS 46:**

**GENERAL AREA OF EXPERTISE FOR ALL SUBCHAPTERS, INCLUDES, BUT NOT LIMITED TO:** Housekeeping, Illumination, Sanitation, Means of egress, noise, gases, vapors, fumes, dust, mists, process safety management, fire protection and prevention, fall protection, hand tools, powered hand tools, mooring barges, abrasive wheels, jacks, welding and cutting, electrical, scaffolding, material hoist, stairways and ladders, diving, confined spaces, cranes and rigging, cold



Exhibit I
Archer Motion to Exclude

work, hot work, sandblast and painting, non-skid paint application, watertight door design and use, mooring procedure, anchoring handling,..

Subchapter C - Uninspected Vessels
Subchapter D – Tank Vessels:
Subchapter H – Passenger vessels
Subchapter I - Cargo and Miscellaneous Vessels
Subchapter I-A - Mobile Offshore Drilling Units: Cranes and rigging, personnel net transfers.
Subchapter K – Small Passenger Vessels: personnel net transfers and swing rope transfers.
Subchapter L – Offshore Supply Vessels: personnel net transfers and swing rope transfers.
Subchapter M – Towing Vessels: Making tow safety, winch handling.
Subchapter T – Small Passenger Vessels: personnel net transfers and swing rope transfers.

**WORKING KNOWLEDGE OF FEDERAL REGULATIONS 33:**

**GENERAL AREA OF EXPERTISE FOR ALL SUBCHAPTERS INCLUDES, BUT NOT LIMITED TO:** Welding and cutting safety, hot work, cold work, pipeline taps, fall protection, cranes and rigging, JSA, SEMS programs, hazard analysis, safe work procedures, slip and fall, non-skid paint application, walking and working surfaces, production equipment/piping installation, maintenance, sandblasting/painting, scaffolding, wireline, certain top side drilling activities, air tugger use, working from heights, stairways, ladders, guarding open holes, machine guarding.

Subchapter B – Offshore
Subchapter N - Outer Continental Shelf Activities

**WORKING KNOWLEDGE OF THE FOLLOWING INDUSTRY STANDARDS:**

(API) American Petroleum Institute
(ANSI) American National Standards Institute
(ASME) American Society of Mechanical Engineers
(AWS) American Welding Society
(CGA) Compressed Gas Associations, Inc.
(ASTM) American Society for Testing and Materials
(ABS) American Bureau of Shipping
(NFPA) National Fire Protection Association
(NIOSH) National Institute for Occupational Safety and Health
(SAE) Society of Automotive Engineers
(UL) Underwriters Laboratories
(NEC) National Electrical Code
(AWO) American Waterways Operators
(ISM) International Safety Management
(SSPC) Steel Structures Painting Council.

In-depth accident investigation and report preparation in support of litigation proceedings.



Exhibit I
Archer Motion to Exclude

Safety auditing of fabrications, marine, and construction work to formulate safe work procedures concerning particularly hazardous jobs.

Gas freeing of platform piping and barges before the commencement of hot work.

Performance of Coast Guard and "ABS" hazard abatement surveys before the official certification inspection

Safety Management and control of H2S facilities.

Design of fire protection systems, ($CO_2$ and foam) for marine vessels, pipe laying barges, derrick barges, and oil production facilities.

Training, formulation, and installation of a comprehensive **HAZARD ANALYSIS** program and **(JSA) JOB SAFETY ANALYSIS** program for accident prevention and accident investigation.

**EDUCATION**

Louisiana State University - September 15, 1964, through January 1, 1968
Major: Business Administration - Management

University of New Orleans - August 23, 1984, through December 10, 1984
Course Study: Psychology

Nicholls State University - August 8, 1985, through December 15, 1985
Course Study: Psychology & Safety.

**TECHNICAL AND SAFETY TRAINING**

1970 - Repair and Maintenance of Amerada Bottom Hole pressure gauges - Geophysical Research Corp. - Tulsa, OK.

1970 - Lease Automatic Custody Transfer (L.A.C.T.) Course - Amerada Hess Oil Company - Tulsa, OK.

1970 - Sandblasting and Painting of Tanks, Piping, etc. – Pittsburgh Paint Inc. - Bloomington, TX.

1970 - Supervising for Safety - One Year Home Study Course – National Safety Council.

1971 - Multi-Media First Aid course - American Red Cross - Tulsa, OK.



Exhibit I
Archer Motion to Exclude

1971 - Multi-Media Instructor's Course - American Red Cross - Lafayette, LA.

1971 - Electrical Safety Marine & General Industry - National Electrical Code.

1972 - Industrial Fire Fighting School - Fire Prevention Engineer, Hess Oil Company - Tulsa, OK.

1972 - Confined Space Safety Course - Frank K. Lightfoot CSP - Tulsa, OK.

1973 - Key Man Development Course - National Safety Council - Lafayette, LA.

1973 - Competent Person Course - U.S. Department of Labor - OSHA Lafayette, LA.

1973 - Noise & Hearing Conversation Seminar - Acadian Safety Association - Lafayette, LA.

1973 - Federal Register (OSHA) 1926 as it relates to the oil and Gas Industry - OSHA - Lafayette, LA.

1974 - Offshore Safety Practices - Frank K. Lightfoot CSP - Tulsa, OK.

1974 - Vessel and Tank Entry Procedures - Frank K. Lightfoot CSP - Tulsa, OK.

1974 - Respiratory Protection Course - Scott Air, Inc. - Tulsa, OK.

1974 - Safety Procedures - Hydrogen Sulfide Facilities - Frank K. Lightfoot CSP - Laurel, MS.

1974 - Water Transportation - Frank K. Lightfoot CSP - Lafayette, LA.

1974 - Fire Prevention/Fire Fighting Course - Oil Storage Tanks – Fire Prevention Engineer, Hess Oil Co., and Frank K. Lightfoot CSP. Tulsa, OK.

1974 - Personal Protective Equipment Course - Frank K. Lightfoot CSP - Lafayette, LA.

1975 - Hydrogen Sulfide (H2S) Training Course - Frank K. Lightfoot CSP Laurel, MS.

1976 - CPR Course - American Heart Association - Harvey, LA.

1976 - CPR Instructor's Course - Delgado College - New Orleans, LA.

1977 - Maritime Safety Course - Delgado College - New Orleans, LA.

1979 - Hearing & Noise Seminar - Port Authority - Singapore.



Exhibit I
Archer Motion to Exclude

1985 - Safety Management - Nicholls State University - Thibodaux, LA.

1988 - Defensive Driving Instructor - Hartford Insurance Company

1989 - CSP Preparation Course - USF&G Insurance Company.

1989 - Crane Certification Course - Northshore Crane & Equipment, Inc.

1991 - Crane and rigging safety course - Baton Rouge Chapter of the National Safety Council.

1992 - Mine Entry Safety Survival - Weeks Island, La - U. S. Department of Energy - Strategic Petroleum Reserve

1992 - Bloodborne pathogen standard -Baton Rouge Chapter of the National Safety Council.

1992 - National Safety Council First Aid and CPR - New Orleans Chapter of the National Safety Council.

1993 - Permit Required Confined Space - Weeks Island, La - U. S. Department of Energy - Strategic Petroleum Reserve

1998 - OSHA BASIC SAFETY PLUS - Kenner, LA - G.N.O.I.E.C.

1999 - OSHA HAZWOPER - Baton Rouge, LA - Baton Rouge Safety Council

1999 - Crane Operator Certification Course - Weeks Island, Louisiana - United States Department of Energy - Rico Crane, Inc.

2002 - OSHA 500 COURSE - Baton Rouge, LA - Baton Rouge Safety Council

2004 - API conference on SEMP, rigging & fall Protection Safety – Houston, Texas – American Petroleum Institute.

2005 - Fundamentals of Rigging – API RP 2D - New Iberia, Louisiana – The Crosby Group, Inc. – American Petroleum Certified course.

2005 – Train the Trainer – API RP 2D - New Iberia, Louisiana – The Crosby Group, Inc. – American Petroleum Certified course.

2005 – OSHA 10-HOUR CONSTRUCTION TRAINING – CLICKSAFETY, Inc. – OSHA-approved safety course for construction sites – Course required by United States Department of Energy.

**SAFETY LITERATURE**



Exhibit I
Archer Motion to Exclude

The following safety literature was provided to various oil companies and/or governmental institutions in Indonesia, the Philippines, Thailand, and Brunei. This material was reviewed, approved, and incorporated into the various safety regulations governing the oil and gas industry.

Marine operations safety manuals - included pipe-laying barges, derrick barges, jet barges, crane barges, supply barges, dredges (bucket and suction), tugboats, and supply boats.

Fabrication yard operations safety manuals - included cranes, rigging rope and wire rope, scaffolding, personal protective equipment, welding operations, and working from heights, etc.

Safe Work Procedure manuals, derived from Job Safety Analyses performed on particularly hazardous jobs, - included welding, working from heights, various forms of egress/ingress in marine operations, material handling operations (manual, cranes, mechanical equipment, etc.).

Water Transportation Safety procedures - included emergency equipment use, life-saving equipment use, maintenance of equipment, duties of the Captain, and support personnel during egress/ingress operations and cargo transfer.

Emergency Evacuation procedures - included abandon ship drills, fire onboard drills, oil/gas well blow-out evacuations, military unrest.

Expatriation of a Deceased Employee – procedures included the necessary tests and exams required to expedite proceedings.

Confined Space Safety Procedures - Markel Wet Drift - Weeks Island, La - U. S. Department of Energy - Strategic Petroleum Reserve

**INSTRUCTOR/GUEST LECTURER**

Instructor/Guest Lecturer at Delgado College for a special series of courses dealing with marine Safety. My section covered the safe work procedures in the use of cranes, wire rope, slings, and rigging.

Guest Lecturer at a special meeting of the American Welding Society. The meeting's agenda dealt with the Engineer and Architect's responsibility towards safety in the fabrication and installation of structural steel.

Instructor/Guest Lecturer at the University of New Orleans (downtown).Paralegal studies concerning accident investigation and expert testimony.

Lafayette Paralegal Association – “ACCIDENT INVESTIGATION”

Instructor Multi-Media First Aid and CPR.



Exhibit I
Archer Motion to Exclude

Instructor in Fire Fighting and Fire Prevention.

Instructor for respiratory protection and the use of fresh air breathing equipment (tank, vessel, and hydrogen sulfide facility entry).

Trained three Singapore nationals and an Indonesian nationalist in Safety Management and Safety methods.

Taught short courses and held safety meeting in:

Material handling (manual and mechanical) - included cranes, rigging, lifting, transport, forklifts, elevators, conveyors, etc.

Personal Protective Equipment: head, face, eyes, hearing, hands, feet, and respiratory.

Water, air, and land Transportation Safety Procedures.

**WORK EXPERIENCE**

**January 1, 1994, to Present**

**Total Safety Services - Harvey, LA**

Job Description: President

To offer contract safety programs to the oil and gas industry, and litigation support for accidents involving personal injury to the legal community.

**September 25, 1987, to 1997**

**Contract Safety Consultants - Marrero, LA**
**President**

Job Description: President

To offer contract safety programs to the oil and gas industry, and litigation support for accidents involving personal injury to the legal community. Test and certify candidates in safe rigging techniques, crane operations, and over-the-water transfers (swing rope and personnel basket).

**November 1986 to September 25, 1987**

**Engineering Inspection and Investigation, Inc., New Orleans, LA**

Job Description:

Employed as a safety consultant. Duties included investigating personal injury cases, researching the applicable codes and regulations, and providing a comprehensive report in preparation for litigation proceedings.

**December 1985 to November 1986**

**Gulf South Laboratories, Inc. - New Orleans, LA**

Employed as a fireproofing, welding, sandblasting, and painting inspector. My duties included the inspection of various construction sites to assure the customer that the building and safety specifications associated with the job were being met. Weekly reports were written confirming the inspection services provided.

Experience:

Responsible for the welding and sandblasting/painting operations performed in conjunction with the building of Pumping Station No. 13 for Jefferson Parish. Assisted the field engineer in his project management activities.

Fireproofing investigator for the U.N.O. Assembly Center.

Welding & Fireproofing inspector for the construction of the Waggaman Elementary School.

Fireproofing inspector of Doctor's Hospital.

Fireproofing inspector for three elementary schools in Jefferson Parish.

Welding inspector and water tower investigator for the U.S. Navy Base - Algiers.

Hydrostatically tested gas pipelines for Louisiana Gas Service.

Inspector for the repair and painting operations of the fifteen high-rise water towers located throughout Jefferson Parish. These water towers were repaired, sandblasted, and painted.

Inspector for the porcelain finished traffic control signs (built and coated in California) for the New Orleans International Airport.

Inspector for the sandblasting/painting operations associated with the coating of sewerage treatment plants in Avondale, LA, Morgan City, LA, and LaPlace, LA.



Exhibit I
Archer Motion to Exclude

**August 1985 to December 1985**

**College:**

Attended Nicholls State University and worked as a security guard in a fabrication yard and a counselor for teens at the Lafourche Parish Justice Facility.

**February 1985 to May 1985**

**Inspection Consultants, Inc. - New Orleans, LA**

Job Description: Vice President

As a safety consultant and part-owner, my duties included the installation of safety programs for the industrial customer, accident investigation, and safety audits. Safety manuals were produced to provide a workable safety program for the customers.

**July 1983 to February 1985**

**Gulf South Laboratories, Inc. - New Orleans, LA**

Job Description:

Same as above.

**July 1978 to March 1982**

**McDermott, Inc. - (South East Asia Group) - Singapore**

Company Description:

McDermott, Inc. was the largest offshore construction company in the world. The southeast Asia Group operated between Japan and Australia and consisted of a fabrication yard on Batom Island in Indonesia, the Jurong Yard in Singapore, and the Marine and Diving Divisions.

The Batom Fabrication yard was considered the largest in that area and employed over 2,300 nationals and expatriates; its function was the fabrication of offshore platforms, barges, boats, drilling rigs, and other oil-related equipment.

The Jurong Yard was mostly used for support purposes but did do some small fabrication work. The Marine Division consisted of three center slot pipe-laying barges, one crane barge, two jet barges, one derrick barge, and various supply and tug boats.

The Diving Division performed salvage work, subsurface tie-ins, and completed underwater well installations.

Job Description:

Employed as the manager of the Safety Department for the South East Asia Group. Managerial duties included the supervision of the Workmen Compensation Department, which consisted of two employees and the Medical Department (eighteen Filipino doctors and one American medic), and four nationals.

Administrative Duties:

The installation of an American-type safety program in this area. As the workforce consisted of various nationalities, the safety manuals, safe work procedures, accident reports, etc. had to be translated and published into six different languages.

Significant Safety Duties included:

To apply on-the-job training techniques to the national safety personnel in safety management procedures.

To act as a liaison between the management of McDermott, Inc., and officers of various oil companies and countries concerning safe work practices associated with the oil and gas industry in their areas.

To supervise all air and sea rescues.

To evaluate new work locations and to set up emergency evacuation procedures for our personnel.

To provide safety information to the various companies and countries for their review and approval.

To install safe work procedures for hazardous jobs.

To supervise the gas freeing of production platforms before hot work commencing.

To assist in the design of fire-fighting, and prevention equipment on our vessels, barges, and projects.

Achievements:

The Batom Fabrication yard was the only yard in the far east to successfully fabricate the Indonesian-designed "Tin Dredge" without it catching fire and being destroyed. Due to the coating of the various material carrying shoots, the barge would catch fire and burn when exposed to any cutting or burning operations. An

automatically activated foam system was designed for use during its fabrication and a continuous fire watch was devised and employed for the 24 hours a day, six-month job.

**April 1976 to July 1978**

**McDermott, Inc. (Marine Pipeline and Diving Division) - Harvey, LA**

Job Description: Safety Supervisor - Marine Pipeline and Diving Divisions

Company Description:

The Marine Pipeline Division then considered the best and largest in the United States, consisted of three large pipe-laying barges, one derrick barge, two jet barges, and a variety of tugs, supply boats, and crew boats. The Diving Division worked off these barges and vessels and therefore came under the same safety rules and regulations. Both employed approximately 1,500 persons of various crafts and performed the same type of work as their counterparts did in the South East Asia Group.

Administrative Duties:

Co-authored a new Safety manual, Medics Manual, and started a Safe Work Procedure Manual. This manual would be an ongoing project taken from the Safety Job Analysis reports performed on various aspects of our work. A new Safety Awards Program was started, and a New Employee Indoctrination Program and pre-employment. Hearing and Physical exams were initiated. A new computer analysis program was developed to evaluate our accident statistics, and new accident report procedures were installed to go along with it.

Safety Duties:

Holding monthly safety meetings aboard each piece of equipment, investigating accidents, holding abandon ship drills, monitoring the safety awards program, and supervising gas freeing operations on barges and platforms before the commencement of hot work.

Achievements:
The largest and deepest (1,200 foot) offshore platform in the world was towed and set on location by my division during my employment without sustaining a single lost-time accident.

**September 1970 to April 1976**

**Amerada Hess Corp. - Lafayette, LA**

Company Description:



Exhibit I
Archer Motion to Exclude

Amerada Hess Oil Company was the sixth largest independent oil company in the world. The Lafayette Region consisted of eight oil and gas production fields located from Como, Texas to Laurel, MS., and employed some 900 workers. There were two manned offshore production and storage platforms and two manned inland-water oil production and storage facilities; the other four locations were land-based.

Job Description:

Initially hired as a Production Technician, my duties included wireline work, supervising the installation of pipelines, and piping, all types of gauge repairs, oil and gas production measurements, and general maintenance work.

To establish a Corporate Safety Department, six employees throughout the United States and Canada were promoted to Safety Representatives. An extensive safety-training program was started and headed by the Corporate Safety Manager, Mr. Frank K. Lightfoot, CSP. Mr. Lightfoot was the former chairman of the oil and gas section of the National Safety Council.

Safety Duties:

Traveling to the eight oil and gas production fields and holding monthly safety meetings, investigating accidents, teaching first aid courses, making safety inspections, auditing safe work procedures, and supervising the testing of oil storage tanks for oxygen or flammables before hot work commencement.

Achievements:

The Lafayette Region was the first and only region to go for one full year without a lost-time accident during my employment. The management presented the region with a special awards banquet and was praised in the company's Safety newsletter.

**June 1969 to July 1970**

**Indel, Inc. - New Orleans, LA**

Job Description:

Manager of the New Orleans Branch. Sold, rented, and repaired Amerada Bottom Hole pressure equipment. Sold computer tape, disc packs, and other computer supplies. Sold photo-recording supplies, as Indel, Inc. was a distributor for Kodak and Dupont.

Experience:

Supervised the performance of Reservoir Limits Tests offshore. Using the Amerada Bottom Hole Pressure Gauge, the extent and amount of oil reserves were measured and calculated.



Exhibit I
Archer Motion to Exclude

**March 1968 to June 1969**

**Smith Wallender Wireline - Harvey, LA**

Job Description:

Employed as a wireline operator offshore. Performed bottom hole pressure surveys and well completions; changed out gas lift valves and subsurface safety valves.

## DISCLOSURE OF EXPERT TESTIMONY

1 BOBBY MOREE V. SOUTHERN SHIPBUILDING CORP.
YEAR: 1992
COURT: US DISTRICT - EASTERN DISTRICT - NEW ORLEANS, LA - JUDGE SCHWARTZ
PLAINTIFF: UNGAR & BYRNE

2 JOHN E. JORDAN V. INTERCONTINENTAL BULKTANK CORP
YEAR: 1990
COURT: 18 JUDICIAL DISTRICT COURT - PORT ALLEN, LA
PLAINTIFF: TERRY BELL

3 ROBERT S. BOWMAN, JR. V. PAN AM WORLD SERVICES, INC.
YEAR: 1989
COURT: US DISTRICT - EASTERN DISTRICT, NEW ORLEANS, LA - JUDGE SCHWARTZ
DEFENSE: JONES WALKER

4 LEROY DARDAR, JR V. CONOCO, INC & ABC CRANE COMPANY
YEAR: 1992
COURT: US DISTRICT - EASTERN DISTRICT, NEW ORLEANS, LA - JUDGE MINTZ, JR.
PLAINTIFF: HAROLD WHEELAHAN

5 GLENN W. D. GRAY V. TEXACO, INC.
YEAR: 1991
COURT: STATE COURT, CAMERON, LOUISIANA - JUDGE FONTENOT
PLAINTIFF: J.B. JONES



Exhibit I
Archer Motion to Exclude

6 LINDSEY FRANCIS V. JOHN E. GRAHAM & SONS
YEAR: 1991
COURT: STATE COURT, CAMERON, LOUISIANA - JUDGE FONTENOT
DEFENSE: HUNTER LUNDY

7 AUDREY D. FAUCHEAUX V. TERREBONNE PARISH CON.
YEAR: 1990
COURT: 32 TH JUDICIAL DISTRICT COURT - PARISH OF TERREBONNE - JUDGE: FALLON
DEFENSE: DUVAL, FUNDERBURK

8 U.S. ABATEMENT VS. MOBIL EXPLORATION & PRODUCING, USA
YEAR: 1993
COURT: US DISTRICT COURT - EASTERN DISTRICT - NEW ORLEANS, LA - BANKRUPTCY COURT - JUDGE BROWN
DEFENSE:

9 LARRY SAMPSELL V. B&I WELDING SERVICES, INC
YEAR: 1993
COURT: 25 TH JUDICIAL DISTRICT COURT - PLAQUEMINES, LA - JUDGE KIRBY
PLAINTIFF: GEORGE NALLY

10 C. RAVEN BENOIT VS. CRAIN BROS, INC.
YEAR: 1994
COURT: STATE COURT, CAMERON, LOUISIANA - JUDGE FONTENOT
PLAINTIFF: J.B.JONES
.

11 LEON HUVAL VS. C.F. BEAN CORPORATION
YEAR: 1994
COURT: FEDERAL COURT, LAFAYETTE, LA - JUDGE REBECCA DOHERTY
PLAINTIFF: MORROW & MORROW

12 RICKY LINTON, VS. GREAT LAKES DREDGE & DOCK CO.
YEAR: 1994
COURT: STATE COURT, HARRIS COUNTY- JUDGE JOHNSON
DEFENSE: HUNTER LUNDY
.

13 RICHARD VIATOR VS. GORDON'S TRUCKING, CO.



Exhibit I
Archer Motion to Exclude

YEAR: 1994
COURT: UNITED STATES DISTRICT COURT LAFAYETTE
DEFENSE: GOLEAMINO

14 BRANDON DESHOTEL VS. KMART CORP.
YEAR: 1994
COURT: UNITED STATES DISTRICT COURT - EASTERN DISTRICT
DEFENSE: JONES WALKER

15 GEORGE BRANIFF VS. BLUE STREAK
YEAR: 1994
COURT: 24 TH JUDICIAL DISTRICT COURT
PLAINTIFF: TERRY BELL

16 CHARLES PALOMBO VS. CAMERON OFFSHORE BOATS, INC.
YEAR: 1995
COURT: WESTERN DISTRICT LAKE CHARLES
DEFENSE: VERRON

17 JAMES WALKER VS. MOBIL OIL CORP.
YEAR: 1995
CASE NO: 94 C 305
COURT: NORTHERN DISTRICT OF ILLINOIS -JUDGE ROBERT W. GETTLEMAN
PLAINTIFF:

18 CHARLES BOUQUE VS. CHEVRON
YEAR: 1995
COURT: UNITED STATES DISTRICT COURT LAFAYETTE
DEFENSE:

19 PATRICIA PICOU VS. DIAMOND REEF SEAFOOD
YEAR: 1999
COURT: 15 TH JUDICIAL DISTRICT COURT - JUDGE COX
PLAINTIFF: JOHN JAY

20 WILLIAM BREAUX VS. LOUISIANA MACHINERY CO., ET AL

YEAR: 1998
COURT: FOURTH JUDICIAL DISTRICT COURT - JUDGE BECHNEL
PLAINTIFF: GIBBY ANDRY

21 CARROLL BOUDREAUX VS. U.S.A. & BAY MANAGEMENT
YEAR: 2000
COURT: US DISTRICT - EASTERN DISTRICT - NEW ORLEANS, LA - JUDGE BERRIGAN
PLAINTIFF: UNGAR & BYRNE

22 BILLY GILPATRICK VS. ENSCO OFFSHORE COMPANY
YEAR: 2000
COURT: FIFTEENTH JUDICIAL DISTRICT COURT - JUDGE RUBIN
PLAINTIFF: GILPATRICK

23 CHICK KIM CHOO VS. EXXON
YEAR: 2000
COURT: FEDERAL COURT IN HOUSTON: JUDGE BELSON
PLAINTIFF: CHARLES MUSSCLEWHITE

24 DALE J. ESTAY VS. TERMINAL STEVEDORES, INC.
YEAR: 2000
COURT: 29 TH JUDICIAL DISTRICT COURT - PARISH OF ST. CHARLES - JUDGE: ROBERT CHIASSON
DEFENSE: JONES WALKER

25 U. V. JEAN MOTT VS. FALCON DRILLING COMPANY, INC.
YEAR: 2000
COURT: 32 TH JUDICIAL DISTRICT COURT - PARISH OF TERREBONNE - JUDGE: WALKER
PLAINTIFF:

26 WENDELL BYRD VS. ROWAN COMPANIES, INC.
YEAR: 2001
COURT: 16 TH JUDICIAL DISTRICT COURT PARISH OF ST. MARY - JUDGE: SIMMONS
PLAINTIFF: ELWOOD STEVENS

27 RONALD DICKEY VS. TAIRA LYNN MARINE.



Exhibit I
Archer Motion to Exclude

YEAR: 2001
COURT: 34 TH JUDICIAL DISTRICT COURT PARISH OF ST. BERNARD - JUDGE: BUCKLEY
PLAINTIFF: RONNIE PENTON

28 JAMES DAGGS VS. GULF ISLAND CONTRACTORS, INC.
YEAR: 2001
COURT: 32 TH JUDICIAL DISTRICT COURT PARISH OF TERREBONNE
JUDGE: WIMBISH
PLAINTIFF:

29 KEVIN AMOS AND JENNIFER AMOS VS. NABORS OFFSHORE CORPORATION.
YEAR: 2002
COURT: US DISTRICT - EASTERN DISTRICT - NEW ORLEANS, LA - JUDGE THOMAS G. PORTEOUS, JR.
PLAINTIFF: ST. MARTIN & WILLIAMS

30 MARY ANN BUTEAUX VS. R & B FALCON
YEAR: 2002
COURT: 32 TH JUDICIAL DISTRICT COURT PARISH OF ST. TERREBONNE
JUDGE: WALER
DUVAL, FUNDERBURK

31 TODD AUCOIN VS. CAL DIVE INTERNATIONAL, INC.
YEAR: 2002
COURT: 16TH JUDICIAL DISTRICT COURT, PARISH OF ST. MARY
JUDGE: LEONARD
PLAINTIFF: DAVID PARISOLA

32 TERRY LYNN HAYLES VS. SONAT EXPLORATION CO.
YEAR: 2002
COURT: CIVIL DISTRICT COURT, PARISH OF ORLEANS
JUDGE: DIROSA
DEFENSE: LISKOW & LEWIS

33 JUAN LOPEZ VS. MARINE DRILLING COMPANY ET AL
YEAR: 2002
COURT:15 TH JUDICIAL DISTRICT COURT PARISH OF VERMILION



Exhibit I
Archer Motion to Exclude

JUDGE: BROUSSARD
PLAINTIFF: GEORGE FLOURNEY

34 JERRY P. HELMER VS. F & B FALCON
YEAR: 2002
COURT:16 TH JUDICIAL DISTRICT COURT PARISH OF ST. MARY
JUDGE: PORTER
DEFENSE: DUVAL, FUNDERBURK

35 AARON J. NOEL VS. DIAMOND OFFSHORE DRILLING, INC.
YEAR: 2003
COURT: UNITED STATES DISTRICT COURT - HOUSTON, TEXAS
JUDGE: SIM LAKE
PLAINTIFF: BLAKE JONES

36 ODILON CHACHA COTO, ET AL VS. J. RAY MCDERMOTT, S. A. ET AL
YEAR: 2003
COURT: CIVIL DISTRICT COURT, PARISH OF ORLEANS
JUDGE: MARVIN GAHAGAN
PLAINTIFF: JOHN O'QUINN

37 ABEL RODULPHO ESQUIVEL, ET AT VS. KELLOGG BROWN & ROOT, INC.
YEAR: 2003
COURT: 190 TH JUDICIAL DISTRICT, HARRIS COUNTY, TEXAS
JUDGE: JENNIFER ELROD
PLAINTIFF: JOHN O'QUINN

38 ANTHONY F. DIXON VS. MORENO ENERGY MARINE, INC.
YEAR: 2003
COURT: 38 TH JUDICIAL DISTRICT COURT, PARISH OF CAMERON
JUDGE: FONTENOT
DEFENSE: WOODLEY WILLIAMS

39 TERRELL PARFAIT VS. TRANSOCEAN & SHELL
YEAR: 2004
COURT: CDC NEW ORLEANS



Exhibit I
Archer Motion to Exclude

JUDGE: ROBIN GIARRUSSO
PLAINTIFF: ST MARTIN & WILLIAMS

40 ROBERT MCINNIS VS. PARKER DRILLING
YEAR: 2004
COURT: CIVIL DISTRICT COURT, PARISH OF ORLEANS
JUDGE: ROBIN GIARRUSSO
DEFENDANT – MR. JEFFERSON TILLERY & MR. LEE STRAYHAN

41 DUPLECHIN VS. DUPHIL, INC.
YEAR: 2004
COURT: 38 TH JUDICIAL DISTRICT COURT, PARISH OF CAMERON
JUDGE: FONTENOT
TYPE OF TESTIMONY: TRIAL
PLAINTIFF – KEVIN DUCK – DUCK LAW FIRM

42 GUILLORY VS. SEA MAR MANAGEMENT, INC.
YEAR: 2006
COURT: 16 JUDICIAL DISTRICT, PARISH OF IBERIA
JUDGE: COMEAUX
DEFENSE – WILLIAM BASS – VOORHIES & LABBE

43 JONES VS. PRODUCTION MANAGEMENT, CHEVRON, HOUMA INDUSTRIES
YEAR: 2006
COURT: EASTERN DISTRICT FEDERAL COURT
JUDGE KURT D. ENGELHARDT
PLAINTIFF ED SHERMAN

44 CEDRIC NICHOLS VS. WEEKS MARINE, INC. ET AL
YEAR: 2006
COURT: EASTERN DISTRICT FEDERAL COURT
JUDGE ELDON E. FALLON
PLAINTIFF: RANDY UNGAR

45 GRAYLING VITAL VS. COASTAL CATERING, LLC
YEAR: 2008
COURT: EASTERN DISTRICT FEDERAL COURT



Exhibit I
Archer Motion to Exclude

JUDGE A. J. McNAMARA
PLAINTIFF: DARLENE JACOBS & AL SARRAT

46 ROBERT C. BAUCOM VS. SISCO STEVEDORING, LLC, WARRIOR & GULF
YEAR: 2008
COURT: SOUTHERN DISTRICT OF ALABAMA
JUDGE: WILLIAM STEELE
PLAINTIFF: LOUIS ST. MARTIN

47 TRACY COMMINGS VS. MIKE HOOKS, INC.
YEAR: 2008
COURT: EASTERN DISTRICT OF LOUISIANA
JUDGE JAY ZAINEY
PLAINTIFF: JOE GUIDRY

48 ROZMARYNOSKI VS. J. RAY MCDERMOTT
YEAR: 2008
COURT: CIVIL DISTRICT COURT, PARISH OF ORLEANS
JUDGE: DAROSA
CLIENT: PLAINTIFF: MR. JOHN O'QUINN & MR. CHARLIE MUSSCLEWHITE

49 JAMES JOSEPH VS. OMEGA PROTEIN, INC.
YEAR: 2008
COURT: EASTERN DISTRICT OF LOUISIANA
JUDGE: LANCE AFRICK
CLIENT: PLAINTIFF: MR. WILLIAM GEE & LARRY CURTIS

50 DAVID LITTETON VS. TRANSOCEAN OFFSHORE DEEPWATER DRILLING, INC.
YEAR: 2009
SOUTHERN DISTRICT OF MISSISSIPPI
JUDGE: DANIEL P. JORDAN III
PLAINTIFF: CHRIS ERNY

51 STEVEN E. KUITHE VS. GULF CARIBE MARIMINE, INC.
YEAR: 2010
SOUTHERN DISTRICT OF ALABAMA
JUDGE: WILLIAM H. STEELE

PLAINTIFF KEN JACQUES & LOUIS KOERNER

52 TYNIRSHA W. RHINE VS. BAYOU PIPE COATING, INC.
YEAR: 2010
16TH JUDICIAL DISTRICT COURT, PARISH OF NEW IBERIA
JUDGE: GERARD B. WATTIGNY
PLAINTIFF KEN JACQUES & LOUIS KOERNER

53 BRAD BOUTIN VS. NEWFIELD EXPLORATION CO.
YEAR: 2010
WESTERN DISTRICT OF LOUISIANA
MAG. JUDGE HILL
PLAINTIFF: DeGRAVELLES, PALMINTIER, HOLTHAUS & FRUGE LLP

54 LEONARD GOTCH VS. TRANSOCEAN, INC.
YEAR: 2011
25TH JUDICIAL DISTRICT COURT - PLAQUEMINES
JUDGE: KEVIN CONNER
PLAINTIFF: BLAKE JONES

55 ERIC VINCENT OWENS VS. ABDON CALLAIS OFFSHORE, LLC
YEAR: 2011
EASTERN DISTRICT OF LOUISIANA
JUDGE: SARAH S. VANCE
PLAINTIFF: KRISTI POST

56 KENNY CHOATE VS. ALLIS-CHALMERS TUBULAR
YEAR: 2011
42nd JUDICIAL DISTRICT COURT
DESOTO PARISH, LOUISIANA
JUDGE CHARLES ADAMS
PLAINTIFF: MR. SCOTT J. CHAFIN, JR – GREGORIO, GREGORIO & PAYNE

57 RUSSELL DESELLE, JR. VS. LAREDO CONSTRUCTION, INC. ET AL
YEAR: 2012
WESTERN DISTRICT OF LOUISIANA
JUDGE: HAIK



Exhibit I
Archer Motion to Exclude

PLAINTIFF: MR. AARON ALLEN – MOTT & ALLEN

58 TROY ESTELLE VS. WEST END MARINE, INC. SANDRIDGE OFFSHORE, LLC
YEAR: 2112
16TH JUDICIAL DISTRICT COURT, PARISH OF ST. MARY
JUDGE: JAMES R. McCLELLAND
PLAINTIFF: MR. DAVID AND JEANNE LABORDE – LABORDE LAW FIRM

59 SCOTT DELAHOUSSAYE VS. PISCES ENERGY
YEAR: 2012
EASTERN DISTRICT OF LOUISIANA
JUDGE: JANE TRICHE MILAZZO
PLAINTIFF: MR. DAVID BATEMAN

60 JESSICA SIMON VS. LEGACY OFFSHORE LLC
YEAR: 2013
23RD JUDICIAL DISTRICT COURT – PARISH OF ASSUMPTION
JUDGE: RALPH TUREAU
PLAINTIFF: HERMAN, HERMAN, KATZ & COTLAR: MR. JED CAIN

61 CHARLES PAES VS ROWAN COMPANIES, INC
YEAR: 2013
EASTERN DISTRICT OF LOUISIANA
JUDGE: LANCE AFRICK
PLAINTIFF: MR. TIM YOUNG

62 ROSARIO CHERMIE VS CALLAIS & SONS, LLC
YEAR: 2013
EASTERN DISTRICT OF LOUISIANA
JUDGE: KURT D. ENGELHARDT
PLAINTIFF: MS. KRISTI POST

63 JASON THOMAS VS. SHELL OIL COMPANY
YEAR: 2013
MEDIATION JUDGE: A. J. KROUSE
PLAINTIFF: MR. LARRY BEST

64 ERNEST GUIDRY VS. ABC INSURANCE TANNER & ENERGY 21
YEAR: 2015



Exhibit I
Archer Motion to Exclude

27TH JUDICIAL DISTRICT COURT PARISH OF ST. LANDRY
JUDGE: JAMES DOHERTY, JR
PLAINTIFF: MR. BLAKE DAVID

65 RONALD BIBBINS, SR VS. CONSOLIDATED GRAIN & BARGE, INC.
YEAR: 2015
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA
JUDGE: IVAN L.R. LEMELLE
MAGISTRATE JUDGE: MARY ANN VIAL LEMMON
PLAINTIFF: MS. KRISTI POST

66 RICHARD PRICE VS. GREAT LAKES DREDGE & DOCK COMPANY, LLC
YEAR: 2015
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA
JUDGE: LANCE AFRICK
MAGISTRATE JUDGE: ROBY
DEFENSE: JONES WALKER, JEFFERSON TILLERY

67 JASON DEROUEN VS. HERCULES LIFTBOAT COMPANY, LLC, Y&S MARINE, INC. ET AL
YEAR: 2015
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA
JUDGE: FALLON
MAGISTRATE JUDGE: SHUSHAN
DEFENSE: STAINS, EPPLING, JASON KENNY, TONY STAINS

68 BRAD HEBERT VS. MAINTENANCE ENTERPRISES, INC.
YEAR: 2016
18TH JUDICIAL DISTRICT COURT
PARISH OF IBERVILLE
STATE OF LOUISIANA
DIVISION D
PLAINTIFF: SAUNDERS & CHABERT - SCOTTY CHABERT

69 ATLANTIC SOUNDING, CO, INC VS. JESSICA R. SMITH
YEAR: 2016
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA
JUDGE: MILAZZO
MAGISTRATE JUDGE: NORTH
PLAINTIFF: THE YOUNG LAW FIRM - MS. MEGAN MISKO



Exhibit I
Archer Motion to Exclude

70 STEVE GRANGER, IV VS. BISSO MARINE, LLC
YEAR: 2016
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA
JUDGE: FALLON
MAGISTRATE JUDGE: KNOWLES
PLAINTIFF: LAMOTHE LAW FIRM, LLC - MR. RICHARD MARTIN

71: BRAYTON BAYARD VS. CAMERON, INC.
YEAR: 2018
UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
LAFAYETTE DIVISION
JUDGE: REBECCA DOHERTY
MAG. JUDGE CAROL WHITEHURST
PLAINTIFF: JEROME H. MOROUX – BROUSSARD & DAVID, LLC

72: RORY CASTILLE VS APACHE CORP
YEAR: 2018
UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
LAFAYETTE DIVISION
JUDGE: REBECCA DOHERTY
MAG. JUDGE CAROL WHITEHURST
DEFENSE: JEFFERSON TILLERY – JONES WALKER

73: MARCUL LOMAX VS. MARQUETTE TRANSPORTATION
YEAR: 2018
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA
JUDGE: JANE TRICHE MILAZZO
MAG. JUDGE KAREN WELLS ROBY
PLAINTIFF: MS. KRISTI POST – BLAKE JONES LAW FIRM

74: JOHNNY DEAN, SR VS. SEA SUPPLY, INC.
YEAR: 2018
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA
JUDGE FALLON
MAG. JUDGE KNOWLES
DEFENSE: JEFFERSON TILLERY – JONES WALKER



Exhibit I
Archer Motion to Exclude

75: DEVIN BARRIOS VS. CENTAUR, LLAC
YEAR: 2018
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA
JUDGE: JANE TRICHE MILAZZO
PLAINTIFF: JOSEPH WAITZ – WAITZ & DOWNER

76: GARY ROBIN VS. WEEKS MARINE, INC.
YEAR: 2018
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA
JUDGE SUSIE MORGAN
PLAINTIFF: RYAN LUMINAIS – SHER, GARNER, CAHILL, RICHTER, KLEIN & HILBERT

77: JEFFERY MCCARTY VS. ENTERPRISE MARINE SERVICES, LLC
YEAR: 2019
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA
JUDGE SUSIE MILAZZO
PLAINTIFF: JOSEPH B. MARINO, III - THE YOUNG FIRM

78: RYAN R. KINNERSON VS. ARENA OFFSHORE, LP, SPARROW OFFSHORE, LLC
YEAR: 2019
UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
JUDGE: FALLON
PLAINTIFF: TOM EDWARDS, DOMENGEAUX, WRIGHT, ROY & EDWARDS

79: ALEX VARGAS VS MANSON GULF, LLC, C&G WELDING, INC.
YEAR: 2020
UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
JUDGE: BARRY W. ASHE
PLAINTIFF: MR. PATRICK DENNIS & MR. MARK DOYLE - DOYLE LLP

80:WAYNE C. RAYMOND VS. MARINE TRANSPORTATION SERVICES, INC. ET AL
YEAR: 2020
UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
JUDGE: MICHAEL J. JUNEAU
PLAINTIFF: MR. BLAKE DAVID



Exhibit I
Archer Motion to Exclude

81: JEFFREY L. SOUDELIER, JR VS. PBC MANAGEMENT, INC., FLORDIA MARINE TRANSPORTERS
YEAR: 2021
29TH JUDICIAL DISTRICT COURT - PARISH OF ST. CHARLES, STATE OF LOUISIANA
JUDGE: CONNIE M. AUCOIN
DEFENSE: JASON KENNY – STAINS, EPPLING & KENNY

82: ALLEN TAYLOR VS. B&J MARTIN, INC. ET AL
YEAR: 2021
EASTERN DISTRICT OF LOUISIANA
JUDGE JY C. ZAINEY
DEFENSE: JEFFERSON TILLERY - JONES WALKER

*****************************************************************************************

**DEPOSITION TESTIMONY**
**SINCE 1987**

1. ABATE VS. FALCON DRILLING – sandblasting safety
2. ALLEN VS. CONTINENTAL CONSTRUCTION CO., INC.
3. ALFORD VS. NOBLE DRILLING
4. ALEXANDER VS. MARATHON OIL CO.
5. ANTOINE VS. BHP BILLITON PETROLEUM, INC. – hit by water from a psi hose
6. ANTHONY VS. ACBL
7. ANDERSON VS. DIAMOND OFFSHORE DRILLING – owt, boat to boat
8. ANDERSON VS. HARVEY GULF
9. AMOS VS. NABORS DRILLING – see trial – LO/TO cut off a finger
10. ARNAUD V. PINE BLUFF
11. ATKINSON VS. WARRIOR ENERGY
12. AUCOIN VS. CAL DIVE INTERNATIONAL
13. BARBER VS. C&C TECH
14. BAYARD VS. CAMERON – struck with chain binder, fall from the transporter
15. BAUCOM VS. SISCO STEVEDORING, LLC, WARRIOR & GULF
16. BEECH VS. PREMIERE
17. BELL VS. K&K TRANSPORTATION, INC.
18. BELL VS. OTTO CANDIES
19. BENOIT VS. CRAIN BROS, INC.
20. BERNARD VS. GREAT LAKES DREDGE & DOCK CO.
21. BILLINZON VS. CONOCO - stairs
22. BILLIOT VS. CHEVRON – fall protection
23. BLAIR VS. BLAKE DRILLING
24. BLANCHARD V. ROWAN COMPANIES, INC.
25. BOREL VS. CHEVRON
26. BOSARGE VS. MAGIC MIKE



Exhibit I
Archer Motion to Exclude

27. BOUDREAUX VS. USA & BAY MANAGEMENT
28. BOUQUE VS. CHEVRON
29. BOURGUE VS. DIAMOND
30. BOUTIN VS. NEWFIELD EXPLORATION
31. BOWMAN VS PAN AM WORK SERVICES
32. BRACEY VS. HALLIBURTON ENERGY SERVICES – SLIP & FALL
33. BRANIFF VS. BLUE STREAK
34. BREAUX VS. J. W. STONE – dropped gear - lifting
35. BRILEY VS. GLOBAL INDUSTRIES- lifting pipe
36. BRISTER V. TEXACO
37. BROUSSARD VS. UNION
38. BRUNET VS. GLOBAL PIPELINE PLUS
39. BURLEIGH VS. FEDERATED MUTUAL INSURANCE – SLIP IN BATHROOM
40. BUTEAUX VS. R&B FALCON
41. BYRD VS. ROWAN – lifting chemical sacks
42. CABOT OIL VS. SMITH MARINE – hurricane evacuation
43. CANIK VS. NATIONAL UNION
44. CANTRELLE VS. BLUE STREAK – personnel net
45. CARDENAS VS. MIKE HOOKS, INC.
46. CISNEROS VS. MARQUETTE TRANSPORTATION gangway and lifting luggage
47. CHARRON VS. HORNBECK OFFSHORE SERVICES, INC. crane and rigging slings
48. CHIASSON VS. MAKO MARINE OPERATORS
49. CHATMAN VS. CARGILL, INC.
50. CHENEUERT VS. GARGILL
51. CHEANAU VS. COASTAL GARGO – crane – load dropped
52. CHICK VS. EXXON – struck by falling valve stem.
53. CISNEROS VS MARQUETTE TRANSPORTATION – lifting his bag onto a boat
54. CLEMENTS VS. GULF RESOURCE - lifting
55. CHOATE VS. ALLIS-CHALMERS - struck by pipe
56. CHOO VS. EXXON
57. COLMAN VS. TRANSOCEAN – slip and fall
58. COLIN VS. AEP MEMCO, LLC Crane & rigging
59. COLLING VS. TIDEWATER
60. COLLINS VS. CARDINAL
61. COLLINS VS. DALE MARTIN OFFSHORE – fall down a stairway
62. COLLINS VS. SEA HORSE MARINE – Crane & rigging
63. COMMINGS VS. MIKE HOOKS, INC.
64. CONOCO VS. HOFMAN MARCELLO
65. CORMIER VS M&M WIRELINE ET AL
66. COTO VS. MCDERMOTT- barge sunk in a hurricane
67. CRAWFORD VS. L&L
68. CROSBY VS. R&B FALCON
69. CRUMP VS. DELOACH MARINE SERVICES, LLC. – pelican hook released fell



Exhibit I
Archer Motion to Exclude

70. CURTIS VS. CHEVRON U.S.A., INC.
71. DAGGS VS. GULF ISLAND CONTRACTORS, INC.
72. DAHL, ROBERT VS. SWIFT ENERGY OPER – slip and fall on wet plywood
73. DARDAR VS. CONOCO
74. DAVID VS C&G BOATS, INC. – personnel net
75. DELANEY VS. MERCHANTS RIVER TRANSPORTATION
76. DEROCHE VS. BERRY BROTHER – Fire on a tank battery
77. DEROUEN VS. HERCULES LIFTBOAT COMPANY, LLC – personnel net transfer
78. DESHOTEL VS. KMART CORP
79. DICKEY VS. TAIRA LYNN MARINE
80. DIXON VS. MAREENO ENERGY MARINE
81. DOMINGUE VS. CHEVRON guarding ladder access way
82. DUERISON VS CLIFF DRILLING
83. DUPLECHIN VS. DUPHIL, INC. - Crane
84. ESKINE VS. RONCO BARGE
85. ESTAY VS. TERMINAL STEVEDORES, INC.
86. FAUCHEAUX VS. TERREBONNE PARISH
87. FERNANDEZ VS. VICTOR EQUIPMENT CO. – gauge exploded
88. FOLEY VS. NORMAN PIPELINE – lifting engine head
89. FOLLIS VS. CHILES ALEXANDER - crane
90. FORSTER VS. SUBSEA
91. FOY VS. HOME DEPOT, INC. – struck by a forklift
92. FOX VS. TEXACO – no swing rope fell trying to get on a jacket.
93. FRANCIS VS. JOHN E. GRAHAM & SONS
94. FREEMAN VS. CHEVRON – slip down a stairway
95. FROST VS. MARATHON OIL CO. – struck by sling on an air tugger
96. GASPARD VS OPI – Stairway
97. GANT VS. SOUTHLAND ENERGY SERVICES, LLC
98. GILPATRICK VS. ENSCO OFFSHORE COMPANY
99. GINN VS. ROWAN – lifting
100. GOTCH VS. TRANSOCEAN INC
101. GRANTHAM VS. AVONDALE INDUSTRIES
102. GRAY VS. TEXACO
103. GREEN VS. ARIES - Gangway
104. GRINDLEY VS. R&B FALCON
105. GUIDRY VS. DIAMOND TANK – Lifting
106. GUILLORY VS. SEA MAR MANAGEMENT
107. HARRINGTON VS COLUMBIA GULF CO, ET AL – hot work on a pipeline
108. HAMMOND VS. MCDERMOTT – struck by equipment
109. HAWKS VS. LUHR BROS – manual material handing on push boat engine room
110. HAYLES VS. SONAT PRODUCTION – lifting valve
111. HAYNES, VS. MOMENTIVE SPECIALTY CHEMICALS, INC.
112. HEBERT VS. M. HOOKS, INC.



Exhibit I
Archer Motion to Exclude

113. HEBERT VS. MAINTENANCE ENTERPRISES, INC.
114. HELMER VS. F & B FALCON
115. HENDERSON VS. ISLAND OPERATING CO. – CRANE RIGGING
116. HENRY VS. L&A CONTRACTING, CO.
117. HOMER VS. DNOW LP – fall from heights
118. HILL VS. CROSS MARINE – fell from a structure
119. HUVAL VS. C.F. BEAN – lifting sling off crane's bucket
120. JACKSON VS. YMCA – slip in the bathroom
121. JOHNSON VS. SUBSEA
122. JOHNSON VS. EXXON DRILLING CO.
123. JOHNSON VS. GLOBAL
124. JOHNSON VS. GULF TRAN, INC.
125. JONES VS. PMI, CHEVRON, HOUMA INDUSTRIES
126. JONES VS. NORTH AMERICAN
127. JONES VS. BISSO, INC.
128. JONES VS. PRODUCTION MANAGEMENT, CHEVRON, HOUMA INDUSTRIES
129. JORDON VS. INTERCONTINENTAL BULKTANK CORP
130. JOSEPH VS. OMEGA PROTEIN, INC.
131. KUITHE VS. GULF CARIBE MARITIME
132. LANDRY VS. GULF CREW
133. LANDRY VS. G. C. CONSTRUCTORS, A JOINT VENTURE – LIFTING
134. LASSEIGNE VS. CHEVRON – s/s fitting valve failed under pressure
135. LAWRENCE VS. APEX, INC.
136. LEBLANC VS DYNAMIC OFFSHORE
137. LEDET VS. KOCH SERVICE, INC. – Transfer hose lifting
138. LEDET VS. JO DE –FALL FROM HEIGHTS
139. LEE VS. CENTRAL GULF – slipped down the ladder
140. LEE VS. GENESIS BOAT RENTALS, INC. - ladder
141. LEONARD VS. MARATHON – Air tugger/rigging
142. LINDOT VS. GREAT LAKES DREDGE & DOCK
143. LITTLE VS. WESTERN HERITAGE INSURANCE – slip fall on the entrance to bldg
144. LITTETON VS. TRANSOCEAN OFFSHORE DEEPWATER DRILLING. INC
145. LOPEZ VS. MARINE DRILLING CO.
146. LOPEZ VS. TIDEWATER, MARINE DRILLING - slipped on a tire at a dock
147. LUDEAU VS. PENROD
148. LUTRELL VS. JWP BOAT RENTALS – no gangway
149. LYONS VS. NORTHSTAR OFFSHORE ENERGY-
150. MANUAL VS. OTIS – slipped on the gangway.
151. MARCEL VS. LEBOUF BROTHERS slipped down the shipyard stairway
152. MARONEY VS. PETROLEUM SERVICES, INC. – slipped on a walkway
153. MARONGE VS. HUNT PETROLEUM – fall from
154. MASSEY VS. ROWAN DRILLING CO. – lifting chemical sacks.
155. MATHIS VS. LAFAYETTE



Exhibit I
Archer Motion to Exclude

156. MATTER OF TAIRA LYNN LIMITED NO. 7 - explosion and fire on barges
157. MCINNIS VS. PARKER DRILLING Trip and fall on the rig floor
158. MCNABB VS. TORCH ENERGY COMPANY – fire explosion
159. MECHE VS. MARINER – fire & explosion on a production platform
160. MEGEE VS LAREDO – machine guarding
161. MEYERS VS. LA CUSTOM COAT
162. MOREE VS. NABORS OFFSHORE -
163. MINCHEW VS. HELIX ENERGY SOLUTIONS – fall from heights
164. MORRIS VS. DIAMOND " M "
165. MORRISON VS. THE SOUTH CENTRAL LOUISIANA TECHNICAL COLLEGE
166. MOTT VS. FALCON DRILLING CO
167. NAVA S. JOHN BLUDWORTH SHIPYARD – Sandblasting equipment
168. NGUYEN VS. RTA – fall protection
169. NICHOLS VS. WEEKS MARINE, INC. – slip fall winch
170. NIX VS. SUBSEA INTERNATIONAL
171. NOEL VS. DIAMOND OFFSHORE DRILLING, INC.
172. NORMAND VS CANAL PLACE - Stairway
173. NORRIS VS. CXY ENERGY, INC.
174. NUGENT VS. HERCULES
175. NUNZ VS. CLAYTON W. WILLIAMS JR.
176. OWENS VWS. ABDON CALLAIS OFFSHORE, INC.
177. PAES VS ROWAN DRILLING
178. PADGETT VS FIELDWOOD ENERGY, LLC – fall protection
179. PALAOMBO V. CAMERON BOAT RENTALS – slip in the galley
180. PARTIN VS. SUPERIOR ENERGY SERVICES, INC. – slip fall on edge of bldg.
181. PARFAIT VS. TRANSOCEAN & SHELL – fell from work stand
182. PARFAIT VS PERFORMANCE ENERGY SERVICES, INC – struck by falling object
183. PARKER VS. CROWN
184. PERRIOR VS. COOPER T. SMITH – ingress/egress out of a barge hatch
185. PERRON VS. MARQUETTE TRANSPORTATIONS – swing rope vessel to vessel
186. PESSON VS. ABSG CONSULTING – stairway on casino
187. PICOU VS. DIAMOND – slipped on the dock
188. PHILLIPS VS. BRAIN CAPPY – fall downstairs no handrail
189. PICOU VS. DIAMOND REEF SEAFOOD – slip fall dock
190. PITRE VS. MESA OPERATING LTD.
191. POORE VS. TRACTOR HYDRO
192. PORTALIS VS. EXXONMOBIL PIPELINE
193. PRICE VS. CAMERON BOAT RENTALS, INC. – slipped downstairs
194. QUIBEDEAUX VS. UNION OIL – fell over the handrail.
195. QUINTANA VS. LAZER, INC.
196. RAGUSA V. GULF COAST LUBE
197. RANGEL VS. PETROLEUM TREATERS – fire explosion
198. REDMANN VS. TRUE NORTH SALMONE US INC. – amputation unguarded winch



Exhibit I
Archer Motion to Exclude

199. RICHARD VS. MONCEAUX – fall from scaffolding
200. RICHARD VS. PRIDE OFFSHORE
201. RICHARDSON VS. TURNER INDUSTRIES – struck by a falling object
202. RICO VS. LA GAMING – Slipped on the gangway
203. RITZELL VS. GULF MARINE ENGINEER
204. RHINE VS. BAYOU PIPE COATING
205. ROBERTSON VS. ANADARKO PETROLEUM – slip non-skid paint
206. ROBIN VS. WEEKS MARINE – boat struck a submerged pipeline
207. ROMERO VS. CONSOLATA NURSING HOME, INC. – trip and fall
208. ROZMARYNOSKI VS. J. RAY MCDERMOTT
209. SAMPSELL VS. B&I WELDING – lifting pipe
210. SANDERS VS C&G WELDING
211. SESSIONS VS. SUNLAND CONSTRUCTION, INC. – OWT push boat
212. SIMS VS. ENERGY CRANE
213. SIMON VS. LEGACY OFFSHORE
214. SINGLETARY VS. TERRAL RIVER SERVICE, INC.
215. SMITH VS. GULF CREWS, INC.
216. SMITH VS. CSE AUTOMATION
217. SMITH VS. ROWAN DRILLING – fire in confined space.
218. SONNIER VS. NOBLE DRILLING – lifting equipment
219. SONNIER VS. DELOACH MARINE SERVICES, LLC – manual material handling
220. SPISAK, TIMOTHY VS. APACHE CORP. – material handling chicksan
221. SPRATLING VS. EDISON CHOUEST slip in the engine room
222. St. JOHN VS. EPIC - diving
223. STEINWINDER VS. MCCALL BOAT RENTALS, INC. – swing rope.
224. STELLY VS. MIKE HOOKS – struck by a boat in the head.
225. STERLING VS EXXON DRILLING
226. STEVENS VS. ENERGY XXI – personnel net transfer
227. STEWART VS. BISSO
228. TALEVICH VS. CARDINAL – fell off personnel net
229. TAYLOR VS. TESCO CORP
230. THE MATTER OF TAIRA LYNN LIMITED fire and explosion Kirby barges
231. THERIOT VS. PAULSEN – dock plate fell
232. THIBODEAUX VS. CHEVRON – swing rope transfer, fell in the water
233. THOMAS VS. GALLO struck head on piping
234. TISSUE VS. PENROD – Hand tools misuse
235. TRANSPORTATION VS. SOUTH COAST – shocked while welding
236. TURNER VS. EXXON
237. TYLER VS. TORCH - crane & rigging
238. USA ABATEMENT VS. MOBIL EXPLORATION
239. USE VS. HERCULES OFFSHORE, INC.
240. VERDIN VS. FOREST OIL – fell in a hole in the deck,
241. VERDIN VS. CHEVRON & WARREN PET. – fall from the tank



Exhibit I
Archer Motion to Exclude

242. VIATOR VS. GORDON'S TRUCKING CO. – struck by a boat.
243. VITAL VS. COASTAL CATERING. LLC – stairway.
244. YOUNG VS. INTERMOOR, INC. – pry bar, lifting case
245. WALKER VS SUNLAND CONSTRUCTION, INC. ET AL – working off of a float
246. WASHAM VS. OSFI
247. WEDGE VS. CAJUN DEEP FOUNDATIONS
248. WILCOX VS. WILD WELL
249. WILEY VS. TRANSOCEAN – crane/crush by pipe
250. WILLIAMS VS CHEVRON – trip and fall on piping on deck
251. WILSON VS. RAY BRANDT NISSAN trip non painted yellow curb
252. WOMACK VS. FREEPORT, BAKER/MO – crane and rigging
253. WOOD VS. LONGNECKER PROPERTIES, INC. ET AL - step into D ring pan and fall
254. WOODEL, BRADLEY VS. GLOBAL INDUSTRIES OFFSHORE, LLC - Personnel net
255. WYKOFF VS. INTERNATIONAL MARINE, INC. – welding shock



Exhibit I
Archer Motion to Exclude