TOTAL SAFETY SERVICES, INC.
218 MAGNOLIA STREET
LONG BEACH, MISSISSIPPI 39560

ACCIDENT INVESTIGATION – SAFETY CONSULTING - LITIGATION SUPPORT

# LLOYD J. GUSMAN, JR.
# VERSUS
# ARCHER SHIPPING, LTD., KIRAN INTERNATIONAL HOLDING COMPANY, LTD., and KIRAN HOLDING AS

DATE
May 6, 2021

CIVIL ACTION: 20-984

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA
JUDGE LANCE M. AFRICK*
MAG. JUDGE VAN MEERVELD

Prepared for

MR. BARRETT R. STEPHENS
LEWIS & CAPLAN, APLC
3631 CANAL STREET
NEW ORLEANS, LOUISIANA 70119

TELEPHONE NO.:(504) 415-0945
111TOTAL@GMAIL.COM

EXHIBIT
A

# INTRODUCTION

This **preliminary** ROOT CAUSE ANALYSIS report investigates the accident that occurred aboard the ***KIRAN BOSPHORUS***, a Bulk Carrier ship, owned by Kiran Holding AS, located at the ADM Midstream facility, MM110, on the Mississippi River, on or about April 2, 2019, at or about 10:00 PM, and outlines the findings from that investigation.

# QUALIFICATIONS

***Please see my Curriculum Vitae for a further explanation of my qualifications as a Safety Professional.***

**QUALIFICATIONS:** A safety professional, in any given industry, is required to have a working knowledge of the various operations his company performs in that industry, as well as a working knowledge of the applicable governing regulations. I have over 50 years of safety experience in the industries relating to the exploration, production, and transport of oil and gas and the marine, general, and commercial industries. While working in these industries, I have developed expertise relating to safety issues on production platforms, barges (derrick, crane, pipe laying, dredging, drilling, jack-ups, lift-boats, spud, supply, deck, oil, tank, etc.), structural, fabrication yards, and vessels/boats (ship, MODU, tug, tow, supply, crew, etc.), and commercial and industrial buildings and building projects.

This on-the-job work experience began in the mid-sixties while working offshore in the Gulf of Mexico on production platforms and drilling rigs, performing the duties of a Roustabout, Rigger, Welder's Helper, and Wireline Operator. I also worked on the Mississippi River, worked in Fabrication yards and Shipyards as a Roustabout, Rigger, Welder's Helper, and Heavy Equipment, and Crane Operator. Further safety experience and expertise were derived from being the manager/supervisor of the Safety Department for Amerada Hess Corp. (Lafayette region); J. Ray McDermott, Inc. (Marine and Diving Divisions, Harvey Group), McDermott International, Inc. (Singapore, South East Asia Group) and the president or owner of Contract Safety Consultants, Preferred Employees, and Total Safety Services, Inc. Companies I worked for included, New Orleans Stevedores, Houma Welders, Smith Wallander, Boland Machine and Manufacturing. My safety consulting experience was gained by providing safety consultant services at the following: Gulf South Laboratories, Engineering Inspection and Investigation, Inc., Inspection Consultants, Inc., Ray Gibbins Industries, Allied Wireline, Western Wireline, Popich Brothers, Space, L&L Construction, Kaough & Jones, Kranco, Garza Welding, T & A Wireline, TCB Industries, Rembco, Foley Construction, Delta Coatings, Delta Temp, Inc., Cortex, Southern Environmental Control, Eagle Marine, American Marine, Mosby Enterprises, Total Marine Services, Vela Garage, Doomlar, Energy Drilling, Grady Crawford, Guilliot Construction, J & J Electric, Taylormade Enterprises, U. S. Abatement, Vogt Construction, Wescorp Construction, and Blake Drilling,

The companies I was employed by or contracted with followed the Federal regulations listed below and voluntarily followed the Industry Standards of Care as listed. As their safety officer, I was required to have a

working knowledge of those regulations and standards of care and the ability to apply them to the company's oil and gas exploration and productions and marine, general, industrial, and commercial work activities.

**Subcategories for each section are listed in more detail in my *Curriculum Vitae.***

**Working knowledge of Federal Regulations 29:**
1910 General Industry, 1926 Construction, 1915 Shipyard, 1918 Longshoring, 1919 Gear Certification

**Working knowledge of Federal Regulations 46:**
Subchapter C - Uninspected Vessels
Subchapter D – Tank Vessels
Subchapter H – Passenger vessels
Subchapter I - Cargo and Miscellaneous Vessels
Subchapter I-A - Mobile Offshore Drilling Units
Subchapter K – Small Passenger Vessels carrying more than 150 passengers
Subchapter L – Offshore Supply Vessels
Subchapter M – Towing Vessels
Subchapter T – Small Passenger Vessels

**Working knowledge of Federal Regulations 33:**
Subchapter B – Offshore
Subchapter N - Outer Continental Shelf Activities

**Working knowledge of the following industry standards:**
(API) American Petroleum Institute
(ANSI) American National Standards Institute
(ASME) American Society of Mechanical Engineers
(AWS) American Welding Society
(CGA) Compressed Gas Associations, Inc.
(ASTM) American Society for Testing and Materials
(ABS) American Bureau of Shipping
(NFPA) National Fire Protection Association
(NIOSH) National Institute for Occupational Safety and Health
(SAE) Society of Automotive Engineers
(UL) Underwriters Laboratories
(NEC) National Electrical Code
(AWO) American Waterways Operators
(ISM) International Safety Management
(SSPC) Steel Structures Painting Council.

## METHODOLOGY – ROOT CAUSE ANALYSIS

The evaluation tool I use to investigate and analyze an accident is based on widely recognized and accepted accident investigation analysis principles and methods employed in the safety profession: the **ROOT CAUSE ANALYSIS (RCA)**.

My **ROOT CAUSE ANALYSIS (EVENTS AND CAUSAL FACTOR ANALYSIS)** is used to investigate this accident and my report is a structured step-by-step technique and procedure for ascertaining and analyzing the causes of accidents. The PROBLEMS AND DEFICIENCIES listed below in my report are examples of the major accident categories that should have been included when the crew completes a **(JSA)** and would be included in a ROOT CAUSE ANALYSIS investigation:

**EXEMPLARY MAJOR ACCIDENT CATEGORIES**
**EQUIPMENT / MATERIAL PROBLEMS,**
**PROCEDURE PROBLEMS,**
**DESIGN PROBLEMS,**
**TRAINING DEFICIENCIES,**
**MANAGEMENT PROBLEMS.**

Examples of the accident subcategories listed in my report address the specific accident PROBLEMS AND DEFICIENCIES related to the accident:

**EXEMPLARY SUBCATEGORIES**
**DEFECTIVE TOOLS / EQUIPMENT,**
**PRE-EMPLOYMENT EMPLOYEE EVALUATION,**
**PRE-JOB / EMPLOYEE EVALUATION (JSA),**
**PERSONAL PROTECTIVE EQUIPMENT,**
**TRAINING / CERTIFICATION / LICENCES,**
**FEDERAL AND /OR STATE STANDARDS / INDUSTRY STANDARDS,**
**INDUSTRY SAFETY MANUALS AND PUBLICATIONS.**

# ROOT CAUSE ANALYSIS

## I. DATA COLLECTION

The following documents were reviewed in preparation for this preliminary root cause analysis report:

**Deposition Testimony:**

- Mr. Lloyd Gusman
- Mr. Roy Burpbacker
- Mr. Melih Ciftci
- Mr. Dejuante Murray

**Miscellaneous documents:**

- **DEFENDANT'S ANSWERS TO CLAIMANT'S INTERROGATORIES**
- **EMPLOYER'S CARRIERS RESPONSES TO CLAIMANT'S REQUEST FOR PRODUCTION OF DOCUMENTS**
- **CLAIMANT'S ANSWERS TO INTERROGATORIES AND REQUEST FOR PRODUCTION OF DOCUMENTS**
- **CLAIMANT'S ANSWERS TO INTERROGATORIES AND REQUEST FOR PRODUCTION OF DOCUMENTS**
- **INTERROGATORIES**
- **PHOTOGRAPHS**
- **COMPLAINT**
- **FIRST REPORT OF INJURY**
- **DRAWING**
- **MR. LLOYD GUSMAN STATEMENT**

# II ACCIDENT DESCRIPTION

Mr. Lloyd Gusman was employed as a Laborer by Neeb-Kearney & Company, LLC., and was contracted out to Coastal Cargo Company to work aboard the ***KIRAN BOSPHOROUS***, a Bulk Carrier ship, being unloaded at the ADM Midstream facility at MM 110 on the Mississippi River. The Chief Officer of the ***KIRAN BOSPHORUS*** was Mr. Melih Ciftci. The Coastal Cargo Company's Supervisor was Mr. Roy Bnipbaclicr, and the Foreman was Mr. Robert Pack. Mr. Joseph Barrow and Mr. DeJaunte Murray were also witnesses to Mr. Gusman's accident.

Mr. Gusman was a crewmember aboard the ***C/B ELISA A***, an Industrial Vessel crane barge, owned and operated by Coastal Cargo Company, and was assigned to work aboard the ***KIRAN BOSPHOROUS***, during a cargo transfer procedure in conjunction with the ***C/B ELISA A***. Mr. Gusman and his fellow crewmembers were placed aboard the ship via a personnel carrier. At some point in time, Mr. Gusman and the other crewmembers

were instructed to relocate the ***C/B ELISA A's*** shifting cable to another location on the ship so the barge's crane could have access to another hold in the ship. As Mr. Gusman was working with the cable he slipped on a foreign substance left on the ship's designated walkway and fell whereupon he sustained his injury.

Before he fell, Mr. Gusman testified that he had asked his supervisor to see if someone could clean the deck. The supervisor then asked someone on the ship to clean the deck but was ignored. The testimony indicates that Mr. Pack ordered the crew to return to work, moving the shifting cables, without first having the ship's crew clean the deck, and the designated walkway, of any foreign substance present during the cargo transfer. Mr. Gusman sustained his injury when he slipped on the deck while performing his assigned duties.

# III ASSESSMENT / OPINIONS

***The following opinions are preliminary and may be amended, added to, or changed as other discovery and deposition testimony is provided.***

# OPINION NO. 1

## FAILURE TO ESTABLISH A PROTOCOL PROBLEM

**MR. MELIH CIFTICI, THE CHIEF OFFICER OF THE *KIRAN BOSPHOROUS,* FAILED TO ESTABLISH A PROTOCOL FOR THE UNLOADING OF THE VESSEL'S HATCHES AND HOUSEKEEPING PRIORITIES OF THE DECKS.** It is my opinion based on my education, training, and experience that Mr. Ciftici failed to establish a protocol between the ***KIRAN BOSPHOROUS'*** supervisors and crew and the supervisors and crew of the ***C/B ELISA A*** to address the housekeeping activities of cleaning the deck of the Urea after the various hatches were unloaded, and before members of the longshoring crew boarded the vessel to move the crane barge.

- Chief Officer Ciftici knew the Urea was a small-hard- granular-bead-like product that when spilled onto the deck of his ship produced a hazardous slippery condition.
- Chief Officer Ciftici knew that it was the ship's crew's responsibility to clean the deck of any hazardous substances before allowing the longshoring crew to enter the ship.
- Chief Officer Ciftici knew that the longshoring crew had no choice but to walk through this hazardous slippery substance to move their crane barge.

Yet, Chief Officer Ciftici did not produce a protocol that abated this hazard by having the ship's crew clean the deck before allowing the longshoring crew to board the ship

- Chief Officer Ciftici testified that he produced a discharge plan for unloading the various holds on the ***KIRAN BOSPHORUS.***

- Chief Officer Ciftici testified that the discharge plan was provided to the longshoring supervisors.
- Chief Officer Ciftici testified that he was aware that the cargo moved by the longshoring crew would spill onto the ship's decks.
- Chief Officer Ciftici testified that at a convenient time after a hold was unloaded, he would send the ship's crew to go and clear the product from the deck.
- Chief Officer Ciftici testified that he had made calculations relating to the unloading process concerning the stability of the ship during discharging operations.
- Chief Officer Ciftici testified that he knew that the crane barge had to be moved from one hold to another to continue the discharging process on the ship.
- Chief Officer Ciftici testified that the longshoring crew would follow the discharge plan for each hold.
- Chief Officer Ciftici testified that if the ship's crew observed that the longshoring crew was not following the discharge plan, they would step in and stop the operation.
- Chief Officer Ciftici testified that he decides in which order the various cargo holds will be unloading and informs the longshoring crew through the discharge plan.

Chief Officer Ciftici and the other officers on board this ship knew when the longshoring crew was finished each hold. They knew that the product was spilling onto the deck. They knew the crane barge had to be moved to this next designated hold set out in the discharge plan. They were watching to make sure the longshoring crew followed the discharge plan. They knew the longshoring crew had to board the ship to move the crane barge. They knew the ship's crew was responsible for cleaning the deck.

Yet, Chief Officer Ciftici and the other officers on board this ship failed to clean the deck of this ship before allowing the longshoring crew to board the ship and move the crane barge.

*************************************************************************************

# OPINION NO. 2

## EQUIPMENT PROBLEM

### *KIRAN BOSPHOROUS* SUPERVISOR'S FAILURE TO PROVIDE MR. GUSMAN AND THE OTHER CREWMEMBERS FROM THE *C/B ELISA A* WITH A SAFE DESIGNATED

**WALKWAY FREE FROM SLIPPING HAZARDS.** It is my opinion based on my education, training, and experience that the supervisors of the ***KIRAN BOSPHOROUS*** failed to clean the deck of their vessel, or have it cleaned, before allowing the crew from the ***C/B ELISA A*** to walk/work on the deck full of a slippery foreign substance. Before he fell, Mr. Gusman testified that he had asked his supervisor to see if someone could clean the deck. The supervisor then asked someone on the ship to clean the deck but was ignored.

Photographic evidence shows that this ship had a designated walkway along the deck next to the cargo holds. This designated walkway is seen in the photographs as shown by two distinctive strips filled in with a contrasting color decking. A designated walkway is established by the vessel's owner to provide a safe means of transgressing the deck. It is specifically designed to assure any worker that the designated walkway is free from all hazards (slipping, tripping, etc.). The designated walkway establishes a safe walkway that the worker can use with the confidence of his/her safety.

## INDUSTRY STANDARDS USED TO BOLSTER MY OPINION:

**CODE OF FEDERAL REGULATIONS
TITLE 29 - LABOR
SUBTITLE B - REGULATIONS RELATING TO LABOR
CHAPTER XVII -- OCCUPATIONAL SAFETY AND HEALTH ADMINISTRATION
DEPARTMENT OF LABOR
PART 1918 - SAFETY AND HEALTH REGULATIONS FOR LONGSHORING**

**1918.91(a)**
**General**. Active work areas shall be kept free of equipment, such as lashing gear, and materials not in use, and clear of debris, projecting nails, strapping and other objects not necessary to the work in progress.
**1918.91(b) Slippery surfaces.** The employer shall eliminate conditions causing slippery walking and working surfaces in immediate areas used by employees.

*************************************************************************

**ASTM F1166-07 (Reapproved 2013)
STANDARD PRACTICE FOR
HUMAN ENGINEERING DESIGN FOR MARINE SYSTEMS, EQUIPMENT,
AND FACILITIES1,2**

11.12 *Walkways, Passageways and Alternate Means of Personnel Movement:*
11.12.1 *Walkways and Passageways:*
11.12.1.2 Walkways, passageways, decks and all other walking surfaces shall have a nonskid surface sufficient to provide a coefficient of friction (COF) of 0.6 or higher measured when the surface is wet.
*****************************************************************************************

**AMERICAN BUREAU OF SHIPPING**
**THE APPLICATION OF ERGONOMICS TO MARINE SYSTEMS**

**SECTION 10 Maintenance Considerations**
**2 Principles (1 August 2013)**
These maintainability and accessibility principles are directed toward the accomplishment of necessary maintenance tasks quickly, safely, accurately and effectively with minimum requirements for personnel, skills and special tools.

**2.2 Maintenance Task Access Analysis**
**2.2.1 Analysis**
An analysis of maintenance tasks should be performed for the purpose of sizing and outfitting maintenance workspaces. The analysis addresses concerns such as: design of maintenance platforms; **work surfaces**; work envelopes; tools, spare parts and spent part stowage; and consumables storage at a maintenance site during planned or corrective maintenance.

**2.2.2 Typical Analysis Steps**
A maintenance area task and requirements analysis typically includes the following steps:
Step 1 List (1) general and frequent maintenance tasks (such as **housekeeping** and routine or and recurring maintenance), and (2) list major planned maintenance or corrective maintenance actions

i) Number of participants/maintainers involved for each task
ii) List of major equipment/components to be removed, and replaced, or repaired in place or nearby for each task

**10 Walkways and Work Platforms (1 August 2013)**
**10.1 General Principles**
The principles listed below apply to the design of walkways and ramps and are not represented in the following figures or tables.

vi) Walkways and ramps exposed to the elements should have additional slip resistance due to potential exposure to water and ice.

*********************************************************************************************

# OPINION NO. 3

## FAILURE TO USE STOP WORK AUTHORITY PROBLEM

**THE OFFICERS OF THE *KIRAN BOSPHOROUS AND THE C/B ELISA A'S* FAILURE TO USE THEIR STOP WORK AUTHORITY TO STOP THIS JOB WHEN THEY ESTABLISHED THE EXISTENCE OF A HAZARD ON THE JOB.** It is my opinion based on my education, training, and experience that the officers and/or crewmembers aware of the slipping hazard on the deck of the ***KIRAN BOSPHOROUS,*** and the supervisors of the ***C/B ELISA A,*** should have used their STOP WORK AUTHORITY and stop this job when it was determined that a foreign substance was present on the deck during the moving of the ***C/B ELISA A*** using the barge's shifting cables. Both sets of officers/supervisors were aware that the barge had to be shifted using the shifting cables to gain access to another hold. This, of course, meant that certain crewmembers were going to be required to negotiate the ship's deck by the various deck fitting used to position the barge next to the ship. This deck area was not cleaned before ordering Mr. Gusman and other crewmembers to move the shifting cables. By not cleaning the deck, both sets of supervisors exposed these men and Mr. Gusman to known slipping hazards resulting in Mr. Gusman's accident.

Mr. Gusman, failing to have his attempt to use his Stop Work Authority addressed by Mr. Pack when he asked that the deck be cleaned, Mr. Gusman had no choice but to expose himself to the hazardous slippery condition on this ship's deck, or quit, and walk off of his job.

Mr. Murry backs up Mr. Gusman's thinking when he testified as follows:

Page 15: Q So, Mr. Murray, do you know what would have happened if any member of the crew would have disobeyed Mr. Pack's instruction to continue working?

Page 16: THE WITNESS: He would have got fired.

*********************************************************************************************

**FEE SCHEDULE:**

Hourly charges are from portal to portal.
All expenses are reimbursed by the client.
$1920.00 for deposition and trial testimony (a minimum 3-hour charge, includes preparation time)
$320.00 per hour for all other services provided (fees are subject to annual increases).
$ 0.86 per mile for travel

The opinions found in this report are professional safety opinions relating only to this accident. While the expert opinions concern factual circumstances, which may be found by the trier of fact to constitute fault, they are not intended to be legal conclusions, as this is a matter for the court to determine and the trier of fact to

decide. These opinions are based solely upon my many years of experience in the field of safety as it relates to this particular accident and should not be compared to other opinions in other cases.

If further discovery, research, inspections, and/or review should develop additional information that would alter my opinion, the conclusions reached herein would be subject to my revision and this report amended as necessary.

Sincerely Yours

Robert E. Borison

Robert E. Borison
President
Total Safety Services, Inc.

## APPENDIX

## DEPOSITION TESTIMONY USED TO FORM MY OPINION

***This pagination may not follow the transcript of the official depositions.***

**MR. LLOYD J. GUSMAN, JR. TESTIFIED AS FOLLOWS:**

Page 31: I mean, the accident that brings us here today happened on April 2nd, 2 019, I

Page 71: Q. Records that we've been provided seem to suggest that you started with Coastal on February 6th, 2019 or about two months before your accident. Does that sound right? A. Yes.

Page 86: Q. And when you started your shift or whatever would all six of y'all go on together? A. No. It was just three of us up there. There was just three. Q. And one of them was --

Page 87: A. And two -¬ Q. --a crane operator? A. No. The crane operator was already in the crane. Q. Right.

Page 88: All right. So had your crew taken the Q. place of another crew? A. Yes. All right. And is one called a day crew and one the night crew? A. Night crew, yes. So you're on the night crew? I was on the night crew.

Page 89: Q. So somebody's getting the instruction as to what hold or what job you need to do, and then they're relaying that to you? Yes.

Page 90: Q. What did you do on April 1st on that ship? A. We had got --we unloaded off the -- we didn't have to go on no ship. We unloaded off the side of the ship putting stuff out the ship into the plat -- I can't think of the name. But a platform. It was a platform that we had to move the covers and to take stuff off the ship to put on into the covers. So we had to go on side the water to unhook the covers for

the crane to move the -- the -- the things over that day. Q. So are you unloading cargo and putting that cargo in, like, a hopper barge next to the

Page 91: Ship? A. Next to the ship.

Page 92: Q. And was there anything -- what was the cargo; do you remember? What was the product being moved? A. Looked like sand. Q. Okay. And was it -¬

Page 93: Q. And for the first day you're on the hopper barge? Yeah. I'm on the hopper barge that A. day.

Page 94: Q. So day one all your time was spent on the hopper barge, not on the ship? A. Not on the ship.

Page 94: Q. Right. A. I mean, the first ship was another ship. 'Cause when I come back next there's a different ship, 'cause they got different product. I mean, the first ship was sand, you

Page 95: know. Q. Okay. A. The second ship was some white stuff. I don't know what that was. Q. All right. That's where my misunderstanding was. Okay. I thought you meant the white stuff that -¬ A. No. No. No. This two different ships. Q. Okay. So the first time you saw the ship that was involved in your accident was the day of your accident? A. Yes.

Page 95: Q. All right. I got you. And you're telling us that the crane operator picked you up -- to the ship that you were on the day of your accident they picked you up and put you on that deck? A. On that deck.

Page 96: Q. And what was the first instruction you received once you got on the ship? A. We got to move the lines to get to the second hold. Q. Okay. A. So they told me to go move that line. And that's when the guy -- I asked -- I asked the supervisor, Do we got to clean this up? He said, No. That's for the people on the ship to do. We just got to move the line for the barge. So he had told the dude that work on the ship. And he asked him, Is y'all going to clean it up? He laughed and kept walking. So I just got to the line. When I unhooked the line I walked to where it was safe. And I pulled it, and it got stuck. So I'm walking back. Let the line go, walking back. Next thing you know my legs just went completely underneath me 5 feet in the air. And I come

Page 97: down, blam. And that was that.

Page 99: A. The west, the West Bank. Q. And was the ship facing upriver, or was it facing down river; do you know? A. The ship was facing -- let me see. I guess that's upriver.

Page 100: MR. STEPHENS: Just for the record, if I get my nautical terms right, that would be the starboard side of the ship so.

Page 103: Q. Okay. So it's fair to say that at the

Page 104: time of your accident starboard, A. Q. you're on the right, or side of the ship -- Yes, sir. -- to do this work? Okay.

Page 104: Q. picture All of right. So I think I got a better all this now. So when you got on there and the supervisor you said we need to move, know, move the lines to adjust the barge, that's that of the first thing you were tasked to do night; is that right? Yes. Q. And at that point there's this white White Q. A. stuff stuff. -- on the deck? Yes. already some

Page 106: Q. Okay. Show me that on that photograph, if you will. A. Look like it's right here, 'cause I was moving -- the line was coming from here. The line was coming here. And it got hooked in here. So I had to walk back. Itried to -- I walked way over here. The line was long, 'cause it was not too -- it had too much stuff. It had too much stuff. And when I pulled the line it got stuck. So I had to go back to unhook it, to unhook it. So when I got to the thing next thing I know I was in the air.

Page 107: Q. But were your feet on the green area or the red area when you slipped, if you remember? A. I don't remember.

Page 118: Q. I mean, but moving that line was the very first task that you were told to do as well. Correct? A. Yes.

Page 119: Q. All right. And did you-all talk about the white stuff that was on the deck at that point? A. Well, we saw the white -- that's when I asked the guy do we got to clean it up. Q. Right. A. And he said no, that's for the people on the ship to do so. Q. And you don't know the name of that guy? A. I don't know his name. Q. What was his title? A. He was the lead -- he was the --he had the red hat. He wore the red hat. So he was the inspector, the -- mostly inspector and the lead, you know. So he had kind of -¬ cause he been there 20 something years. Q. And that's a Coastal guy?

Page 119: A. Yeah, Coastal. Q. And you talked about a conversation

Page 120: with somebody that appeared to be a member of the ship's crew. Right? A. Yes. He had the conversation with the guy about -- I was right there by him when he asked the guy if they going to clean that up. Q. Okay. That was my question. You overheard him? A. Yeah, I overheard him say that. Q. And when he said, Are you-all going to clean this up the guy just kind of chuckled and he kept walking? A. And kept walking.

Page 121: Q. All right. And at the time of your accident, there's three Coastal guys on the A. On the ship. ship deck? Yeah? Yes. A.

Page 130: Q. Okay. And then the detailed description says, Mr. Gusman was aboard the vessel pulling the lines of the ELISA A rig up to shift the rig from hatch 5 to hatch 4 -- is the ELISA A the name of the vessel where the crane was? A. I guess.

Page 130: Q. And the statement that he was going from hatch 5 to hatch 4, do you know if that's the actual numbering or -¬ A. I don't – I thought it was 1, 2, and 3, me. I don't know. Q. Okay -- when he slipped on the loose cargo that was on the deck -- causing him to fall backwards. That's accurate. Right? A. Yes.

Page 132: Q. And then on this report -- and I'm just giving you these names to see if they ring a bell. It says foreman's name, Robert Pack. Do you remember if that's the lead man one way or the other? Do you know? A. The foreman -- the foreman will be the supervisor that's on the ship. Q. Okay. Does the name Robert Pack ring a bell from that night, or do you know? A. I mean, not really, I mean.

Page 175: Q. The ship's crew wasn't doing the actual cargo operations, were they? A. I mean, far as I know, I don't -- I don't know who the crane operator was. I know when --my crew we had a crane operator. But, now, for the second -- first crew, I don't know. Q. I understand. But if it was like your crew, It would've been another Coastal guy? A. Yeah, it'd been a Coastal guy. I mean, but by the time we got on this ship, if this stuff was on that deck, that should've been cleaned up before we got on that ship, cause it took us a hour and something -- I mean, it took us awhile before we got to this ship.

Page 180: So did you feel like when you fell Q. that you slipped because it was rolling under your shoe, or did it feel like it was liquid

Page 183: Thank you. Before you actually Q. slipped and fell had you had any near falls or feeling like you might slip that night? A. That night? Q. Yeah. A. Well, when you -- when you first walked on it you -- you know it was slippery. So you had to take your time. That's why I asked them do we have to clean it up, and they said that's for the people on the ship so.

Page 197: Did I understand you correctly when you testified earlier that the first assignment that you were given to be performed on the ship's deck was that cable work you described? A. Yes. Q. Can you tell me -- and did I also understand you correctly that you and the fellow Coastal coworkers were on the ship's deck for a certain period of time before you started doing the cable work? A. Yes. Q. During that period of time did you stay in one spot on the ship's deck, or did you-all walk around on the deck? A. We stood in one -- not i n one spot. We were -- we walked towards the -- the deck that was clean -¬
Page 197: Q. Okay. A. --to the end. We were just checking out to see how far the barge had to go.

**MR. EMIL ROY BRUPBACHER TESTIFIED AS FOLLOWS:**
Page 10: A I worked for Coastal Cargo.
Page 10: Q What position did you hold at Coastal? A I first was a -- I started as a terminal manager and then moved up to general superintendent.
Page 15: Q Are you familiar with that location that's been identified as ADM midstream mile marker 110? A Yes.
Page 16: At the time of the
Page 16: incident we're here about today, do you recall which of those two positions you held? General superintendent.
Page 16: A General
Page 16: Q Mr. Brupbacher, were you aboard the Kiran Bosphorous at the time of Mr. Gusman's alleged incident? A I don't think so.
Page 17: Q The foreman? Can you tell from this form, sir, who the foreman was at the time of the incident that we're here about? A Yes. Robert Pack.
Page 18: Q Can you explain to us, sir, what your understanding of that term is? A Well, being as it's over at midstream, this tells me that they were probably -- they were shifting the wires so that they can shift -- they shift the wires from one hatch to the other or, depending on what location of the vessel, so that they can
Page 19: shift the floating crane from one hatch to the next so they can start working on the next hatch.
Page 19: Mr. Gusman was aboard the vessel,
Page 19: pulling the lines of the Elisa A rig up to shift the rig from hatch 5 to hatch 4, when he slipped on the loose cargo that was on the deck of the vessel, causing him to fall backwards. Do you see that section, sir? A I do.
Page 19: Q Are you familiar with the Elisa A rig? A I am.
Page 19: Q Was that a Coastal Cargo rig, or was that an ADM rig? A It's Coastal Cargo's floating crane.
Page 21: Q In your experience, sir, when Coastal is unloading cargo from a vessel such as the one described in this form, who's responsible for clearing the vessel's deck during the cargo operation? A That would be the ship's crew.
Page 22: Q It's just saying, to your knowledge, if you know in this particular instance. A Oh. Well, I mean, for any vessel, I mean, it's the ship's crew to make sure that the deck is clear during operations.
Page 23: But so you'll note on that exhibit, Mr. Brupbacher, that there's a big circle and then there are some arrows. I'd like to talk about the arrows first. I'll represent to you that, in his deposition, Mr. Gusman

indicated that the arrows are pointing to where the wires would have been located that they had to shift. In your experience, is that the general area where wires would be located? A Yeah, somewhere around there.

Page 24: Q From what's depicted in that photograph, sir, would you agree with me that the vessel's deck is entirely covered by the product?

Page 24: THE WITNESS: The majority of it.

Page 24: Q Based on that photograph and your experience, sir, can you identify any practical way that Mr. Gusman could have avoided the product on the deck and still performed his duty in shifting the wires?

Page 25: A No. This should have been cleared before they started pulling wires.

Page 25: Q But as it appears here, it was not cleared, but based on what you've seen or you see in this photograph and your experience, can you identify any way that Mr. Gusman could have avoided the product and still performed his job? A No.

Page 25: Q So, stated another way, sir, based on the photograph and your experience, you would agree that Mr. Gusman had no choice but to walk on the product that's depicted on the deck in order to perform his duties in shifting the wires?

Page 25: THE WITNESS: That's correct.

Page 25: Q Okay. Also, Mr. Brupbacher, you indicated and we've talked about that you've had experience unloading urea, which appears to be depicted in this exhibit. Can you

Page 26: describe the consistency of that product? Is it like sand? Is it granular? Is it bead-like? It's a granular, small bead (indicating), a little bit bigger than sand, depending on,

Page 26: you know -- a little bit bigger than a grain of sand, but not much.

Page 34: Q Would the Coastal foreman have any of his own paperwork or JSA's for an off-load like this? A No.

Page 35: Q Does Coastal have an employee manual or safety manual that an employee like

Page 36: Mr. Gusman would be given? A They do training with the foremans.

Page 38: In terms of hierarchy

Page 38: for vessel operations, vessel loading and unloading, you'd be the top in terms of operations -- A Correct. Q -- in your role? And then you have a vessel superintendent? A Correct. Q And below him would be a foreman like Mr. Pack? A Right. Q And below Mr. Pack would be the workers like Mr. Gusman and his other laborers? A Correct.

Page 38: Q And who would have been the vessel superintendent involved, if you know, for the Kiran Bosphorous' unloading in April of 2019? A That would be an ADM employee. Because the ADM employee -- this is ADM's vessel, and we would send a crew to assist them in unloading their vessels. So whatever ADM superintendent was in charge of that vessel that day, he would be in charge of my crews.

Page 39: Q And whoever that ADM superintendent was for this particular job that we're here about, you don't know who that was? A I don't know.

Page 39: Q So the urea cargo that we've been talking about, you described it to some extent, and I'm just going to probe a little bit more. Have you ever stepped on it, yourself? A I have. It's very slippery. Q Okay. And that's part of my question. Is it -- when you step on it, does it maintain its shape and integrity, or does it flatten out? A No, it pretty much maintains its integrity.

Page 41: Q And you know they have multiple cargo holds -- A Correct. Q -- running from the bow all the way back to the house, for example, right? A Correct. And sometimes behind the house. Q Yes, and sometimes behind. And so the Coastal Cargo crane barge -- which in this case is the Elisa A, correct? A Correct. Q -- moves up and down the side of the ship, correct, to get alongside the hold that it's going to be working? A Correct. Q And if it's a bulk cargo like urea, is it like a clam bucket that's used to get the cargo out of the hold? A That's correct.

Page 44: Q Okay. So the best crane operator with the best bucket and no wind is still going to have some amount of urea come out, correct? A Yes.

Page 44: Q Now, when the crane operator is doing the operation and he's in position, the crane barge is in position, where are your guys typically standing? A Once they get all the lines hooked up and moved, my guys get off the vessel and go

Page 45: back to the floating crane.

Page 46: Q All right. And then is there some communication that typically happens when a hold is finished where your guy calls the ship officer or crew member and says, We're finished with hold 3, we want to move to hold 4? A Well, that would be the ADM supervisor's call of where they would shift them to. They had radios that they would contact, they would contact the ADM supervisor, let them know, Hey, we're almost finished hatch 5. And then the ADM supervisor would say, Okay, I need y'all to switch over to this hatch, y'all are going to work this hatch next.

Page 47: Q Right. And I'm trying to figure out how does the ship get word that we're finished and we're ready to move? A The foreman is supposed to let the ADM supervisor know that we're finished in that hatch, and then the -- because the ADM supervisor would usually sit in an office inside of here (indicating). Q What are you pointing at when you say here? A Just at the house, there are some offices or some stuff like a -- it's called a -- I call it a superintendent's office.

Page 48: We would notify them, letting

Page 48: them know we're almost finished. They would notify the ship's crew, Hey, we're going to shift from here to there. They would notify my guys where to shift to.

Page 49: Q Okay. So if Gusman gets up there and he's told it's time to shift the lines and this stuff is on the deck, he ought to say, What are we doing here, is somebody going to clean this up before he makes that walk? A Well, he's supposed to notify the ship's crew.

Page 49: Q So you don't know whether the ship's crew was even aware that somebody from the longshore crew was moving lines when Gusman was actually moving line, do you? A I don't.

Page 49: Q Or you don't know if anybody from the ship's crew was aware that they may have finished with one particular hold and were ready to go to another hold. You don't know that either, right? A I don't.

Page 51: Q And if you were the foreman, you would want to make sure, whether it's the vessel crew or one of your guys, that they would clean up an area before sending a guy out to work on a deck like that, correct? A If I was the foreman, absolutely. Q In other words, you would tell -- you would

Page 52: tell Gusman, Hold up until we get this area cleaned up, we don't want to go walking across this stuff, correct? A Correct.

Page 68: Q All right. So would that indicate that, in that type of scenario, when a hold is complete and the crane barge needs to be shifted, would that be the time period for the vessel's crew to clear the deck of any loose cargo? A Correct.

Page 68: Q And so would you agree with me that by the time Coastal's employees get back on the deck of the vessel, the deck should already be cleared by the vessel's crew of any of that loose cargo? A Correct.

Page 69: Q Do you recall ever seeing the Coastal crew sweeping cargo off of a vessel deck while midstream at the ADM mile marker 110? A I do not.

Page 73: Q From a practical standpoint, having worked in the industry, Mr. Brupbacher, if Mr. Gusman expressed a concern to the foreman about the condition but he was, nevertheless, ordered to still perform his job, would you expect him to disobey that order? A Yes.MR.

**MR. DEJUANTE ANTONIO MURRAY TESTIFIED AS FOLLOWS:**

Page 7: Q How long were you employed at Coastal Cargo? A Three years. Q What was your job title at Coastal? A Well, I was a rigger, rigging, doing longshoreman work.

Page 12: Q Mr. Murray, do you know who was responsible for cleaning loose cargo off the deck of the vessel? A The shipmate. Q When you say the shipmate, do you mean the ship's crew, sir? A Yeah.

Page 13: Q Okay. So when you and the crew got on the deck that night and observed that that cargo was on there, did anyone on the crew express concern that the cargo was there? A Yeah. Q Do you recall who it was that did that? A If I'm not mistaken, I think it was Joseph Barrow or Robert Pack. It was either Barrow or Pack.

Page 13: Q In your experience at Coastal, sir, was the vessel's crew supposed to have that product cleared from the deck by the time you got on the vessel? A Yeah.

Page 14: Q All right. When you say nothing, sir, what happened after somebody expressed concern? What did you and the rest of the crew do? A We asked, all right, one of the supervisors, called on the radio and asked -- you know, told him that they got leave can argue up there and we about to pull the lines up, and nothing happened. And, you know, we're on -- you know, we had to move; you know, we couldn't just sit up there and wait. So --

Page 14: Q When you say that it was radioed in, was it radioed in to a Coastal supervisor or an ADM supervisor?

Page 14: A An ADM supervisor. You know, because all

Page 14: of us have radios -- not everybody, but I had a radio, and I overheard someone saying that it's a lot of cargo on top of the ship and we needed someone to clean it up, you know, sent to clean it up.

Page 15: Q Who instructed -- after that radio call was made, who instructed the crew to proceed with working? A I think it was -- whoever the supervisor was, got up there and told us, you know, what to do, you know, told us to pull the lines up.

Page 15: Q If the records we have indicate that Mr. Robert Pack was the foreman that night, would that sound correct to you? A Right.

Page 15: Q So, Mr. Murray, do you know what would have happened if any member of the crew would have disobeyed Mr. Pack's instruction to continue working?

Page 16: THE WITNESS: He would have got fired.

Page 16: Q Say that again, sir. A He would have got fired, he probably got fired or got taken off the schedule or sent home, you know, for not complying.

Page 16: Q Okay. So is it fair to say, then, sir, that on the night of April 2nd, 2019, after Mr. Pack instructed the crew to return to work, your options were either to return to work or, effectively, to leave the job? A Yeah.
Page 19: Q Okay. Sir, based on your experience and the photograph that we just showed you and also what you observed on the night of the accident, was there any practical way that Mr. Gusman could have avoided the product on the deck and still performed his duties in shifting wires? A It would have been impossible for him to perform.
Page 19: Q And so, stated another way, based on what you observed on the night of the accident, you would agree that Mr. Gusman had no choice but to walk on that product in order to perform his duties? A Yes, sir.
Page 20: Q Okay. Just to make sure I didn't miss anything, sir, you said that on the night in question, the responsibility for cleaning that material off of the deck belonged to the crew of the vessel? A Yes.
Page 22: Q Did ADM have a supervisor out on scene on the night of the accident? A Yeah, they had someone there. Q Do you remember the guy or girl's name? A I think it was Chris. I think it was Chris if I'm not mistaken. Q Chris? A Yeah.
Page 24: Q But did Coastal, for example, have something called stop work authority?
Page 25: A No.
Page 25: Q You ever heard of stop work authority? A No, sir.
Page 30: Q Were you helping move or shift the lines from your rig to the ship? A Yes, sir. Q Did you have to walk on that same cargo? A Yeah.

**MR. MELIH CIFTCI TESTIFIED AS FOLLOWS:**
Page 14: Q All right. And it's my understanding that at the time of the accident we're here about today, you were the chief officer of
Page 15: the Kiran Bosphorus? A Yes.
Page 19: A But I sign contract with Archer Shipping.
Page 24: Q Now, Melih, if you could explain to me, so it's my understanding that at the time of the incident that we're here about today, the Kiran Bosphorus was anchored at the ADM mile marker 110 midstream in the
Page 24: Mississippi River.
Page 25: A Yes, I remember, because we discharging urea, I remember that one.
Page 25: Q It's basically like the white beady stuff for fertilizer, right? A Right. Correct.
Page 26: Q And so, in your experience, and in particular relating to the Kiran Bosphorus, is it safe to say that, as the chief officer, you are working hand in hand with the cargo crew to discharge the cargo? A Yes.
Page 26: Q Okay. And so on April 2nd, 2019, you would agree that you were actually aboard the Kiran Bosphorus during those cargo operations? A Yes. Q Is it also fair to say that on that night, you, as the chief officer, had developed this discharge plan that we just discussed and provided it to whatever company was actually discharging the cargo? A Yes.
Page 30: Q All right. In your experience, Melih, when bulk cargo is being discharged from a

Page 31: vessel like the Kiran Bosphorus, is it true that sometimes that cargo will spill onto the deck of the ship? A Yes.
Page 31: Q In your experience, when that happens, who is responsible for cleaning the loose cargo from the deck of the ship? A It depends on the -- which country you are. It depends on the -- which port you are.
Page 33: Q No, I think that's fair. So, at least on April 2nd, 2019, the action that you were taking as the chief officer is if you saw loose cargo on the deck, you would send the ship's crew members to go and clear it from the deck? A Yes, in convenient time, I sent the guys to clean the deck.
Page 37: Q Okay. And so I understand you don't tell them how to move the crane barge, but you would agree with me that to get from one hold to another on the vessel, the crane barge would have to be moved? A Yes.
Page 37: Q Yes. Absolutely. A In fact, I do not say when they finish one step in the discharging sequence. They just finish according to their calculation, and they change it. So when they change it, I don't say -- I mean, every step, I don't call anybody and change it. It's just automatic -- Q Yes, sir. A They just go --
Page 38: Q And that's what I understood it to mean, is that when you put the plan together, you're not saying, Okay, you hit a thousand pounds; I'm ordering you to go to the next one. You basically give them the plan, and then as they progress according to the plan, they just automatically do that, correct? A Yes. But as the ship's crew and the ship's officers, we follow the plan and if we see it does not fit with the plan, of course, I can say, No, no, no, don't discharge number 2, go back again on number 3.
Page 38: Q Right. A It's also -- how can I say -- my authority. I decide which to discharge.
Page 39: Q And would you agree with me that when a cargo company is discharging bulk cargo from the vessel, that company's employees would have to board the vessel in order to move the crane barge's wires that would allow the crane barge to access another hold? A Mostly, yes.
Page 40: Q Sure. Sure. Now, in the instances where the cargo company's employees have to get on the vessel so the crane barge can be moved, would you agree with me that if there's loose cargo on the ship's deck before those cargo company employees get on the vessel, that the ship's crew is responsible for clearing the deck? A Yes.
Page 40: Q Would that be the same protocol on the Kiran Bosphorus on the night of April 2nd, 2019? A Yes, we prepared the ship for the discharge operation, that's our responsibility.
Page 41: Q So, hypothetically, on April 2nd, 2019, if
Page 41: you would have been the officer on watch and would have seen loose cargo on the deck, you would have ordered your crew members to clear the deck of that loose cargo before the cargo company employees got on the ship? A Yes, but it depends on the loose cargo's position. If the loose cargo is on the crane working area, I cannot order that kind of thing.
Page 43: Q Did you see, in that photograph, that the deck appears to be coated with a white substance? A Yes.
Page 44: Q Sure. Does the substance in that photograph appear to be urea from what you observed? A Yes.
Page 44: Q And what I'll submit to you, it appears
Page 45: that the deck is pretty well covered in that substance, correct? A Yes. But, I mean, in normal cases, we got more cargo on deck, not like that. You know, sometimes you can't see the red place or the green place.

Page 45: Q Okay. And with the cargo being located where it is on the deck -- because what I want to do, Melih, is get back to that question I had for you about when you would order the ship's crew to go sweep the deck and clear the loose cargo. In the situation as depicted in that photograph, would you order the ship's crew to sweep the deck of that loose cargo before the cargo company's employees boarded the vessel? A Yes, in this situation, I order.

Page 51: Q That's fine. It's not a problem. Like I said, Melih, one thing I tell everybody is I don't recall is a fair answer if that is the truth. Okay? Do you recall if on April 2nd, 2019, when necessary, the cargo company's employees

Page 52: would board the Kiran Bosphorus in order to shift the crane barge's wires so that another hold could be accessed? A I just recall some guys coming and moving the barge and asking for some cargo-related questions, yes, but I don't exactly remember what time they come or what date they come, though.

Page 53: A As I said before, it depends on the crane operating area and, also, it depends on because our crew have other jobs, just checking mooring lines and other duties they have. So I ordered that, I can say time by time, when you find time, just keep the deck clean.

Page 53: Q Okay. But you would agree with me that of the duties that you just described, one of the duties of the ship's crew would be to keep the deck clear of loose cargo, correct? A Yes, correct.

Page 55: Q Okay. If the photograph that I showed you depicts the condition of the deck when Mr. Gusman and his co-employees boarded the Kiran Bosphorus, would you agree with me, then, that means that the deck was not cleared by the ship's crew prior to Mr. Gusman boarding the vessel? A I mean, the picture that you showed me, it's not too much cargo, but, yes, it's supposed to be clean, especially in the green line because the green line is the walking line.

Page 55: Q Okay. So the green line -- and we'll attach that photograph as Exhibit 1. And so the green line that's running down the middle of deck is the walking line? A Yes, it's the walking line. Q And in your experience, is that walking line supposed to remain clear of loose cargo? A Yes, supposed to remain clear of the cargo, but it also have nonskid surface.

Page 57: Q All right. And, Melih, if upon boarding the Kiran Bosphorus on April 2nd, 2019, either Mr. Gusman or one of his co-employees asked a ship's crew member to clear the deck of loose cargo, would you have expected that crew member to do that? A Yes, if they ask to clean the deck, they supposed to clean the deck.

Page 58: Q All right. In your experience, the brooms and shovels that you described, are those available to the cargo company employees? A Yes, if they ask it for, we can give them, no problem.

Page 61: Q That's fair. That's fair. Melih, I think the last question I have for you is would you agree with me that if any member of the

Page 62: Kiran Bosphorus crew witnessed a potentially dangerous condition on the ship's deck on April 2nd, 2019, that crew member should have called a stop to the cargo operation until the condition was corrected? A Yes, but I just want to make an explanation. The deck crew, if they see something wrong with the cargo operation, they call the duty officer, and that duty officer can stop it, but if it is more serious, the duty officer is supposed to call me as a chief officer, so I stop the cargo operation. And if it is beyond my authority, so I call the master, this is how it works.

Page 64: Q All right, Melih. Just a few questions for me, and I might be jumping around a little bit. So on the day of the accident that we're talking about here, April 2nd, did anybody from the cargo company or any of the stevedores ask you to clean the deck? A No, nobody ask it to me.
Page 64: Q Are you aware of anybody asking your crew members to do so? A No. I think -- as I said, no, I don't remember nobody ask it to me or I don't remember asking to our crew to clean the deck or something else.
Page 65: Q Okay. And when stevedores or the cargo company employees are on the deck of the ship, are they supposed to remain in that green walkway? A Yes, they supposed to remain on the green walkway.
Page 65: Q And if the stevedores were going to unhook the barge wire, could they have done that by walking in the green walkway? A Yes. Yes.
Page 66: Q Okay. A We just supervising the operation, we just following the operation. Q Okay. Kind of just keeping an eye on it, is that fair? A Yes, make calculations and just following the steps with the guys.
Page 67: So Ms. Walsh asked
Page 67: you about whether you recall any crew member being asked to clean the deck, and you said that you did not, correct? A Yes, I don't recall nobody asking me to clean the deck or something, yes.
Page 67: Q But you testified earlier and would agree with me that had a member of the Kiran Bosphorus crew been asked to clean the deck of the loose cargo, it was their responsibility to do that, correct? A I mean it is -- how can I say? It's not a particle of paper or particle of order, it's general in our trainings, we speak about the cargo operations trainings, and I
Page 68: always teach them, I always tell them to keep the deck clean.
Page 69: Q Melih, you were reading my mind. You didn't, personally, receive it, but you can't speak for every crew member of the Kiran Bosphorus that was aboard the vessel on April 2nd, correct? A Yes.